# 14-0781-cv

## United States Court of Appeals

*for the*

## Second Circuit

ELIOT COHEN, on behalf of himself and all others similarly situated,

*Plaintiff-Appellant,*

DAVID HALE, CHARLES SHOEMAKER, on behalf of themselves and all others similarly situated, PHILIP RICASATA, STAN SKLENAR,

*Plaintiffs,*

– v. –

UBS FINANCIAL SERVICES, INC., UBS AG,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX

WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP
*Attorneys for Plaintiff-Appellant*
270 Madison Avenue
New York, New York 10016
(212) 545-4600

GIBSON DUNN & CRUTCHER LLP
*Attorneys for Defendants-Appellees*
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries .................................... A-1

Declaration of Catherine Reyna, for Defendant, in
  Support of Motion to Compel Arbitration, dated
  May 3, 2012 ............................................ A-16

Exhibit 1 to Reyna Declaration –
UBS Financial Services Inc.'s 2007 Financial
Advisor Compensation Plan .................................. A-21

Exhibit 2 to Reyna Declaration –
UBS Financial Services Inc.'s 2008 Financial
Advisor Compensation Plan .................................. A-52

Exhibit 3 to Reyna Declaration –
UBS Financial Services Inc.'s 2009 Financial
Advisor Compensation Plan .................................. A-83

Exhibit 4 to Reyna Declaration –
UBS Financial Services Inc.'s 2010 Financial
Advisor Compensation Plan .................................. A-108

Exhibit 5 to Reyna Declaration –
Plaintiff Cohen's signed Acknowledgement of the
2007 Financial Advisor Compensation Plan .......... A-131

Exhibit 6 to Reyna Declaration –
Plaintiff Shoemaker's signed Acknowledgement
of the 2007 Financial Advisor Compensation
Plan ...................................................... A-132

Exhibit 7 to Reyna Declaration –
Plaintiff Ricasata's signed Acknowledgements of
the 2007, 2008 and 2009 Financial Advisor
Compensation Plans................................ A-133

ii

**Page**

Exhibit 8 to Reyna Declaration –
Plaintiff Sklenar's signed Acknowledgement of
the 2007 Financial Advisor Compensation Plan.... A-136

Exhibit 9 to Reyna Declaration –
Plaintiff Hale's signed Acknowledgements of the
2007 and 2008 Financial Advisor Compensation
Plans....................................................................... A-137

Declaration of Robert Abrams, for Plaintiffs, in
Opposition to Motion to Compel Arbitration,
dated June 8, 2012 ................................................... A-139

Exhibit A to Abrams Declaration –
Securities and Exchange Commission's Release
No. 34-66774, Notice of Filing of Amendment
No. 1 and Order Granting Accelerated Approval
of a Proposed Rule Change..................................... A-141

Exhibit B to Abrams Declaration –
Regulatory Notice 12-28, Securities and
Exchange Commission approval of Amendments
to FINRA Rule 13204 concerning Collective
Action Claims ......................................................... A-147

Declaration of Charles Shoemaker, Plaintiff, in
Opposition to Motion to Compel Arbitration,
dated June 5, 2012 ................................................... A-151

Declaration of Philip Ricasata, Plaintiff, in
Opposition to Motion to Compel Arbitration,
dated June 7, 2012 ................................................... A-157

Declaration of Eliot Cohen, Plaintiff, in Opposition
to Motion to Compel Arbitration, dated
June 7, 2012 ............................................................ A-162

iii

**Page**

Memorandum and Order of the Honorable Barbara
    S. Jones, dated December 4, 2012 ........................  A-167

Opinion and Order of Lorna G. Schofield, dated
    January 22, 2014 ....................................................  A-185

Stipulation and Order to Dismiss with Prejudice
    Plaintiffs' Complaint, dated February 14, 2014 .....  A-192

Notice of Appeal, dated March 12, 2014 ...................  A-195

STAYED,CLOSED,APPEAL,CASREF,ECF,RELATED

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:12–cv–02147–LGS–JLC**

| | |
|---|---|
| Eliot Cohen v. UBS Financial Services, Inc. et al | Date Filed: 03/23/2012 |
| Assigned to: Judge Lorna G. Schofield | Date Terminated: 02/14/2014 |
| Referred to: Magistrate Judge James L. Cott | Jury Demand: Plaintiff |
| Related Case: 1:11–cv–02308–KMW | Nature of Suit: 710 Labor: Fair Standards |
| Case in other court:  California Central, 2:11–cv–03623 | Jurisdiction: Federal Question |
| Cause: 29:201 Fair Labor Standards Act | |

**Plaintiff**

**Eliot Cohen**
*on behalf of himself and all others
similarly situated*

represented by **Betsy C. Manifold**
Symphony Tower
750 B Street
San Diego, CA 92101
(619)–239–4599
Fax: (619)–234–4599
Email: manifold@whafh.com
*ATTORNEY TO BE NOTICED*

**Francis M Gregorek**
Wolf Haldenstein Adler Freeman and Herz
LLP
750 B Street Suite 2770
San Diego, CA 92101
619–239–4599
Fax: 619–234–4599
Email: gregorek@whafh.com
*ATTORNEY TO BE NOTICED*

**Jeffrey G. Smith**
Wolf Haldenstein Adler Freeman &Herz
LLP
270 Madison Avenue
New York, NY 10016
212 545 4740
Fax: 212 545 4653
Email: smith@whafh.com
*ATTORNEY TO BE NOTICED*

**Patrick Hugh Moran**
Wolf Haldenstein Adler Freeman and Herz
LLP
750 B Street Ste 2770
San Diego, CA 92101
619–234–4599
Email: moran@whafh.com
*ATTORNEY TO BE NOTICED*

**Rachele R Rickert**
Wolf Haldenstein Adler Freeman and Herz
LLP
750 B Street Suite 2770
San Diego, CA 92101
619–239–4599
Fax: 619–234–4599
Email: rickert@whafh.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **David Hale** | represented by | **Francis M Gregorek** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Betsy C. Manifold** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Jeffrey G. Smith** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Rachele R Rickert** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

**Charles Shoemaker**
*on behalf of themselves and all others similarly situated*

represented by **Betsy C. Manifold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Francis M Gregorek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey G. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Hugh Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachele R Rickert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Philip Ricasata**

represented by **Betsy C. Manifold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Francis M Gregorek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey G. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Hugh Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachele R Rickert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stan Sklenar**

represented by **Betsy C. Manifold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Francis M Gregorek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey G. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

UBS Financial Services, Inc.                    represented by  **John S Battenfeld**
Morgan Lewis &Bockius LLP
300 South Grand Avenue 22nd Floor
Los Angeles, CA 90071–3132
213–612–1018
Fax: 213–612–2501
Email: jbattenfeld@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathy H Gao**
Morgan Lewis &Bockius LLP
300 South Grand Avenue 22nd Floor
Los Angeles, CA 90071
213–612–2500
Fax: 213–612–2501
Email: kgao@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Jay Schaffran**
Morgan, Lewis &Bockius LLP (New York)
101 Park Avenue
New York, NY 10178
(212) 309–6380
Fax: (212) 309–6001
Email: aschaffran@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Joseph Alan Nuccio**
Morgan, Lewis &Bockius LLP (New York)
101 Park Avenue
New York, NY 10178
(609)–919–6659
Fax: (609)–919–6701
Email: jnuccio@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Michael Jonathan Puma**
Morgan, Lewis and Bockius LLP (NY)
101 Park Avenue
New York, NY 10178
(212) 309–6000
Fax: (212) 309–6273
Email: mpuma@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Sam Scott Shaulson**
Morgan, Lewis &Bockius LLP (New York)

101 Park Avenue
New York, NY 10178
(212)–309–6718
Fax: (212)–309–6273
Email: sshaulson@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**UBS AG**                     represented by   **John S Battenfeld**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathy H Gao**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Jay Schaffran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph Alan Nuccio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Jonathan Puma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sam Scott Shaulson**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/27/2011 | 1 | CLASS ACTION COMPLAINT against Defendants John Does, 1–50, UBS AG, UBS Financial Services, Inc. Case assigned to Judge Consuelo B. Marshall for all further proceedings. Discovery referred to Magistrate Judge Carla Woehrle.(Filing fee $ 350:PAID) Jury Demanded., filed by plaintiff Eliot Cohen.(ghap) (mg). [Transferred from California Central on 3/23/2012.] (Entered: 04/28/2011) |
| 04/27/2011 |  | 21 DAY Summons Issued re Complaint – (Discovery) 1 as to Defendants John Does, 1–50, UBS AG, UBS Financial Services, Inc. (ghap) [Transferred from California Central on 3/23/2012.] (Entered: 04/28/2011) |
| 04/27/2011 | 2 | CERTIFICATION AND NOTICE of Interested Parties filed by Plaintiff Eliot Cohen. (ghap) (mg). [Transferred from California Central on 3/23/2012.] (Entered: 04/28/2011) |
| 04/28/2011 | 3 | Dismissal of Parties Designated by a Fictitious Name filed by Plaintiff Eliot Cohen (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 04/28/2011) |
| 05/04/2011 | 4 | STANDING ORDER by Judge Consuelo B. Marshall. This action has been assigned to the calendar of the Honorable Consuelo B. Marshall. Both the Court and the attorneys bear responsibility for the progress of litigation in the Federal Courts. To secure the just, speedy, and inexpensive determination of every action, Fed. R. Civ. P. 1, all counsel are ordered to familiarize themselves with the Federal Rules of Civil Procedure and the Local Rules of the Central District of California and comply with these rules. This Order controls the procedures used in this case. See Item 7, regarding Motions: Motions shall be filed in accordance with Local Rules 6 and 7. Local Rule 6–1 provides: "The notice of motion shall be filed with the Clerk not later than twenty–eight (28) days before the date set for hearing, and |

| | | |
|---|---|---|
| | | shall be served on each of the parties electronically or, if excepted from electronic filing, either by deposit in the mail or by personal service." This Court typically hears motions on Mondays, beginning at 10:00 a.m. The briefing schedule for the motion shall be governed by Local Rules 6 and 7. (Refer attached Order for other requirements.) (lom) [Transferred from California Central on 3/23/2012.] (Entered: 05/04/2011) |
| 06/13/2011 | 5 | NOTICE Consent to Become a Party Plaintiff filed by Plaintiff Eliot Cohen. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 06/13/2011) |
| 06/13/2011 | 6 | NOTICE Consent to Become a Party Plaintiff filed by Plaintiff Eliot Cohen. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 06/13/2011) |
| 07/12/2011 | 7 | WAIVER OF SERVICE Returned Executed filed by Plaintiff Eliot Cohen. upon UBS Financial Services, Inc. waiver sent by Plaintiff on 6/30/2011, answer due 8/29/2011. Waiver of Service signed by John S. Battenfeld, Attorney. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 07/12/2011) |
| 07/12/2011 | 8 | WAIVER OF SERVICE Returned Executed filed by Plaintiff Eliot Cohen. upon UBS AG waiver sent by Plaintiff on 6/30/2011, answer due 8/29/2011. Waiver of Service signed by John S. Battenfeld, Attorney. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 07/12/2011) |
| 08/10/2011 | 9 | STIPULATION to Stay Case pending transfer to the Southern District of New York by the MDL panel filed by DEFENDANTS UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Proposed Order To Stay Action For Ninety (90) Days)(Battenfeld, John)[Transferred from California Central on 3/23/2012.]. (Entered: 08/10/2011) |
| 08/10/2011 | 10 | ORDER by Judge Marshall STAYING CASE for ninety (90) days, if this case is not transferred to the Southern District of New York within ninety (90) days, the parties shall submit a status report to this Court. The time within which Plaintiff Eliot Cohen and any proponent of class must file a motion for certification in this Court is extended by sixty (60) days from the date set by Local Rule 23–3 of tghe United States District Court (Central District of California. (MD JS–6. Case Terminated), (Made JS–6. Case Terminated.) (jl) [Transferred from California Central on 3/23/2012.] (Entered: 08/10/2011) |
| 10/12/2011 | 12 | ORDER DENYING TRANSFER by Panel on Multdistrict Litigation. Plaintiffs in the above–captioned actions move for centralization of these two actions in the Southern District of New York. Common defendants UBS AG and UBS Financial Services, Inc. (collectively UBS) support the motion. Although all parties agree that centralization is appropriate, the Panel has an institutional responsibility that goes beyond accommodating the particular wishes of the parties. IT IS THEREFORE ORDERED that the motion, pursuant to 28 U.S.C. § 1407, for centralization of these actions is denied. (lom) [Transferred from California Central on 3/23/2012.] (Entered: 10/18/2011) |
| 10/13/2011 | 11 | MINUTE ORDER IN CHAMBERS by Judge Consuelo B. Marshall: On the Court's own motion, this case is set for a Status Conference on Nov. 22, 2011 at 10:00 A.M. Status Reports shall be filed on or before Nov. 8, 2011 (Case reopened. MD JS–5.) (jl) [Transferred from California Central on 3/23/2012.] (Entered: 10/13/2011) |
| 11/03/2011 | 13 | Joint STIPULATION for Extension of Time to File Motion For Class Certification To February 27, 2012 filed by Plaintiff Eliot Cohen. (Attachments: # 1 Proposed Order [Proposed] Order to Extend Deadline For Motion For Class Certification to February 27, 2012)(Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 11/03/2011) |
| 11/03/2011 | 14 | ORDER by Judge Consuelo B. Marshall GRANTING Stipulation for Extension of Time to 13 February 27, 2012 within which Plaintiff Eliot Cohen and any proponent of the class must file a motion for certification. (jl) [Transferred from California Central on 3/23/2012.] (Entered: 11/03/2011) |

| | | |
|---|---|---|
| 11/08/2011 | 15 | STATUS REPORT *Plaintiff's Status Report* filed by Plaintiff Eliot Cohen. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 11/08/2011) |
| 11/08/2011 | 16 | STATUS REPORT *Of Defendants UBS Financial Services Inc. And UBS AG* filed by Defendants UBS AG, UBS Financial Services, Inc.. (Battenfeld, John) [Transferred from California Central on 3/23/2012.] (Entered: 11/08/2011) |
| 11/22/2011 | 18 | MINUTES OF STATUS CONFERENCE held before Judge Consuelo B. Marshall. Leave is granted to Plaintiff's counsel to file a First Amended Complaint. Court Reporter: Cindy Nirenberg. (lom) [Transferred from California Central on 3/23/2012.] (Entered: 12/05/2011) |
| 12/01/2011 | 17 | AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT 1 ; Demand for Jury Trial against Defendants UBS AG, UBS Financial Services, Inc. filed by Plaintiffs Eliot Cohen, Charles Shoemaker. (lom) (lom). [Transferred from California Central on 3/23/2012.] (Entered: 12/02/2011) |
| 12/19/2011 | 19 | NOTICE of Change of Attorney Information for attorney Kathy H Gao counsel for Defendants UBS AG, UBS Financial Services, Inc.. Adding Kathy H. Gao as attorney as counsel of record for UBS Financial Services Inc. and USB AG for the reason indicated in the G–06 Notice. Filed by Defendants UBS Financial Services Inc. and USB AG (Gao, Kathy) [Transferred from California Central on 3/23/2012.] (Entered: 12/19/2011) |
| 12/27/2011 | 20 | Joint STIPULATION for Leave to File [Corrected] And Second Amended Complaint And Filing A Response Thereto filed by Plaintiffs Eliot Cohen, Charles Shoemaker. (Attachments: # 1 Proposed Order)(Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 12/27/2011) |
| 12/27/2011 | 21 | CERTIFICATE OF SERVICE filed by Plaintiffs Eliot Cohen, Charles Shoemaker, re Stipulation for Leave 20 served on 12/27/2011. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 12/27/2011) |
| 12/27/2011 | 22 | ORDER by Judge Consuelo B. Marshall GRANTING Stipulation for Leave 20 : Plaintiffs' [Corrected] Amended Complaint shall be filed on or before Dec. 29, 2011; Plaintiffs are granted leave to file a Second Amended Complaint on or before December 31, 2011; Defendants shall file their Motion to Dismiss, Stay, or Transfer on or before January 9, 2012; Plaintiffs shall file any Opposition to Defendants' Motion to Dismiss, Stay, or Transfer on or before January 30, 2012; Defendants shall file any Reply in further support of their Motion to Dismiss, Stay, or Transfer on or before February 13, 2012; and Defendants' Motion to Dismiss, Stay, or Transfer shall be set for February 27, 2012 at 11:00 A.M. (jl) [Transferred from California Central on 3/23/2012.] (Entered: 12/27/2011) |
| 12/28/2011 | 23 | CORRECTED AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT 17 against Defendants UBS Financial Services, Inc., UBS AG filed by Plaintiffs Eliot Cohen, Charles Shoemaker. (lom) (lom). [Transferred from California Central on 3/23/2012.] (Entered: 12/29/2011) |
| 12/30/2011 | 24 | SECOND AMENDED COMPLAINT 17 , 23 ; Demand for Jury Trial against Defendants UBS AG, UBS Financial Services, Inc. filed by Plaintiffs Charles Shoemaker, Eliot Cohen. (lom) (lom). Modified on 1/25/2012 (lom). [Transferred from California Central on 3/23/2012.] (Entered: 01/03/2012) |
| 01/09/2012 | 25 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by DEFENDANTS UBS AG, UBS Financial Services, Inc.. Motion set for hearing on 2/27/2012 at 11:00 AM before Judge Consuelo B. Marshall. (Attachments: # 1 Memorandum Of Points And Authorities In Support Of Their Motion to Dismiss, Stay, Or Transfer Action Pursuant To The First–To–File Rule Or, Alternatively, Transfer Venue Pursuant To 28 U.S.C. § 1404(a), # 2 Declaration of John S. Battenfeld In Support Defendants UBS Financial Services Inc.'s And UBS AG's Motion to Dismiss, Stay, Or Transfer Action Pursuant To The First–To–File Rule Or, Alternatively, Transfer Venue Pursuant To 28 U.S.C. § 1404(a), # 3 Exhibit A–C of John S. Battenfeld, # 4 Exhibit D–H of John S. Battenfeld, # 5 Declaration Of Matthew Levitan In Support Of Defendants UBS Financial Services Inc.'s And UBS AG's Motion to Dismiss, Stay, Or Transfer Action Pursuant To The First–To–File Rule Or, Alternatively, Transfer Venue Pursuant To 28 U.S.C. § 1404(a), # 6 Proposed |

| | | |
|---|---|---|
| | | Order Granting Defendants UBS Financial Services Inc.'s And UBS AG's Motion to Dismiss, Stay, Or Transfer Action Pursuant To The First–To–File Rule Or, Alternatively, Transfer Venue Pursuant To 28 U.S.C. § 1404(a))(Battenfeld, John) [Transferred from California Central on 3/23/2012.] (Entered: 01/09/2012) |
| 01/30/2012 | 26 | MEMORANDUM in Opposition to MOTION to Dismiss Case 25 *Plaintiffs' Opposition To Defendants' Memorandum Of Points And Authorities In Support Of Their Motion To Dismiss, Stay Or Transfer Their Action Pursuant To The First Filed Rule Or, Alternatively, Transfer Venue Pursuant To 28 U.S.C. § 1404(a)* filed by Plaintiffs Eliot Cohen, David Hale, Charles Shoemaker. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 01/30/2012) |
| 01/30/2012 | 27 | DECLARATION of Betsy C. Manifold In Opposition To MOTION to Dismiss Case 25 *Declaration of Betsy C. Manifold In Support Of Plaintiffs' Opposition To Defendants' Memorandum Of Points And Authorities In Support Of Their Motion To Dismiss, Stay Or Transfer Their Action Pursuant To The First Filed Rule Or, Alternatively, Transfer Venue Pursuant To 28 U.S.C. § 1404(a)* filed by Plaintiffs Eliot Cohen, David Hale, Charles Shoemaker. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 01/30/2012) |
| 01/30/2012 | 28 | OF SERVICE filed by Plaintiffs Eliot Cohen, David Hale, Charles Shoemaker, re Declaration (Motion related), Declaration (Motion related) 27 , MEMORANDUM in Opposition to Motion, 26 *Declaration of Service* served on January 30, 2012. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 01/30/2012) |
| 02/09/2012 | 29 | STIPULATION to Continue Hearing On Motion to Dismiss and Plaintiffs' Deadline To File Motion for Class Certification from Feb. 27, 2012 and Feb. 27, 2012 to March 19, 2012 and May 28, 2012 filed by DEFENDANTS UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Proposed Order Granting Joint Stipulation to Continue: 1) The Hearing On Defendants' Motion To Dismiss, Stay, Or Transfer Action Pursuant To The First–To–File Rule, Or Alternatively, Transfer Venue Pursuant To 28 U.S.C.§ 1404(A); And 2) Plaintiffs' Deadline to File Motion For Class Certification)(Battenfeld, John) [Transferred from California Central on 3/23/2012.] (Entered: 02/09/2012) |
| 02/10/2012 | 30 | ORDER by Judge Consuelo B. Marshall: Defendants' Motion to Dismiss, Stay or Transfer [29] is continued to March 19, 2012 at 11:00 A.M. The deadline for Defendants to file their Reply in support of their Motion to Dismiss, Stay, or Transfer is continued to February 27, 2012. The deadline for Plaintiffs to file their motion for class certification shall be continued to May 28, 2012. (jl) [Transferred from California Central on 3/23/2012.] (Entered: 02/10/2012) |
| 02/13/2012 | 31 | NOTICE filed by Plaintiffs Eliot Cohen, Charles Shoemaker. *Consent To Become A Party Plaintiff* (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 02/13/2012) |
| 02/15/2012 | 32 | NOTICE filed by Plaintiffs Eliot Cohen, Charles Shoemaker. *Consent To Become A Party Plaintiff* (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 02/15/2012) |
| 02/22/2012 | 33 | Joint STIPULATION for Order Granting Joint Scheduling And Tolling Stipulation filed by DEFENDANTS UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Proposed Order Granting Joint Scheduling And Tolling Stipulation)(Battenfeld, John) [Transferred from California Central on 3/23/2012.] (Entered: 02/22/2012) |
| 02/23/2012 | 34 | Joint STIPULATION to Continue Deadline for Defendants to file their Reply in support of their Motion to Dismiss, Stay, or Transfer Action Pursuant to the First–to–File Rule or, Alternatively, Transfer Venue Pursuant to 28 U.S.C. §1404(a) from February 27, 2012 to February 29, 2012 filed by DEFENDANTS UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Proposed Order Granting Joint Stipulation to Continue Defendants' Deadline To File Their Reply In Support Of Their Motion To Dismiss, Stay, Or Transfer Action Pursuant To The First–To–File Rule Or, Alternatively, Transfer Venue Pursuant To 28 U.S.C. § 1404(a))(Battenfeld, John) [Transferred from California Central on 3/23/2012.] (Entered: 02/23/2012) |

| 02/24/2012 | 35 | ORDER Granting Stipulation to Dismiss case 34 by Judge Consuelo B. Marshall. IT IS HEREBY ORDERED that: 1. The deadline for Defendants to file their Reply in support of their Motion to Dismiss, Stay, or Transfer Action Pursuant to the First−to−File Rule or, Alternatively, Transfer Venue Pursuant to 28 U.S. C. § 1404(a) 25 ("Motion to Dismiss, Stay, or Transfer") shall be continued to February 29, 2012; and 2. The hearing on Defendants' Motion to Dismiss, Stay, or Transfer shall remain on March 19, 2012. (lom) [Transferred from California Central on 3/23/2012.] (Entered: 02/27/2012) |
|---|---|---|
| 02/29/2012 | 36 | REPLY IN SUPPORT OF MOTION to Dismiss Case 25 *Defendants UBS Financial Services Inc.'s And UBS AG's Reply Memorandum Of Points And Authorities In Support Of Their Motion to Dismiss, Stay, Or Transfer Action Pursuant To The First−To−File Rule Or, Alternatively, Transfer Venue Pursuant To 28 U.S.C. § 1404(a)* filed by Defendants UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Declaration Supplemental Declaration of John S. Battenfeld In Support Of Defendants UBS Financial Services Inc.'s Reply In Support Of Their Motion to Dismiss, Stay, Or Transfer Action Pursuant To The First−To−File Rule Or, Alternatively, Transfer Venue Pursuant To 28 U.S.C. § 1404(a), # 2 Declaration Supplemental Declaration of Matthew Levitan In Support Of Defendants UBS Financial Services Inc.'s Reply In Support Of Their Motion to Dismiss, Stay, Or Transfer Action Pursuant To The First−To−File Rule Or, Alternatively, Transfer Venue Pursuant To 28 U.S.C. § 1404(a))(Battenfeld, John) [Transferred from California Central on 3/23/2012.] (Entered: 02/29/2012) |
| 03/09/2012 | 37 | NOTICE of Supplemental Authority Supporting Further Opposition to Defendants' Motion to Dismiss, Stay or Transfer Their Action Pursuant to the First Filed Rule or, Alternatively, Transfer Venue Pursuant to 28 U.S.C. § 1404(a) filed by Plaintiffs Eliot Cohen, Charles Shoemaker. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 03/09/2012) |
| 03/14/2012 | 38 | MINUTE ORDER IN CHAMBERS by Judge Consuelo B. Marshall: MOTION OF UBS AG and UBS Financial Services to Dismiss Case 25 , Stay, Transfer Action or to Transfer Venue continued to March 21, 2012 at 9:00 a.m. (jl) [Transferred from California Central on 3/23/2012.] (Entered: 03/14/2012) |
| 03/16/2012 | 39 | ORDER by Judge Consuelo B. Marshall, re Tolling Stipulation 33 (see Stipulation for details) (jl) [Transferred from California Central on 3/23/2012.] (Entered: 03/16/2012) |
| 03/16/2012 | 40 | DEFENDANTS' RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY SUPPORTING FURTHER OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, STAY, OR TRANSFER THEIR ACTION PURSUANT TO THE FIRST−TO−FILE RULE OR, ALTERNATIVELY, TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a) re MOTION to Dismiss Case 25 filed by Defendants UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Declaration Of John S. Battenfeld In Support Of Defendants' Response To Plaintiffs' Notice Of Supplemental Authority Supporting Further Opposition To Defendants' Motion To Dismiss, Stay Or Transfer Action Pursuant To The First−To−File Rule, Or Alternatively, Transfer Venue Pursuant To 28 U.S.C. § 1404(a))(Battenfeld, John) [Transferred from California Central on 3/23/2012.] (Entered: 03/16/2012) |
| 03/19/2012 | 41 | NOTICE OF MOTION AND MOTION for Leave to file Third Amended Complaint filed by Plaintiffs Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker. Motion set for hearing on 5/7/2012 at 11:00 AM before Judge Consuelo B. Marshall. (Manifold, Betsy)[Transferred from California Central on 3/23/2012.] (Entered: 03/19/2012) |
| 03/19/2012 | 42 | MEMORANDUM in Support of MOTION for Leave to file Third Amended Complaint 41 filed by Plaintiffs Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 03/19/2012) |
| 03/19/2012 | 43 | DECLARATION of Betsy C. Manifold In Support Of Plaintiffs' MOTION for Leave to file Third Amended Complaint 41 filed by Plaintiffs Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 03/19/2012) |

| 03/19/2012 | 44 | OF SERVICE filed by Plaintiffs Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, re MOTION for Leave to file Third Amended Complaint 41 , Memorandum in Support of Motion 42 , Declaration (Motion related) 43 served on March 19, 2012. (Attachments: # 1 Proposed Order [Proposed] Order Granting Plaintiffs' Motion for Leave to File a Third Amended Complaint)(Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 03/19/2012) |
| --- | --- | --- |
| 03/19/2012 | 45 | NOTICE OF MOTION AND MOTION to Certify Class *Plaintiffs' Notice Of Motion And Motion For Certification Of A Collective Action* filed by Plaintiffs Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker. Motion set for hearing on 7/23/2012 at 11:00 AM before Judge Consuelo B. Marshall. (Attachments: # 1 Proposed Order [Proposed] Order Granting Plaintiffs' Motion For Certification Of A Collective Action)(Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 03/19/2012) |
| 03/19/2012 | 46 | MEMORANDUM in Support of MOTION to Certify Class *Plaintiffs' Notice Of Motion And Motion For Certification Of A Collective Action* 45 *Plaintiffs' Memorandum Of Points &Authorities In Support Of Their Motion For Certification Of a Collective Action* filed by Plaintiffs Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 03/19/2012) |
| 03/19/2012 | 47 | DECLARATION of Betsy C. Manifold In Support Of Plaintiffs' MOTION to Certify Class *Plaintiffs' Notice Of Motion And Motion For Certification Of A Collective Action* 45 filed by Plaintiffs Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 03/19/2012) |
| 03/19/2012 | 48 | DECLARATION of Jeffrey G. Smith In Support Of Plaintiffs' MOTION to Certify Class *Plaintiffs' Notice Of Motion And Motion For Certification Of A Collective Action* 45 filed by Plaintiffs Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 03/19/2012) |
| 03/19/2012 | 49 | OF SERVICE filed by Plaintiffs Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, re Memorandum in Support of Motion, 46 , MOTION to Certify Class *Plaintiffs' Notice Of Motion And Motion For Certification Of A Collective Action* 45 , Declaration (Motion related), Declaration (Motion related) 47 , Declaration (Motion related), Declaration (Motion related) 48 served on March 19, 2012. (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 03/19/2012) |
| 03/19/2012 | 50 | *Consent To Become A Party Plaintiff* (Manifold, Betsy) [Transferred from California Central on 3/23/2012.] (Entered: 03/19/2012) |
| 03/21/2012 | 51 | MINUTES of Motion of Defendants UBS Financial Services, Inc. and UBS AG to Dismiss, Stay or Transfer Action held before Judge Consuelo B. Marshall. Motion to Transfer Action 25 is GRANTED pursuant to the First to File Rule and 28 U.S.C. 1404(a). Motions to Dismiss and to Stay are denied as moot. This Action is hereby transferred to the Southern District of New York. (Made JS−6. Case Terminated.)Court Recorder: Michelle Ortega. (Attachments: # 1 TRansmittal − CV 22) (lom) [Transferred from California Central on 3/23/2012.] (Entered: 03/22/2012) |
| 03/23/2012 | 52 | CASE TRANSFERRED IN from the United States District Court − District of California Central; Case Number: 2:11−cv−03623. Original file certified copy of transfer order and docket entries received. (sjo) (Entered: 03/23/2012) |
| 03/23/2012 | | Case Designated ECF. (sjo) (Entered: 03/23/2012) |
| 03/23/2012 | | NOTE TO OUT OF STATE ATTORNEYS: Please visit the Court's website at http://www.nysd.uscourts.gov for information regarding admission to the S.D.N.Y. Bar and the CM/ECF Rules &Filing Instructions. (sjo) (Entered: 03/23/2012) |
| 03/23/2012 | | CASE REFERRED TO Judge Barbara S. Jones as possibly related to 11−cv−2308. (sjo) (Entered: 03/23/2012) |

| 03/26/2012 | 53 | NOTICE OF APPEARANCE by Andrew Jay Schaffran on behalf of UBS AG, UBS Financial Services, Inc. (Schaffran, Andrew) (Entered: 03/26/2012) |
| 03/26/2012 | 54 | NOTICE OF APPEARANCE by Michael Jonathan Puma on behalf of UBS AG, UBS Financial Services, Inc. (Puma, Michael) (Entered: 03/26/2012) |
| 03/26/2012 | 55 | NOTICE OF APPEARANCE by Sam Scott Shaulson on behalf of UBS AG, UBS Financial Services, Inc. (Shaulson, Sam) (Entered: 03/26/2012) |
| 03/28/2012 | | CASE ACCEPTED AS RELATED. Create association to 1:11–cv–02308–BSJ –JLC. Notice of Assignment to follow. (pgu) (Entered: 03/28/2012) |
| 03/28/2012 | 56 | NOTICE OF CASE ASSIGNMENT to Judge Barbara S. Jones. Judge Unassigned is no longer assigned to the case. (pgu) (Entered: 03/28/2012) |
| 03/28/2012 | | Magistrate Judge James L. Cott is so designated. (pgu) (Entered: 03/28/2012) |
| 04/16/2012 | 57 | STIPULATION REGARDING FILING OF THIRD AMENDED COMPLAINT. Defendants consent to Plaintiffs' filing of their proposed Third Amended Complaint attached to the Declaration of Betsy C. Manifold in Support of Plaintiffs' Motion for Leave to File a Third Amended Complaint (Dkt. No. 43), a copy of which is attached hereto as Exhibit A, with the express understanding and agreement that their consent to Plaintiffs' filing of their proposed Third Amended Complaint shall not constitute a waiver of any of Defendants' positions, arguments, rights, remedies, or defenses, and that all such positions, arguments, rights, remedies and defenses are expressly preserved, including but not limited to all such positions, arguments, rights, remedies, or defenses relating to the amendments in the proposed Third Amended Complaint and Defendants' position that the amendments in the proposed Third Amended Complaint do not relate back to the date of the original complaint. (Signed by Judge Barbara S. Jones on 4/12/2012) (rjm) (Entered: 04/16/2012) |
| 04/16/2012 | 58 | JOINT SCHEDULING AND TOLLING STIPULATION AND ORDER. IT IS HEREBY STIPULATED, AGREED AND ORDERED as follows: In the interests of efficiency and preserving judicial resources, (a) Defendants' motion to compel arbitration should be deferred until after Plaintiffs' proposed Third Amended Complaint is filed; and (b) Defendants' opposition to Plaintiffs' motion for conditional certification, any discovery relating to that motion, Plaintiffs' reply in support thereof and this Court's ruling on that motion and any discovery and briefing on Plaintiffs' contemplated motion for Rule 23 class certification of Plaintiffs' state law claims should be deferred until after Defendants' anticipated motion to compel arbitration in this action is decided; Plaintiffs shall file their proposed Third Amended Complaint no later than April 13, 2012, and as further set forth regarding the scheduling and tolling as specified in this stipulation and order. (Amended Pleadings due by 4/13/2012.) (Signed by Judge Barbara S. Jones on 4/12/2012) (rjm) (Entered: 04/16/2012) |
| 04/19/2012 | 59 | THIRD AMENDED COMPLAINT amending 24 Amended Complaint, against UBS AG, UBS Financial Services, Inc. with JURY DEMAND.Document filed by Charles Shoemaker, Philip Ricasata. Related document: 24 Amended Complaint, filed by Charles Shoemaker, Eliot Cohen.(pl) (Entered: 04/26/2012) |
| 05/03/2012 | 60 | **FILING ERROR – DEFICIENT DOCKET ENTRY –** NOTICE of Notice of Motion and Motion to Compel Arbitration and Stay This Action. Document filed by UBS Financial Services, Inc.. (Schaffran, Andrew) Modified on 5/18/2012 (db). (Entered: 05/03/2012) |
| 05/03/2012 | 61 | MOTION to Compel Arbitration *and Stay This Action*. Document filed by UBS AG, UBS Financial Services, Inc..(Schaffran, Andrew) (Entered: 05/03/2012) |
| 05/03/2012 | 62 | DECLARATION of Andrew J. Schaffran in Support re: 61 MOTION to Compel Arbitration *and Stay This Action*.. Document filed by UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Schaffran, Andrew) (Entered: 05/03/2012) |
| 05/03/2012 | 63 | DECLARATION of Catherine Reyna in Support re: 61 MOTION to Compel Arbitration *and Stay This Action*.. Document filed by UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit |

| | | |
|---|---|---|
| | | 4, #_5_ Exhibit 5, #_6_ Exhibit 6, #_7_ Exhibit 7, #_8_ Exhibit 8, #_9_ Exhibit 9, #_10_ Exhibit 10, #_11_ Exhibit 11, #_12_ Exhibit 12, #_13_ Exhibit 13, #_14_ Exhibit 14, #_15_ Exhibit 15, #_16_ Exhibit 16, #_17_ Exhibit 17, #_18_ Exhibit 18, #_19_ Exhibit 19, #_20_ Exhibit 20, #_21_ Exhibit 21, #_22_ Exhibit 22, #_23_ Exhibit 23, #_24_ Exhibit 24, #_25_ Exhibit 25, #_26_ Exhibit 26, #_27_ Exhibit 27)(Schaffran, Andrew) (Entered: 05/03/2012) |
| 05/03/2012 | 64 | MEMORANDUM OF LAW in Support re:_61_ MOTION to Compel Arbitration *and Stay This Action*.. Document filed by UBS AG, UBS Financial Services, Inc.. (Schaffran, Andrew) (Entered: 05/03/2012) |
| 05/03/2012 | 65 | **FILING ERROR – ELECTRONIC FILING FOR NON–ECF DOCUMENT –** MEMORANDUM OF LAW in Support re:_61_ MOTION to Compel Arbitration *and Stay This Action*. *Proposed Order*. Document filed by UBS AG, UBS Financial Services, Inc.. (Schaffran, Andrew) Modified on 5/4/2012 (ldi). (Entered: 05/03/2012) |
| 05/03/2012 | 66 | CERTIFICATE OF SERVICE of Motion to Compel Arbitration and Stay This Action served on Jeffrey G. Smith, Robert Abrams, Matthew M. Guiney on 5–3–2012. Service was made by First Class Mail. Document filed by UBS AG, UBS Financial Services, Inc.. (Schaffran, Andrew) (Entered: 05/03/2012) |
| 05/03/2012 | | **\*\*\*NOTE TO ATTORNEY TO RE–FILE DOCUMENT – NON–ECF DOCUMENT ERROR. Note to Attorney Andrew Jay Schaffran to E–MAIL Document No._65_ Proposed Order to Judgments@nysd.uscourts.gov. This document is NOT filed via ECF. (ldi)** (Entered: 05/04/2012) |
| 05/11/2012 | 67 | ENDORSED LETTER addressed to Judge Barbara S. Jones from Robert Abrams dated 5/8/2012 re: Counsel for the plaintiffs request an extension until Friday June 8, 2012 for Plaintiffs to file their opposition to Defendants' Memorandum of Law in support of Their Motion to Compel Arbitration and Stay this action. In turn, Defendants' reply would be due June 29, 2012. ENDORSEMENT: SO ORDERED. (Signed by Judge Barbara S. Jones on 5/11/2012) (ft) (Entered: 05/11/2012) |
| 05/15/2012 | 68 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for General Pretrial (includes scheduling, discovery, non–dispositive pretrial motions, and settlement). Referred to Magistrate Judge James L. Cott. Motions referred to James L. Cott. (Signed by Judge Barbara S. Jones on 5/10/2012) (lmb) (Entered: 05/15/2012) |
| 06/08/2012 | 69 | MEMORANDUM OF LAW in Opposition re:_61_ MOTION to Compel Arbitration *and Stay This Action*.. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Smith, Jeffrey) (Entered: 06/08/2012) |
| 06/08/2012 | 70 | AFFIDAVIT of Jeffrey G. Smith in Opposition re:_61_ MOTION to Compel Arbitration *and Stay This Action*.. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Smith, Jeffrey) (Entered: 06/08/2012) |
| 06/08/2012 | 71 | DECLARATION of Robert Abrams in Opposition re:_61_ MOTION to Compel Arbitration *and Stay This Action*.. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Attachments: #_1_ Exhibit A, #_2_ Exhibit B, #_3_ Exhibit C, #_4_ Exhibit D, #_5_ Exhibit E, #_6_ Exhibit F)(Smith, Jeffrey) (Entered: 06/08/2012) |
| 06/08/2012 | 72 | DECLARATION of David Hale in Opposition re:_61_ MOTION to Compel Arbitration *and Stay This Action*.. Document filed by David Hale. (Smith, Jeffrey) (Entered: 06/08/2012) |
| 06/08/2012 | 73 | DECLARATION of Charles Shoemaker in Opposition re:_61_ MOTION to Compel Arbitration *and Stay This Action*.. Document filed by Charles Shoemaker. (Smith, Jeffrey) (Entered: 06/08/2012) |
| 06/08/2012 | 74 | DECLARATION of Philip Ricasata in Opposition re:_61_ MOTION to Compel Arbitration *and Stay This Action*.. Document filed by Philip Ricasata. (Smith, Jeffrey) (Entered: 06/08/2012) |

| 06/08/2012 | 75 | DECLARATION of Eliot Cohen in Opposition re: 61 MOTION to Compel Arbitration *and Stay This Action*.. Document filed by Eliot Cohen. (Smith, Jeffrey) (Entered: 06/08/2012) |
|---|---|---|
| 06/08/2012 | 76 | DECLARATION of Stan Sklenar in Opposition re: 61 MOTION to Compel Arbitration *and Stay This Action*.. Document filed by Stan Sklenar. (Smith, Jeffrey) (Entered: 06/08/2012) |
| 06/18/2012 | 77 | ENDORSED LETTER addressed to Judge Barbara S. Jones from Andrew J. Schaffran, Esq. dated 6/15/2012 re: We write to respectfully request an extension of the page limit for Defendants' reply memorandum in support of their motion to compel arbitration so that Defendants can fully and adequately address (and so that this Court can consider) the issues raised by Plaintiffs in their opposition to this motion. Defendants specifically request an extension of the page limit for their reply memorandum from 10 pages to a total of 20 pages. ENDORSEMENT: SO ORDERED. (Signed by Judge Barbara S. Jones on 6/18/2012) (ama) (Entered: 06/18/2012) |
| 06/29/2012 | 78 | REPLY MEMORANDUM OF LAW in Support re: 61 MOTION to Compel Arbitration *and Stay This Action*.. Document filed by UBS Financial Services, Inc.. (Schaffran, Andrew) (Entered: 06/29/2012) |
| 06/29/2012 | 79 | DECLARATION of Andrew J. Schaffran in Support re: 61 MOTION to Compel Arbitration *and Stay This Action*.. Document filed by UBS Financial Services, Inc.. (Attachments: # 1 Exhibit Exhibit 1 to Schaffran Decl. – Mansberger v. Ernst & Young, # 2 Exhibit Exhibit 2 to Schaffran Decl. – Cohen – 2007 W–2 (Redacted), # 3 Exhibit Exhibit 3 to Schaffran Decl. – Hale – 2007 and 2008 W–2 (Redacted), # 4 Exhibit Exhibit 4 to Schaffran Decl. – Ricasata – 2007–2010 W–2 (Redacted), # 5 Exhibit Exhibit 5 to Schaffran Decl. – Shoemaker – 2007–2010 W–2 (Redacted), # 6 Exhibit Exhibit 6 to Schaffran Decl. – Sklenar – 2007–2010 W–2 (Redacted), # 7 Exhibit Exhibit 7 to Schaffran Decl. – Cohen Damages Chart, # 8 Exhibit Exhibit 8 to Schaffran Decl. – Hale Damages Chart, # 9 Exhibit Exhibit 9 to Schaffran Decl. – Ricasata Damages Chart, # 10 Exhibit Exhibit 10 to Schaffran Decl. – Shoemaker Damages Chart, # 11 Exhibit Exhibit 11 to Schaffran Decl. – Sklenar Damages Chart, # 12 Exhibit Exhibit 12 to Schaffran Decl. – Chart Showing Wage–Hour Cases in SDNY – 4–27–11 to 3–28–12, # 13 Exhibit Exhibit 13 to Schaffran Decl. – Chart Showing Cases Without Experts, # 14 Exhibit Exhibit 14 to Schaffran Decl. – FINRA Rule 2268)(Schaffran, Andrew) (Entered: 06/29/2012) |
| 06/29/2012 | 80 | DECLARATION of Taryn V. Shelton in Support re: 61 MOTION to Compel Arbitration *and Stay This Action*.. Document filed by UBS Financial Services, Inc.. (Attachments: # 1 Exhibit Exhibit 1 to Shelton Declaration – Spreadsheet of Data Generated from UBSFS's e–database)(Schaffran, Andrew) (Entered: 06/29/2012) |
| 06/29/2012 | 81 | CERTIFICATE OF SERVICE of REPLY MEMORANDUM OF LAW in Support of MOTION to Compel Arbitration and Stay This Action. served on Jeffrey G. Smith, Robert Abrams, Matthew M. Guiney on 06/29/2012. Service was made by Mail. Document filed by UBS Financial Services, Inc.. (Schaffran, Andrew) (Entered: 06/29/2012) |
| 07/12/2012 | 82 | ENDORSED LETTER addressed to Judge Barbara S. Jones from Jeffrey G. Smith dated 7/11/2012 re: We respectfully request permission to submit a sureply of six pages in response to defendant UBS's reply to our opposition to its Motion to Compel Arbitration. This sureply would be submitted by Wednesday, July 18, 2012. ENDORSEMENT: SO ORDERED. (Signed by Judge Barbara S. Jones on 7/12/2012) (ama) (Entered: 07/12/2012) |
| 07/18/2012 | 83 | SUPPLEMENTAL REPLY MEMORANDUM OF LAW in Opposition re: 61 MOTION to Compel Arbitration *and Stay This Action*. *Plaintiffs' Sureply Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration and Stay This Action*. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Smith, Jeffrey) (Entered: 07/18/2012) |
| 07/18/2012 | 84 | DECLARATION of Robert Abrams in Opposition re: 61 MOTION to Compel Arbitration *and Stay This Action*.. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Attachments: # 1 Exhibit |

| | | A)(Smith, Jeffrey) (Entered: 07/18/2012) |
|---|---|---|
| 07/24/2012 | 85 | REPLY to Response to Motion re: 61 MOTION to Compel Arbitration *and Stay This Action. Defendants' Response to Plaintiffs' Sur–Reply in Further Support of Defendants' Motion to Compel Arbitration and Stay This Action*. Document filed by UBS AG, UBS Financial Services, Inc.. (Schaffran, Andrew) (Entered: 07/24/2012) |
| 07/24/2012 | 86 | CERTIFICATE OF SERVICE of Defendants' Response to Plaintiffs' Sur–Reply in Further Support of Defendants' Motion to Compel Arbitration and Stay This Action served on Plaintiffs on 07–24–2012. Service was made by Mail. Document filed by UBS AG, UBS Financial Services, Inc.. (Schaffran, Andrew) (Entered: 07/24/2012) |
| 08/28/2012 | 87 | AFFIDAVIT of Robert Abrams. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Attachments: # 1 Party Plaintiff Consent for James Dugan, # 2 Party Plaintiff Consent for Karl Gates, # 3 Party Plaintiff Consent for Barbara Horvath, # 4 Party Plaintiff Consent for Andrew Jacobson)(Abrams, Robert) (Entered: 08/28/2012) |
| 11/07/2012 | 88 | NOTICE of Supplemental Authority re: 69 Memorandum of Law in Opposition to Motion. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Attachments: # 1 Exhibit A)(Smith, Jeffrey) (Entered: 11/07/2012) |
| 11/15/2012 | 89 | RESPONSE re: 88 Notice (Other) *of Supplemental Authority*. Document filed by UBS AG, UBS Financial Services, Inc.. (Schaffran, Andrew) (Entered: 11/15/2012) |
| 12/04/2012 | 90 | MEMORANDUM and ORDER granting 61 Motion to Compel Arbitration and to stay the action. The Clerk of the Court is directed to terminate motion #61on the ECF docket and to stay the case. (Signed by Judge Barbara S. Jones on 12/3/2012) (cd) (Entered: 12/04/2012) |
| 01/10/2013 | 91 | NOTICE OF CASE REASSIGNMENT to Judge Kimba M. Wood. Judge Barbara S. Jones is no longer assigned to the case. (pgu) (Entered: 01/10/2013) |
| 03/14/2013 | 92 | ORDER: On January 10, 2013, the above–captioned case was transferred to the undersigned. [Dkt. No. 85]. The parties are directed to submit a joint status letter to the Court by March 29, 2013. This letter shall address what motions remain outstanding, how the parties intend to proceed, and any other pending issues in this case. (Signed by Judge Kimba M. Wood on 3/13/2013) (ft) (Entered: 03/14/2013) |
| 07/03/2013 | 93 | MOTION for Reconsideration re: 90 Order on Motion to Compel Arbitration. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar.(Smith, Jeffrey) (Entered: 07/03/2013) |
| 07/03/2013 | 94 | MEMORANDUM OF LAW in Support re: 93 MOTION for Reconsideration re: 90 Order on Motion to Compel Arbitration.. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Smith, Jeffrey) (Entered: 07/03/2013) |
| 07/03/2013 | 95 | DECLARATION of Robert Abrams in Support re: 93 MOTION for Reconsideration re: 90 Order on Motion to Compel Arbitration.. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Errata E)(Abrams, Robert) (Entered: 07/03/2013) |
| 07/09/2013 | 96 | NOTICE OF APPEARANCE by Joseph Alan Nuccio on behalf of UBS AG, UBS Financial Services, Inc.. (Nuccio, Joseph) (Entered: 07/09/2013) |
| 07/16/2013 | 97 | ENDORSED LETTER addressed to Judge Kimba M. Wood from Andrew J. Schaffran dated 7/10/2013 re: The parties have conferred and jointly request that Defendants' opposition deadline be extended to August 7, 2013; and Plaintiffs' reply deadline be extended to August 30, 2013. ENDORSEMENT: Granted. SO ORDERED. (Responses due by 8/7/2013, Replies due by 8/30/2013.) (Signed by Judge Kimba M. Wood on 7/16/2013) (rsh) (Entered: 07/16/2013) |

| 08/07/2013 | 98 | RESPONSE in Opposition re: 93 MOTION for Reconsideration re; 90 Order on Motion to Compel Arbitration.. Document filed by UBS AG, UBS Financial Services, Inc.. (Schaffran, Andrew) (Entered: 08/07/2013) |
|---|---|---|
| 08/07/2013 | 99 | DECLARATION of Andrew J. Schaffran in Opposition re: 93 MOTION for Reconsideration re; 90 Order on Motion to Compel Arbitration.. Document filed by UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Exhibit A)(Schaffran, Andrew) (Entered: 08/07/2013) |
| 08/16/2013 | 100 | NOTICE of Supplemental Authority re: 98 Response in Opposition to Motion. Document filed by UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Schaffran, Andrew) (Entered: 08/16/2013) |
| 08/30/2013 | 101 | REPLY MEMORANDUM OF LAW in Support re: 93 MOTION for Reconsideration re; 90 Order on Motion to Compel Arbitration.. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Smith, Jeffrey) (Entered: 08/30/2013) |
| 09/12/2013 | 102 | NOTICE of Supplemental Authority re: 93 MOTION for Reconsideration re; 90 Order on Motion to Compel Arbitration.. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Attachments: # 1 Exhibit A)(Smith, Jeffrey) (Entered: 09/12/2013) |
| 09/24/2013 | 103 | RESPONSE re: 102 Notice (Other), Notice (Other) *of Supplemental Authority*. Document filed by UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Schaffran, Andrew) (Entered: 09/24/2013) |
| 09/30/2013 | 104 | REPLY re: 102 Notice (Other), Notice (Other), 103 Response *Plaintiffs' Reply to UBS' Response to Notice of Supplemental Authority*. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Attachments: # 1 Exhibit A)(Smith, Jeffrey) (Entered: 09/30/2013) |
| 10/01/2013 |  | NOTICE OF CASE REASSIGNMENT to Judge Lorna G. Schofield. Judge Kimba M. Wood is no longer assigned to the case. (pgu) (Entered: 10/01/2013) |
| 10/08/2013 | 105 | ORDER: WHEREAS, this case has been assigned to me for all purposes. It is hereby ORDERED that counsel review and comply with the Court's Individual Rules and Procedures ("Individual Rules") (available at the Court's website, http://nysd.uscourts.gov/judge/Schofield). Counsel are further directed to submit a joint letter to the Court no later than October 21, 2013. The parties should append the most recent complaint and the most recent scheduling order to the status letter. The letter should be filed via ECF in accordance with the Individual Rules. The status letter should not exceed 5 pages and should include the following as further set forth in this order. Unless notified otherwise by the Court, the parties should presume that any Scheduling Order or Case Management Plan remains in effect notwithstanding the case's transfer. Any request for an extension or adjournment shall be made by letter as provided in Individual Rules I.B.2 and must be received at least 48 hours before the deadline or conference. (Signed by Judge Lorna G. Schofield on 10/8/2013) (lmb) (Entered: 10/08/2013) |
| 10/21/2013 | 106 | STATUS REPORT. *JOINT STATUS LETTER* Document filed by UBS AG, UBS Financial Services, Inc..(Schaffran, Andrew) (Entered: 10/21/2013) |
| 10/21/2013 | 107 | STATUS REPORT. *CORRECTED Joint Status Letter* Document filed by UBS AG, UBS Financial Services, Inc..(Schaffran, Andrew) (Entered: 10/21/2013) |
| 11/07/2013 | 108 | NOTICE of SUPPLEMENTAL AUTHORITY re: 98 Response in Opposition to Motion. Document filed by UBS AG, UBS Financial Services, Inc.. (Attachments: # 1 Exhibit A)(Schaffran, Andrew) (Entered: 11/07/2013) |
| 11/19/2013 | 109 | RESPONSE re: 108 Notice (Other). Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Attachments: # 1 Exhibit A)(Smith, Jeffrey) (Entered: 11/19/2013) |
| 12/03/2013 | 110 | NOTICE of UBS's Reply to Plaintiffs' Response to Its Notice of Supplemental Authority re: 108 Notice (Other), 109 Response. Document filed by UBS AG, UBS Financial Services, Inc.. (Schaffran, Andrew) (Entered: 12/03/2013) |

| 12/16/2013 | 111 | NOTICE of Supplemental Authority re: 93 MOTION for Reconsideration re: 90 Order on Motion to Compel Arbitration., 94 Memorandum of Law in Support of Motion. Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Attachments: # 1 Exhibit A)(Smith, Jeffrey) (Entered: 12/16/2013) |
|---|---|---|
| 01/09/2014 | 112 | RESPONSE in Opposition to Motion re: 93 MOTION for Reconsideration re: 90 Order on Motion to Compel Arbitration. *Response to Plaintiffs' Notice of Supplemental Authority re Lloyd v. Chase.* Document filed by UBS AG, UBS Financial Services, Inc.. (Schaffran, Andrew) (Entered: 01/09/2014) |
| 01/22/2014 | 113 | OPINION AND ORDER re: 93 MOTION for Reconsideration re: 90 Order on Motion to Compel Arbitration filed by David Hale, Philip Ricasata, Charles Shoemaker, Eliot Cohen, Stan Sklenar. For the foregoing reasons, Plaintiffs' Motion for Relief is hereby DENIED in its entirety. The Clerk of Court is directed to close the motion at Docket Number 93. (Signed by Judge Lorna G. Schofield on 1/22/2014) (lmb) (Entered: 01/22/2014) |
| 02/05/2014 | 114 | MOTION for Reconsideration re: 113 Memorandum &Opinion, *Notice of Motion for Reconsideration or Order Certifying an Interlocutory Appeal.* Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar.(Smith, Jeffrey) (Entered: 02/05/2014) |
| 02/05/2014 | 115 | MEMORANDUM of Law in Support re: 114 MOTION for Reconsideration re: 113 Memorandum &Opinion, *Notice of Motion for Reconsideration or Order Certifying an Interlocutory Appeal.* MOTION for Reconsideration re: 113 Memorandum &Opinion, *Notice of Motion for Reconsideration or Order Certifying an Interlocutory Appeal..* Document filed by Eliot Cohen, David Hale, Philip Ricasata, Charles Shoemaker, Stan Sklenar. (Smith, Jeffrey) (Entered: 02/05/2014) |
| 02/06/2014 | 116 | ORDER: WHEREAS, on February 5, 2014, Plaintiffs filed a motion for reconsideration, asking the Court to dismiss the case or in the alternative grant Plaintiffs the right to an interlocutory appeal. It is hereby ORDERED that Defendants shall file a response, no more than seven pages in length, by February 13, 2014., ( Responses due by 2/13/2014.) (Signed by Judge Lorna G. Schofield on 2/6/2014) (lmb) (Entered: 02/06/2014) |
| 02/13/2014 | 117 | LETTER addressed to Judge Lorna G. Schofield from Joseph A. Nuccio dated 2/13/14 re: Joint Stipulation Resolving Plaintiffs' Motion for Reconsideration [Dkt. No. 114]. Document filed by UBS AG, UBS Financial Services, Inc..(Nuccio, Joseph) (Entered: 02/13/2014) |
| 02/14/2014 | 118 | STIPULATION AND ORDER TO DISMISS WITH PREJUDICE PLAINTIFFS' COMPLAINT: IT IS HEREBY ORDERED THAT: the Action shall be dismissed with prejudice, and the plaintiffs may appeal the order of this Court granting defendants' motion to compel arbitration. IT IS STIPULATED AND AGREED that a facsimile copy of the signature(s) on this stipulation may be treated as an original for all purposes. The Clerk of the Court is directed to close this case. (Signed by Judge Lorna G. Schofield on 2/14/2014) (lmb) (Entered: 02/14/2014) |
| 03/13/2014 | 119 | NOTICE OF APPEAL from 90 Order on Motion to Compel Arbitration, 118 Stipulation and Order of Dismissal,, 113 Memorandum &Opinion,. Document filed by Eliot Cohen. Filing fee $ 505.00, receipt number 0208–9453351. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 December 4, 2012 Memorandum and Order, # 2 January 22, 2014 Order and Opinion, # 3 February 14, 2014 Order)(Smith, Jeffrey) (Entered: 03/13/2014) |
| 03/14/2014 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 119 Notice of Appeal. (tp) (Entered: 03/14/2014) |
| 03/14/2014 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 119 Notice of Appeal, filed by Eliot Cohen were transmitted to the U.S. Court of Appeals. (tp) (Entered: 03/14/2014) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIOT COHEN, CHARLES SHOEMAKER, and PHILIP RICASATA, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UBS FINANCIAL SERVICES, INC., UBS AG, <br><br> Defendants. | Civ. No. 12-CIV-02147(BSJ)(JLC) |

## DECLARATION OF CATHERINE REYNA

I, Catherine Reyna, hereby declare as follows:

1.      I am currently employed by Defendant UBS Financial Services Inc. ("UBSFS") as the Human Resources Business Partner for the geographical region of UBSFS's Wealth Management Advisor Group that encompasses branch offices located in California. I work in UBSFS's office located at 1000 Harbor Boulevard, Weehawken, New Jersey 07086 and submit this Declaration in support of Defendants' Motion to Compel Arbitration. I have personal knowledge of the facts set forth in this Declaration, or know them in my capacity as an employee based on corporate and employment records that UBSFS maintains in the regular course of its business, and if called to testify, could and would testify competently to them.

2.      Plaintiffs Eliot Cohen, Charles Shoemaker, Philip Ricasata, David Hale, and Stan Sklenar ("Plaintiffs") were each formerly employed by UBSFS as licensed Financial Advisors.

Their last dates of employment with UBSFS were October 5, 2007, November 4, 2010, January 8, 2010, August 29, 2008, and May 28, 2010, respectively.

3.    Attached to this Declaration as Exhibit 1 is a true and correct copy of UBSFS's 2007 Financial Advisor Compensation Plan.

4.    Attached to this Declaration as Exhibit 2 is a true and correct copy of UBSFS' 2008 Financial Advisor Compensation Plan.

5.    Attached to this Declaration as Exhibit 3 is a true and correct copy of UBSFS' 2009 Financial Advisor Compensation Plan.

6.    Attached to this Declaration as Exhibit 4 is a true and correct copy of UBSFS' 2010 Financial Advisor Compensation Plan.

7.    Attached to this Declaration as Exhibit 5 is a true and correct copy of Plaintiff Cohen's signed Acknowledgement of the 2007 Financial Advisor Compensation Plan.

8.    Attached to this Declaration as Exhibit 6 is a true and correct copy of Plaintiff Shoemaker's signed Acknowledgement of the 2007 Financial Advisor Compensation Plan.

9.    Attached to this Declaration as Exhibit 7 are true and correct copies of Plaintiff Ricasata's signed Acknowledgements of the 2007, 2008 and 2009 Financial Advisor Compensation Plans.

10.    Attached to this Declaration as Exhibit 8 is a true and correct copy of Plaintiff Sklenar's signed Acknowledgement of the 2007 Financial Advisor Compensation Plan.

11.    Attached to this Declaration as Exhibit 9 are true and correct copies of Plaintiff Hale's signed Acknowledgements of the 2007 and 2008 Financial Advisor Compensation Plans.

12.     Attached to this Declaration as Exhibit 10 are true and correct copies of the Employee Forgivable Loan, Promissory Note and Employee Forgivable Loan Letter of Understanding signed by Plaintiff Cohen on September 26, 2000.

13.     Attached to this Declaration as Exhibit 11 are true and correct copies of the Employee Forgivable Loan, Promissory Note and Employee Forgivable Loan Letter of Understanding signed by Plaintiff Shoemaker on August 11, 2005.

14.     Attached to this Declaration as Exhibit 12 are true and correct copies of the Employee Forgivable Loan, Promissory Note and Employee Forgivable Loan Letter of Understanding signed by Plaintiff Shoemaker on October 11, 2007.

15.     Attached to this Declaration as Exhibit 13 are true and correct copies of the Promissory Note and Employee Forgivable Loan Letter of Understanding signed by Plaintiff Sklenar on July 31, 2006.

16.     Attached to this Declaration as Exhibit 14 are true and correct copies of the Promissory Note and Employee Forgivable Loan Letter of Understanding signed by Plaintiff Hale on September 15, 2006.

17.     Attached to this Declaration as Exhibit 15 is a true and correct copy of the FA/PWA Partnering Agreement signed by Plaintiff Ricasata on October 26, 2009.

18.     Attached to this Declaration as Exhibits 16 and 17 are true and correct copies of Financial Advisor Account Reassignment Agreements entered into by Plaintiff Ricasata on August 7, 2008 and December 30, 2009.  Plaintiff Ricasata agreed to the terms of these Account Reassignment Agreements by electronic signature on those dates.

19.     Attached to this Declaration as Exhibits 18 and 19 are true and correct copies of Financial Advisor Account Reassignment Agreements entered into by Plaintiff Shoemaker on

December 17, 2008 and March 8, 2010.  Plaintiff Shoemaker agreed to the terms of these

Account Reassignment Agreements by electronic signature on those dates.

20.      Attached to this Declaration as Exhibits 20 and 21 are true and correct copies of

the Financial Advisor Account Reassignment Agreements entered into by Plaintiff Sklenar on

May 21, 2009 and December 21, 2009.  Plaintiff Sklenar agreed to the terms of these Account

Reassignment Agreements by electronic signature on those dates.

21.      As licensed Financial Advisors, Plaintiffs were each registered with the Financial

Industry Regulatory Authority, Inc. ("FINRA").  FINRA publishes BrokerCheck Reports for all

registered Financial Advisors which include, *inter alia*, the Financial Advisor's registration and

employment history, including dates of registration and employment at each firm the Financial

Advisor worked for.  This information is publicly available on FINRA's website (finra.org).

22.      Plaintiff Cohen's publicly available registration and employment history with

FINRA shows that his registration and employment as a Financial Advisor with UBSFS ended in

October 2007.  Attached to this Declaration as Exhibit 22 is a true and correct copy of excerpts

from Plaintiff Cohen's FINRA BrokerCheck Report.

23.      Plaintiff Shoemaker's publicly available registration and employment history with

FINRA shows that his registration and employment as a Financial Advisor with UBSFS ended

on November 4, 2007.  Attached to this Declaration as Exhibit 23 is a true and correct copy of

excerpts from Plaintiff Shoemaker's FINRA BrokerCheck Report.  Attached to this Declaration

as Exhibit 24 is a true and correct copy of the FINRA Form U5 Uniform Termination Notice for

Securities Industry Regulation for Plaintiff Shoemaker that was filed with FINRA by UBSFS on

November 11, 2010.

4

24.     Attached to this Declaration as Exhibit 25 is a true and correct copy of excerpts from Plaintiff Ricasata's FINRA BrokerCheck Report.

25.     Attached to this Declaration as Exhibit 26 is a true and correct copy of Plaintiff Sklenar's FINRA BrokerCheck Report.

26.     Attached to this Declaration as Exhibit 27 is a true and correct copy of excerpts from Plaintiff Hale's FINRA BrokerCheck Report.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct.

Dated: May 3, 2012

By: _____
CATHERINE REYNA

2406 2007 FA Compensation r1

 UBS

# 2007
# Financial Advisor
# Compensation Plan

For Internal Use Only

CONFIDENTIAL

UBS00001

# Table of Contents

Production-Related Payout . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Asset and Credit Line Growth Award . . . . . . . . . . . . . . . . . . . . . . . . . . .11

Recognition Councils . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

Productivity and UBS Length of Service Awards . . . . . . . . . . . . . . . . . . .18

UBS PartnerPlus/UBS Financial Advisor
Deferred Award Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Expense Allowance Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

Length of Service Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

For Internal Use Only

CONFIDENTIAL

UBS00002

# Production-Related Payout

Your "production" (sometimes called "gross" production) is the product related revenue credited to you by UBS Financial Services Inc. and/or UBS International Inc. (together, "UBS" or "the Firm"). Under this Plan, as compensation in addition to any other form of compensation you may earn from the Firm, you will be entitled to receive a "payout" derived from a percentage of your production less lawful adjustments. Adjustments may include, for example, customer fees waived by you; compensation and benefits for a Client Service Associate ("CSA") or other employees; the cost of seminars you elect to attend; the costs of certain miscellaneous goods and services; overpayments; charge-backs arising out of a customer or other third party reversing or failing to close a transaction; certain registration and consulting fees; production draws; transaction-related expenses (including brokerage and clearing fees on commodity products, as described herein); and payments made under the Retirement Enhancement Program.

Because your payout is net of adjustments, and not based solely on a percentage of your production, it is not earned until all such adjustments have been made. In addition, you will earn your payout (or other production-related compensation) as long as the underlying transaction(s) comply with governing laws, rules of the self-regulating organizations and Firm policies.

Your "payout rates"[1] are the percentages applied to your production to determine your payout before adjustments.

*Example:*



If you desire certain adjustments to be made as set forth in this Plan, UBS may require you to authorize them in writing. UBS will provide the authorization forms/vehicles necessary to carry out your wishes regarding these adjustments.

---

[1] Payout rates vary depending on the product.

For Internal Use Only                                                                 1

CONFIDENTIAL                                                                 UBS00003

**Standard Grid**

"Standard grid" production generally includes production for all products except insurance and annuity products (see page 7). Your rolling six-month standard grid production determines your applicable payout rate for your current month's standard grid production, as shown in the following chart:

| Standard Grid Rolling Six-Month Production Range | | | Monthly Payout Rate |
|---|---|---|---|
| $ 0 | – | $68,749 | 28% |
| $ 68,750 | – | $74,999 | 29% |
| $ 75,000 | – | $82,499 | 30% |
| $ 82,500 | – | $89,999 | 31% |
| $ 90,000 | – | $98,999 | 32% |
| $ 99,000 | – | $137,499 | 33% |
| $137,500 | – | $149,999 | 34% |
| $150,000 | – | $164,999 | 35% |
| $165,000 | – | $192,499 | 36% |
| $192,500 | – | $199,999 | 37% |
| $200,000 | – | $219,999 | 38% |
| $220,000 | – | $412,499 | 39% |
| $412,500 | – | $499,999 | 40% |
| $500,000 | – | $549,999 | 41% |
| $550,000 | – | $687,499 | 42% |
| $687,500 | + | | 43% |

*Example:*
*Your last five months' standard grid production totals $185,000 and your current month's standard grid production is $40,000, for a six-month total of $225,000. Your standard grid payout rate for the current month will be 39%.*

**Additional Terms and Conditions:**

- Gross production over $2,000,000 during the plan year will be paid an additional percentage point, excluding the following types of production:
  - Regional Institutional Sales (RIS) production paid at leveled payout rates
  - Production with no payout (e.g., RMA® renewals)
  - Production paid at a 100% payout rate
  - Lending production paid at leveled payout rates

- Certain business is paid at leveled payout rates, including:
  - Directed business processed via split FA numbers (e.g., QA) from the Equity desks: standard grid payout rate up to a maximum of 38%.

2                                                    For Internal Use Only

CONFIDENTIAL                                      UBS00004

- – Directed business processed via split numbers from the Prime Broker Desk (e.g., IJ): 29%.
- – Equity and municipal (excluding negotiated new issue) production in RIS accounts: 29%.
- – Production generated by Financial Advisors who are capped at a leveled rate of 24%, based on production levels and NYSE length of service (NYSELOS) (see page 10).

- Transactions resulting in production of less than $100 are paid at your applicable grid payout rate, but are not included in your rolling standard grid production for purposes of determining payout rate, with the exception of the following:
  - – Mutual funds and mutual fund dividend reinvestments
  - – Trailing commissions
  - – Fees
  - – UBS-sponsored and co-sponsored UITs
  - – Global time deposits
  - – Certificates of deposit
  - – Commercial paper
  - – CODA-SEP, SEP, SIMPLE and 401(k) accounts
  - – Syndicate offerings
  - – Auction rate preferreds and auction rate certificates

- Transactions resulting in production of less than $100 are included in your "total production," which is used for purposes of determining your insurance and annuity payout rates, Productivity and UBS Length of Service Awards, and to determine Recognition Council, UBS PartnerPlus℠, and Business Builder Program eligibility.

- RMA and Business Services Account BSA® renewal fees are included in your production for the purpose of calculating standard grid payout rates; however, you will not receive any payout related to these items.

- Listed equity and over-the-counter commissions discounted below $50 will automatically be increased to $49.99. For example, a pre-discounted ticket of $60 is discounted 50% to $30. The ticket will automatically be increased to $49.99. Option commissions discounted below $35 will automatically be increased to $34.99. Commodity commissions discounted below $30 will automatically be increased to $29.99.

- Payout rates for production generated in RIS accounts are calculated as follows:
  - – Equity and municipal (excluding muni-negotiated new issue) production: 29%.
  - – TFI new issue (including APS), TFI secondary, and muni-negotiated new issue: standard grid rate minus 10 percentage points. ARCs will be grid minus 10 percentage points, effective February 1, 2007.

CONFIDENTIAL                                                    UBS00005

- — Standard TFI sales credit: 60%. The Core RIS FAs, and those with at least $25,000 in standard TFI sales credits, will be eligible to participate in a year-end bonus.

- The payout on business related to ongoing corporate relationships with companies assigned by Corporate Employee Financial Services (CEFS) is as follows:
  - — Exercise Revenue (includes revenue from all stock benefit plan transactions, such as ESPP, RSA etc.): 100% of production paid at a 22% leveled rate, not subject to ticket charges.
  - — Plan Admin Revenue (revenue derived from CEFS charges to corporate clients for administrative services e.g., Admin Fees): Net payment equal to 10% of the admin revenue for each corporate client will be paid annually. No gross production will be received for these payments.
  - — Reinvestment Revenue: Production is paid at the standard grid payout rate and is subject to ticket charges

- Brokerage and clearing fees on commodity products are adjusted before the payout rate is applied, unless:
  - — The ticket is not discounted,
  - — The ticket is $250 or greater and the contract rate is $20 or more, or
  - — The ticket is $1,000 or greater and the contract rate is $15 or more.

- Payout rates for referral fees to and from the Global Referral Desk are calculated as follows:
  - — For referrals to the Global Referral Desk, FAs receive credit for 1/3 of the revenue as production credits at a 65% payout rate for four years. Thereafter, the FA receives no further payout related to the referral.
  - — For referrals from the Global Referral Desk, FAs will receive credit for 2/3 of the revenue at the standard grid payout rate for four years and credit for 100% of the revenues thereafter.
  - — Additional information can be found at the Business Support Overview (InfoNet) under *Administrative/Global Referral Program*.

- A commodity futures ticket, for the purpose of this Compensation Plan, is defined as the closing of an existing position ("a round turn"). Identical contracts (i.e., for the same commodity, side and month) traded on the same exchange and closed out on the same day in the same account are aggregated as one ticket. Identical options on futures contracts (i.e., for the same side, strike price, premium and expiration month) traded on the same exchange and opened on the same day in the same account are aggregated as one ticket; similarly, identical options on futures contracts closed on the same day are aggregated as one ticket.

- Financial Advisors that have qualified for directed business will receive 75% of the gross sales credits on transactions executed by the Equity Trading Desks in a split FA number (e.g., QA01). Payout rate is standard grid to a maximum of 38%.

4

CONFIDENTIAL

UBS00006

- Production credits and the related payouts on syndicate transactions become earned only after the close of the penalty bid period and upon verification that the client retained the position until that time and that the transaction or transactions complied with applicable laws, rules and policies. Production credits on syndicate transactions will be advanced, but will not be earned until the previously mentioned conditions have been satisfied. If production credits are advanced and the pre-conditions to earning are not met and/or your employment is terminated, at the Firm's discretion, UBS will recoup the unearned syndicate payment including in the form of an adjustment to your unearned standard grid payout.

**Ticket Charges**

All listed equity, over-the-counter (principal and agency), and option business outside of a wrap fee account is paid at a reduced rate, by reducing the grid rate to account for $12 for each trade

- Transactions with the same security, side, date and account are aggregated as one ticket.

- No ticket charge will apply to the following transactions:
  - Equity RIS transactions that are paid at a leveled rate
  - Directed business processed via split FA numbers from the Equity (e.g., QA) and Prime Broker (e.g., IJ) desks that are paid at a leveled rate
  - Production generated by FAs who are capped at a leveled payout rate based on their prior-year production and NYSELOS
  - Transactions covered under the wrap fee in InsightOne™, Strategic Advisor, and managed accounts
  - Exercise revenue on CEFS accounts that is paid at a leveled rate of 22%
  - Preferred and convertible transactions (both agency and principal)

- A reduced ticket charge will apply to New Financial Advisors (NFAs) in the Development Program, based on the NFA's number of months in production:

| | | | |
|---|---|---|---|
| 0 | – | 24 months | $6 |
| 25 | – | 36 months | $8 |
| 37 | – | 48 months | $10 |
| Greater than 48 months | | | $12 |

- The ticket charge will not result in a payout below zero for any individual transaction

For Internal Use Only                                             5

CONFIDENTIAL                                             UBS00007

**Investment Solutions (IS) Wrap Fees**

- Payout rates for wrap fees processed in a managed account and InsightOne℠ fees and Strategic Advisor fees will be the standard grid payout rate plus 4 percentage points.

- Products include:
  – InsightOne
  – Managed Accounts Consulting (MAC – wrap fee only)
  – Portfolio Management Program (PMP)
  – Premier Portfolio Management Program (PPM)
  – UBS Selections℠
  – ACCESS℠
  – PACE℠ Multi Advisor
  – IS Hard Dollar Consulting Fees
  – UBS Fiduciary Trust Company (wrap fee only)
  – Private Wealth Solutions (wrap fee only)
  – UBS Strategic Advisor

Only Financial Advisors paid under the Standard Compensation Plan are eligible for this payout.

You may elect to participate in various Investment Solutions programs. Under the terms of these programs, you will receive wrap fees related to accounts participating in such programs. Wrap fees are advances paid to you on expected fees. Wrap fees are paid quarterly but are earned incrementally on a pro rata basis based on the number of days that the account remains with the Firm. For more information concerning how you are compensated on Investment Solutions programs and products, please refer to summaries and descriptions published on InfoNet which are incorporated herein by reference.

Further, if the account terminates prior to the end of the period for which advances were paid, UBS shall recoup any advanced and unearned fees as an adjustment to your production. Similarly, if your employment is terminated for any reason prior to the end of the period for which advances were paid, the Firm is authorized to adjust the amount of the unearned advances from your unearned standard grid payout. If the amount of the unearned advances exceeds the amount of your unearned standard grid payout, you must immediately repay the Firm any outstanding unearned advances.

For Internal Use Only

CONFIDENTIAL                                                        UBS00008

**Insurance and Annuity Grid**

Insurance and annuity products have a separate payout rate grid based on both your rolling six-month total production and rolling six-month insurance and annuity production, as shown on the following grid:

| Rolling Six-Month Total Production | Rolling Six-Month Insurance and Annuity Production | | |
|---|---|---|---|
| | $0 – $24,999 | $25,000 – $49,999 | $50,000+ |
| $0        – $89,999 | 38% | 38% | 38% |
| $90,000  – $149,999 | 38% | 43% | 43% |
| $150,000 + | 38% | 43% | 48% |

- As with payouts for standard grid business, payouts for insurance/annuity products are earned net of adjustments.

- For insurance/annuity production, you will receive the higher of your monthly standard grid rate or your monthly insurance/annuity grid rate.

- Only Financial Advisors paid under the Standard Compensation Plan are eligible for this payout.

*Example:*
*Your last five months' insurance and annuity production totals $35,000 and your current month's insurance and annuity production is $10,000, for a six-month insurance and annuity total of $45,000. Your rolling six-month total production is $225,000, making your payout rate on insurance and annuity production for the current month 43%.*

For Internal Use Only                                                                 7

CONFIDENTIAL                                                                 UBS00009

**Lending**

Credit Lines
Financial Advisors will receive gross production credits per year on non- purpose loans booked in a Credit Line account as follows: Net Spread -15 bps (Net Spread is defined as spread over LIBOR). Production credits will be earned only on the drawn portion of the Credit Line for the number of days that the loan is outstanding.

Credit Line production is included in your production for the purpose of calculating standard grid rates but is paid out at a flat rate of 8% for the first $100 million of a single loan balance and 2% for the incremental loan balance exceeding $100 million.

- Variable Rate Loans: Production credits on a variable rate loan (including Premier Variable Credit Line, Prime Credit Line and UBS Financial Services Credit Line) are earned based on the actual net spread for the quarter. Production credits are received at the end of each calendar quarter for that quarter.

  *Example:*
  *A client opens a $1,000,000 Credit Line on March 22, 2007 priced at LIBOR + 150 bps, which remains continuously drawn at the same $1,000,000 through June 21, 2007. The FA will receive a production credit in June 2007 of $3,450.00 ($1,000,000 x 1.35% [Net Spread of 150 bps – 15 bps] ÷ 360 interest days x 92 interest days in the quarter). The payout is $276 ($3,450 x 8%).*

- Fixed Rate Loans: Production credits on a Premier Fixed Rate Credit Line with a maturity of one year or less are based on projected net spread. The production credit will be received at the end of the month in which the loan was booked. If a loan's maturity is greater than one year, the first year's production credit will be received in the month it is booked, and subsequent production credits will be credited on each annual anniversary.

  *Example 1.*
  *A client opens a $1,000,000 Fixed Rate Credit Line priced at LIBOR + 150 bps on January 17, 2007, with a maturity date of January 17, 2008, the FA will receive a $13,687 production credit ($1,000,000 x 135 basis points (1.35%)) ÷ 360 x 365 interest days. The payout is $1,095 ($13,687 x 8%).*

  *Example 2:*
  *If the loan above had a two-year maturity, the FA would be credited with $13,687 in January 2007 and again in January 2008.*

Production credits for variable and fixed rate loans booked during the last four business days of the month will be received in the following month

FAs are not compensated on purpose (margin) loans.

8                                                        For Internal Use Only

CONFIDENTIAL                                          UBS00010

## Residential Mortgages

A one-time production credit is received for primary mortgages, the drawn portion of Super Jumbo home equity lines, and home equity loans. It will be credited approximately 30 days after the closing of the loan and is paid at the standard grid payout rate.

- Primary Mortgages: FAs receive a one-time 30 basis point production credit based on the loan amount.

- Super Jumbo Home Equity Lines: FAs receive a one-time 30 basis point production credit based on the drawn amount.

- Home Equity Loans: FAs receive a one-time 15 basis point production credit based on the closed loan amount.

There are no production credits for standard home equity lines of credit and UBS employee mortgages.

FAs who finance their own mortgages through UBS Mortgage LLC will receive their choice of a $500 rebate check or the standard production credit. FAs who meet the definition of Preferred Client will have up to $1,500 of lender fees waived (appraisal, credit report, application fee, tax report).

## Letters of Credit

Production credits for Letters of Credit are calculated as a percentage of the letter of credit fee, and added to the FA's overall production credit which is paid at the standard grid payout rate.

Please refer to the Lending chapter under the Products Overview (InfoNet) for further information on loan products.

CONFIDENTIAL

UBS00011

**Incremental 1% Payout**

- Production in fee-paying RMAs and Business Services Account BSAs will be paid at the standard grid rate plus 1 percentage point. Wrap fees processed in a managed account and InsightOne and Strategic Advisor fees are calculated at grid payout rate plus 4 percentage points and are not eligible for the incremental 1% payout rate.

- The incremental 1% payout rate relative to business generated in RMAs and Business Services Account BSAs with deferred billing will be paid retroactively once the RMA/Business Services Account BSA fee is paid.

- The incremental 1% payout rate will not apply to any account for which the fee is waived.

- The incremental 1% payout rate will be paid to Financial Advisors on the Standard Compensation Plan only. Production in accounts leveled at a fixed payout rate will not receive the incremental 1%.

**Cap Plan Policy**

If you have been with the Firm for one full calendar year and you are not being paid under the NFA Compensation Plan, you will be subject to a 24% payout rate on your production, including IS wrap and insurance/annuity business, and no ticket charges will apply to your production. Credit Lines are paid at 8%. There is no payout on RMA and Business Services Account BSA renewal fees.

- Your NYSELOS (see table on page 25) was 5 to 10 years and your prior year's total production for all products was below $200,000.

- Your NYSELOS (see table on page 25) was 11 or more years and your prior year's total production was below $250,000.

- You will be not be eligible for the Asset and Credit Line Growth Award.

- If, during the current year, your production exceeds the minimum levels stated above, you will be subject to the regular payout rates (including IS wrap, insurance/annuity and incremental 1%), where permitted, retroactive to January 1. Ticket charges will apply to your production. At that time, you will also become eligible for the Asset and Credit Line Growth Award.

For Internal Use Only

CONFIDENTIAL                                                                      UBS00012

# Asset and Credit Line Growth Award

This award measures the combined Net New Asset and Credit Line growth based on year-end results.

- Net New Asset growth is defined as the value of securities and/or cash received into new and existing accounts, offset by the value of securities and/or cash leaving these accounts.

- Credit Line growth is defined as the net change in outstanding Credit Line balances. Note: Paydowns of balances as of 12/31/03 (inception of award) will not be adjusted from the growth calculation in 2004 and thereafter.

The award is calculated on Net New Asset and Credit Lines beginning at $5 million as follows:

| Net New Asset and Credit Line Growth | Award |
|---|---|
| First $50 million ($5 million minimum) | 15 basis points |
| From $50 million to $100 million | 10 basis points |
| From $100 million to $150 million | 5 basis points |
| From $150 million to $200 million | 2.5 basis points |

- The award is capped at 5% of the Financial Advisor's production.

- RIS, Corporate Cash Management and Prime Brokerage accounts are excluded from the award calculation. The Firm reserves the right to exclude other types of institutional accounts in the future.

- Subject to the award definitions and rules set forth herein, 80% of the award is paid in cash; 20% is deferred. The award will be deferred into PartnerPlus for eligible FAs and into the FA Deferred Compensation Plan for FAs who are not eligible for PartnerPlus. As with payouts for standard grid business, Asset and Credit Line Growth Awards are earned net of adjustments.

- Awards totaling less than $3,000 will be paid 100% in cash.

Each FA is able to track his/her daily Net New Asset/Credit Line activity in the Business Tracking system. Award projections are updated monthly.

CONFIDENTIAL                                          UBS00013

*Example #1*
*Assumptions:*
   FA has 2007 Net New Asset and Credit Line growth of $12 million.
   FA has 2007 production of $450,000.
   Award is capped at $450,000 x 5% = $22,500.

*Award Calculation:*

| | | |
|---|---|---|
| $12 million @ 15 bps = | | $18,000 |
| | Total | $18,000 |
| Cash Award is $18,000 x 80% = | | $14,400 |
| Deferred Award is $18,000 x 20% = | | $3,600 |

*Example #2*
*Assumptions:*
   FA has 2007 Net New Asset and Credit Line growth of $55 million.
   FA has 2007 production of $1,750,000.
   Award is capped at $1,750,000 x 5% = $87,500.

*Award Calculation:*

| | | |
|---|---|---|
| $50 million @ 15 bps = | | $75,000 |
| $5 million @ 10 bps = | | $5,000 |
| | Total | $80,000 |
| Cash Award is $80,000 x 80% = | | $64,000 |
| Deferred Award is $80,000 x 20% = | | $16,000 |

*Example #3*
*Assumptions:*
   FA has 2007 Net New Asset and Credit Line growth of $24 million.
   FA has 2007 production of $600,000.
   Award is capped at $600,000 x 5% = $30,000.

*Award Calculation:*

| | | |
|---|---|---|
| $24 million @ 15 bps = | | $36,000 |
| | Total | $36,000 |
| This FA's award is capped at $30,000. | | |
| Cash Award is $30,000 x 80% = | | $24,000 |
| Deferred Award is $30,000 x 20% = | | $6,000 |

12                                    For Internal Use Only

CONFIDENTIAL                                    UBS00014

**Teams**

Financial Advisors who do all of their production and asset gathering as a team will have the option of electing to participate as a team for purposes of the 2007 Asset and Credit Line Growth Award. For teams, the minimum threshold for the award will be multiplied by the number of FAs in the team. The team must achieve the "combined" threshold. Either the entire team qualifies as a whole, or no one qualifies.

Completed Net New Asset and Credit Line team election forms must be submitted by May 15, 2007.

*Example*
*A two-person team with a 70I30 split. The minimum threshold for this team is $10,000,000 in Net New Asset & Credit Line Growth (2 team members x $5,000,000 min.)*

*If the team has 2007 Net New Asset and Credit Line growth of $10,500,000, they would receive an award of $15,750. FA 1 would receive $11,025 (70%), and FA 2 would receive $4,725 (30%).*

*If the team has 2007 Net New Asset and Credit Line growth of $9,000,000, they would not receive an award. Although FA 1 has Net New Asset and Credit Line growth of $6,300,000 (which exceeds the minimum for an FA who is not part of a team), the team did not meet its goal.*

*The hurdle for the Recognition Council adjustment ($5 million or $12 million) will be calculated in the same way.*

**Award Definitions and Rules**

- All positions in DVP accounts, commodities, and option positions are not included in the asset calculation.

- Assets must be new to our Firm and held here (shown on UBS Financial Services Inc. client statements) on December 31, 2007, to generate credit for the award. New assets held away that are not reflected on aforementioned client statements will not count as new assets. Assets that come into other UBS business units (e.g., Global Asset Management, Hedge Fund Services, Investment Bank) through FA referrals will not count as net new assets. Documented asset referrals to/from booking centers in Wealth Management International will be included/excluded from net new assets.

- Market appreciation/depreciation is not included in the asset calculation.

For Internal Use Only                                                                     13

CONFIDENTIAL                                                              UBS00015

- Dividends and interest received are not included in the asset calculation; however, cash out of an account will be offset by dividends and interest received during the year.

- If cash taken out of an account increases margin balances, there will be no impact on the award calculation.

- Activity related to assets and credit lines housed in split accounts will be allocated on the same percentage as production splits:
  - If an FA within a split arrangement leaves our Firm, the remaining FA(s) becomes fully responsible for the assets and credit lines six months after the FA departs. If assets and credit lines leave during the first six months, the remaining FA's maximum liability is determined by the split arrangement.
  - If an FA within a split arrangement retires, the remaining FA(s) is fully responsible for all subsequent activity in the account(s).

- An FA becomes FA of record the day that his/her FA number appears on the account:
  - FAs who receive an account from an FA who leaves our Firm will not be penalized for assets and credit lines that leave the account during the first six months.
  - FAs who receive an account from an active FA are fully responsible for the account and any subsequent activity.

- Documented asset referrals to/from banking centers in Wealth Management International will be included/excluded from net new assets for the first 12 months of the referral agreement. For example, if an FA refers an account, he or she will receive credit for the assets. If an FA receives a referred account, he or she will not receive net new asset credit.

- Restricted securities are considered new assets in 2007 if they become free to trade or are saleable in 2007. They will be credited automatically when they are moved into a SEG or BOX position. If not, you must notify Branch Administration to get credit for those assets.

- Financial Advisors paid under the Standard FA Compensation Plans and NFAs on the 2002 Compensation Plan are eligible for the award. Recruits become eligible once they have completed 12 months of production at our Firm and are paid on the Standard Compensation Plan. NFAs on the 2004 Compensation Plan are not eligible for this award. Prorated awards are calculated for FAs who are not eligible for the full 12-month period.

 For Internal Use Only

CONFIDENTIAL UBS00016

- This award is conditioned upon and rewards continued employment with our Firm. Thus, you must be employed by our Firm on the payment date to be entitled to receive the cash portion of the award, and on the vesting dates in order to earn and be entitled to the deferred portions. The deferred portion of the Asset and Credit Growth Award, along with the related Turbo and Market interest for Financial Advisors, vests in 20% increments each January 1 in years 2014 through 2018.

For Internal Use Only

15

CONFIDENTIAL

UBS00017

# Recognition Councils

There are three Recognition Councils for top-performing Financial Advisors. A targeted number of qualifiers will be set for each Recognition Council category as follows:

| Year 2008 Council Level | NYSE Reg Date | 2007 Recognition Council Production Ranking |
|---|---|---|
| Chairman's Council | — | Top 240 FAs |
| President's Council | — | Next 525 FAs |
| Pacesetter | Prior to 7/00 | Next 1000 FAs |
| | 7/00 – 6/01 | Top 40 in NYSELOS category |
| | 7/01 – 6/02 | Top 40 in NYSELOS category |
| | 7/02 – 6/03 | Top 40 in NYSELOS category |
| | 7/03 – 6/04 | Top 40 in NYSELOS category |
| | 7/04 – 6/05 | Top 50 in NYSELOS category |
| | 7/05 – 12/07 | Top 50 in NYSELOS category |

Each month, Financial Advisors can review their rankings, along with current projected production levels for each council, via Business Tracking.

Hard-dollar production thresholds will be determined and communicated after the third quarter.

For Internal Use Only

CONFIDENTIAL

UBS00018

Financial Advisors exceeding the following Net New Asset and Credit Line thresholds will receive an additional credit to their 2007 production only for purposes of achieving Recognition Council status.

- Financial Advisors with Net New Asset and Credit Line growth of $5,000,000 to $11,999,999 will receive a 10% production adjustment.

  or

- Financial Advisors with Net New Asset and Credit Line growth of $12,000,000 or greater will receive a 25% production adjustment.

Recruits become eligible for the additional credit once they have completed 12 months of production at UBS.

*Example:*

| | Actual Production | Net New Assets and Credit Lines | Production Adjustment % | Dollars | Recognition Council Production |
|---|---|---|---|---|---|
| FA #1 | $500,000 | $3,000,000 | 0 | 0 | $500,000 |
| FA #2 | $500,000 | $6,000,000 | 10 | $50,000 | $550,000 |
| FA #3 | $500,000 | $15,000,000 | 25 | $125,000 | $625,000 |

In addition to production and net new assets and credit lines, the Firm may consider, the Financial Advisor's disciplinary history as well as his/her compliance with Firm rules, standards and policies and/or the rules and regulations of applicable SROs when determining eligibility for recognition councils.

CONFIDENTIAL

UBS00019

# Productivity and UBS Length of Service Awards

Deferred Productivity and UBS Length of Service Awards are granted based on your current year's production and are contributed into PartnerPlus.

The 2007 awards will be calculated as follows:

|  | Annual Productivity Award | Annual UBS LOS Award (UBSLOS of three years and above, see table on page 25) |
| --- | --- | --- |
| Chairman's Council | 2% | 2% |
| President's Council | 1% | 2% |
| Pacesetter |  |  |
| Prior to 7/00 | 1% | 1% |
| 7/00 – 6/01 | 1% | 1% |
| 7/01 – 6/02 | 1% | 1% |
| 7/02 – 6/03 | 1% | 1% |
| 7/03 – 6/04 | 1% | 1% |
| 7/04 – 6/05 | 1% | — |
| 7/05 – 12/07 | 1% | — |

- Financial Advisors who are not eligible based on the above schedule but who generate $300,000 in gross production for the 2007 calendar year will be granted a 1% Productivity Award.

- Awards are projected monthly based on year-to-date production and granted annually. Awards granted based on 2007 production, along with the related UBS PartnerPlus Turbo and Market interest, will be earned and vest in 20% increments on each January 1 in years 2014 through 2018. (See pages 19 – 22 for details on the PartnerPlus Plan.)

- Productivity and UBS Length of Service (LOS) Awards are granted not only based on productivity, but also continued employment. You must be employed by the Firm on the award vesting dates in order to earn and be entitled to the award.

18

For Internal Use Only

CONFIDENTIAL

UBS00020

# UBS PartnerPlus/UBS Financial Advisor Deferred Award Plan*

**UBS PartnerPlus**

UBS PartnerPlus is a unique wealth accumulation plan designed to provide significant financial rewards to our Financial Advisors.

Eligibility
- All 2008 Recognition Council members (based on 2007 production) and all Financial Advisors who generate a minimum of $300,000 in gross production during 2007 will have their 2007 deferred awards credited to UBS PartnerPlus and will be eligible to make a voluntary contribution in the year 2008.

Base Plan
- Contributions to the Plan will include the deferred Productivity and UBS Length of Service (LOS) Awards, the deferred portion of the Asset and Credit Line Growth Award and voluntary contributions.

- The Plan will credit interest on a tax-deferred basis, compounded annually at the following rates for each year's contributions:
  - Years 1 – 4 = "Turbo rate," defined as four times the "Market rate"
  - Years 5 – 10 = "Market rate"

Note: Market rate reflects UBS short-term cost of funds rate, defined as the yield of the offered rate of our 30-day commercial paper, averaged over the number of business days in the month. The maximum Turbo rate is 32%. The maximum Market rate is 8%.

Voluntary Contributions
- The Financial Advisor may elect to make pretax voluntary contributions of up to 50% of the deferred awards granted, as long as the combined Firm and voluntary contributions do not exceed $100,000.

* In the event of a conflict between the summary of the plans set forth in this brochure and the Plan Documents, the Plan Documents will control. Capitalized terms herein have the meaning ascribed to them in the Plan Document.

For Internal Use Only                                                              19

CONFIDENTIAL                                                        UBS00021

*Examples:*

| Annual Firm Contributions | Maximum Allowable Voluntary Contributions | Total PartnerPlus Contributions |
|---|---|---|
| $50,000 | $25,000 | $75,000 |
| $80,000 | $20,000 | $100,000 |
| $125,000 | $0 | $125,000 |

- The voluntary contributions will earn interest at the Turbo rate during Years 1 – 4 and Market rate for Years 5 – 10, compounded annually.

- Voluntary contributions will be deducted monthly from the Financial Advisor's commission checks. Once elected, a voluntary contribution cannot be stopped or changed for that calendar year.

Vesting
- Contributions to UBS PartnerPlus beginning January 1, 1999:
  – Firm contributions, and Turbo and Market interest earned on Firm contributions, will vest 20% per year, beginning after six years, through Year 10.

- Contributions to UBS PartnerPlus prior to January 1, 1999:
  – Firm contributions vest according to their original schedule. Turbo and Market interest earned on Firm contributions vest after 10 years.

- Voluntary contributions vest immediately. Turbo and Market interest earned on voluntary contributions prior to January 1, 1999, will vest after 10 years. Turbo and Market Interest earned on voluntary contributions beginning January 1, 1999, will vest 20% per year, beginning after six years, through Year 10.

- Firm contributions and Turbo and Market Interest Vest immediately upon death, long-term disability and Qualifying Separation.

- Qualifying Separation, for the purpose of this plan, requires you to satisfy three requirements:

  1. Age and Length of Service Requirement:
     – At least age 55 with 10 years of UBS service; or
     – At least age 65 with 5 years of UBS service

  2. Separation Agreement Requirement: You must sign a separation agreement that includes, to the fullest extent permissible by law, non-compete, non-solicitation and non-disclosure covenants, in the form provided by UBS.

20                                    For Internal Use Only

CONFIDENTIAL                                    UBS00022

3. Transfer of Book of Business Requirement: You must have made an effective transition of the book you serviced, in the reasonable judgement of UBS and your branch manager.

- Participants with a Qualifying Separation between the ages of 45 and 54, with 15 years of service and 10 years in the Plan, must meet the Separation Agreement and Transfer of Book of Business Requirements and additionally are subject to the following vesting provisions:
  - Firm contributions credited to the Plan prior to January 2004 and related Turbo and Market Interest earned on those Firm contributions and Turbo and Market Interest related to voluntary contributions credited to the Plan prior to 2004 will vest immediately.
  - All voluntary contributions and related vested Turbo and Market interest, Vested Firm contributions and related vested Turbo and Market interest are distributed upon Qualifying Separation.
  - Unvested Firm contributions and Unvested Turbo and Market interest on Firm contributions and voluntary contributions credited to the Plan beginning January 2004 will remain in the Plan and will be distributed at the earlier of the normal vesting date or second anniversary of the Qualifying Separation, earning a Market Rate of interest from the date of Qualifying Separation through the distribution date.

In-Service Distributions
- All vested Firm and voluntary contributions and related vested Turbo and Market Interest will be paid to the Financial Advisor after the 10-year anniversary of each year's contribution unless previously withdrawn.

For detailed information, please refer to the PartnerPlus Brochure under Business Support/Employee and HR/Financial Advisor Compensation/PartnerPlus Plan.

**UBS Financial Advisor Deferred Award Plan**

Base Plan
Contributions to the Plan include NFA deferred awards and the deferred portion of the Asset and Credit Line Growth Award for those Financial Advisors not eligible for the UBS PartnerPlus Plan.

The Plan will credit Interest on a tax-deferred basis, compounded annually at the following rates for each year's contributions:

- Year 1 through 4 = "Turbo rate," defined as four times the "Market rate"

- Years 5 through 10 = "Market rate"

For Internal Use Only                                                                 21

CONFIDENTIAL                                                              UBS00023

**Note**: Market rate reflects UBS short-term cost of funds rate, defined as the yield of the offered rate of our 30-day commercial paper, average over the number of business days in the month. The maximum Turbo rate is 32%. The maximum Market rate is 8%.

Vesting
Firm contributions and the related Turbo and Market interest will vest 20% per year, beginning after six years, through year 10.

Distributions
All vested Firm contributions and related vested Turbo and Market interest will be paid to the Financial Advisor after the 10-year anniversary of each year's contribution.

**Additional Information Relating to PartnerPlus and the FA Deferred Award Plans**

Financial Condition of the Firm
- Participants in UBS PartnerPlus/UBS Financial Advisor Deferred Award Plan are "unsecured" creditors of UBS Financial Services Inc., the sponsor of these plans. This means that, in the event of its insolvency, claims of participants would be subordinate to "secured" creditors, if any, and participants' Firm and voluntary contributions and the Market and Turbo interest credited thereon would be at risk.

- To help you decide whether to elect to make voluntary contributions into UBS PartnerPlus, you may access the current statement of the Firm's financial condition at http://financialservicesinc.ubs.com/PWIC/CMA/workflow/FILE_DATA/PWS/pdf/ StatementofFinancialCondition.pdf. UBS AG's annual and interim reports submitted to the Securities and Exchange Commission, which also contain information about our financial condition, may be found at http://www.ubs.com/1/e/investors/ sec_filings.html.

Refer to the PartnerPlus Brochure for detailed information not provided in this summary. Copies of the PartnerPlus Brochure and Plan Documents can be found at the Business Support Overview (InfoNet) under *Employee and HR/Financial Advisor Compensation/PartnerPlus Plan*. If there is any difference between this summary and the Plan Document, the Plan Document will govern. Capitalized terms herein have the meanings ascribed to them in the Plan Document.

For Internal Use Only

CONFIDENTIAL                                            UBS00024

# Expense Allowance Programs

### Pacesetter Expense Allowance Program

Recognition Council members are eligible for a discretionary expense allowance for the purpose of promoting business. This allowance is generally considered nontaxable; however, certain expenses may be reported as taxable income.

The year 2008 Pacesetter expense allowance granted to each Recognition Council member is as follows:

|  | Pacesetter Expense Allowance |
|---|---|
| Chairman's Circle (Chairman's Council five consecutive years) | $10,000 |
| FAs > $3 million in production | $10,000 |
| All other Chairman's Council FAs | $5,000 |
| President's Council FAs | $3,500 |
| Pacesetter (prior to July 2000 NYSE registration date) | $2,000 |
| Pacesetter (post-July 2000 NYSE registration date) | $1,500 |

Business expenses eligible for reimbursement include, but are not limited to, business meals and entertainment, travel and lodging, computer leasing, subscriptions and seminars.

Refer to the Expense Reimbursement Programs Guidelines for additional information. A copy of the Guidelines can be found at the Business Support Overview (InfoNet) under *Employee and HR/Financial Advisor Compensation/ Expense Reimbursement Programs.*

### Business Builder Program

- The Business Builder Program gives eligible Financial Advisors the ability to use their pretax dollars for certain business-related expenses.
  - 2007 Production (October year-to-date annualized) of $200,000 or Recognition Council status qualifies a Financial Advisor for the year 2008 Business Builder Program.

CONFIDENTIAL                                                    UBS00025

- The Business Builder expense allowance supplements the Pacesetter expense allowance for Recognition Council members.

- Eligible Financial Advisors may elect to receive an expense allowance of up to 2% of their projected production by adjusting pretax compensation in an equal amount.

*Example:*

| | |
|---|---|
| *2007 October year-to-date production* | *$375,000* |
| *Projected 2007 production ($375,000 ÷ 10 x 12)* | *$450,000* |
| *Maximum year 2008 compensation adjustment* | |
| *and expense allowance ($450,000 x 2%)* | *$9,000* |

- The Business Builder expense allowance will be funded through 11 equal monthly pretax adjustments from the production checks, beginning in February. If your net check does not cover the amount of the monthly adjustment, future adjustments will be changed to make up the difference.

- Once an election is made to adjust compensation to fund the Business Builder expense allowance, it cannot be changed or stopped during the year. In addition, in accordance with IRS regulations, any unused expense allowance in the Business Builder account is forfeited.

- Business expenses eligible for reimbursement include, but are not limited to, business meals and entertainment, travel and lodging, computer leasing, subscriptions and seminars. Refer to the Expense Reimbursement Programs Guidelines for additional information. A copy can be found at the Business Support Overview (InfoNet) under *Employee* and *HR/Financial Advisor Compensation/Expense Reimbursement Programs.*

For Internal Use Only

CONFIDENTIAL                                                            UBS00026

# Length of Service Policy

Your LOS, both in the industry and at UBS, affects many aspects of the
Compensation Plan. Industry LOS is generally determined by your NYSE registration
date. UBS LOS is determined by your date of registration with UBS. LOS for the year
is calculated each January 1, based on the chart below.

| NYSE or UBS Registration Date | 2006 LOS | 2007 LOS | 2008 LOS |
|---|---|---|---|
| July 1, 2007 -- June 30, 2008 | — | — | 0 |
| July 1, 2006 – June 30, 2007 | — | 0 | 1 |
| July 1, 2005 – June 30, 2006 | 0 | 1 | 2 |
| July 1, 2004 – June 30, 2005 | 1 | 2 | 3 |
| July 1, 2003 – June 30, 2004 | 2 | 3 | 4 |
| July 1, 2002 – June 30, 2003 | 3 | 4 | 5 |
| July 1, 2001 – June 30, 2002 | 4 | 5 | 6 |
| July 1, 2000 – June 30, 2001 | 5 | 6 | 7 |
| July 1, 1999 – June 30, 2000 | 6 | 7 | 8 |
| July 1, 1998 – June 30, 1999 | 7 | 8 | 9 |
| July 1, 1997 – June 30, 1998 | 8 | 9 | 10 |
| July 1, 1996 – June 30, 1997 | 9 | 10 | 11 |
| July 1, 1995 – June 30, 1996 | 10 | 11 | 12 |
| July 1, 1994 – June 30, 1995 | 11 | 12 | 13 |
| July 1, 1993 – June 30, 1994 | 12 | 13 | 14 |
| July 1, 1992 – June 30, 1993 | 13 | 14 | 15 |
| July 1, 1991 – June 30, 1992 | 14 | 15 | 16 |
| July 1, 1990 – June 30, 1991 | 15 | 16 | 17 |

CONFIDENTIAL                                                    UBS00027

# Arbitration

With the exception of claims for injunctive relief, you and UBS agree that any disputes between you and UBS including claims concerning compensation, benefits or other terms or conditions of employment and termination of employment, or any claims for discrimination, retaliation or harassment, or any other claims whether they arise by statute or otherwise, including but not limited to, claims arising under the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, as amended, The Age Discrimination in Employment Act of 1967, The Worker Adjustment and Retraining Notification Act, The Employee Retirement Income Security Act, The Americans With Disabilities Act, The Equal Pay Act of 1963, The Americans With Disabilities Act of 1990, The Family and Medical Leave Act of 1993, The Sarbanes-Oxley Act, or any other federal, state or local employment or discrimination laws, rules or regulations, including wage and hour laws, will be determined by arbitration as authorized and governed by the arbitration law of the state of New York. Any such arbitration will be conducted under the auspices and rules of The NASD, Inc. If for any reason, the NASD is unavailable or unable to hear the matter, then the appropriate forum is The New York Stock Exchange Inc., to the extent that forum is available. Subject to the parties' right to appeal or seek vacatur under applicable law, you and UBS agree that the decision of the Arbitrator(s) will be final and binding on the parties. You and UBS further agree that any disputes between you and UBS shall be heard, as set forth above, by the NASD or the NYSE without consolidation of such claims with any other person or entity. By agreeing to the terms of this Compensation Plan, you waive any right to commence, be a party to or an actual or putative class member of any class or collective action arising out of or relating to your employment with UBS or the termination of your employment with UBS.

For Internal Use Only

CONFIDENTIAL                                              UBS00028

# Conclusion

The 2007 Financial Advisor Compensation Plan summarizes many, but not all, of the elements of your compensation. The continuation of your employment after receipt of this plan and/or acceptance of benefits hereunder shall be deemed your consent to its terms, whether or not you execute the FA Compensation Plan Acknowledgement set forth at the end of this document. This Plan is not a promise, an agreement or a contract that your employment is guaranteed or that the policies and practices that are described will always be the same. Except for the arbitration provision on page 26 and the terms and conditions set forth therein, UBS Financial Services Inc. and/or UBS International Inc., in its sole discretion and without notice, may add to, modify, change or rescind any of the policies, practices, procedures or guidelines in whole or in part at any time. In the event of changes, you may be notified via e-mail and they will be posted on Business Support Overview (InfoNet) under Employee and HR/Financial Advisor Compensation. UBS also reserves the right to lower your monthly payout rates if you demonstrate negligence or carelessness or otherwise fail to comply with Firm rules, standards, practices and policies and/or applicable law, including the rules and regulations of applicable SROs[1]. In addition, you will earn no production or fees on transactions that the Firm determines should be reversed, that a customer or other third party fails to consumate or that do not comply fully with the terms of this Plan, all applicable laws, rules and policies, and the rules associated with the specific product then in effect.

Current compensation (including but not limited to monthly production payouts and annual awards) and the vesting of deferred compensation are not earned until adjustments are made and unless the transactions comply with governing laws, rules of the self-regulating organizations and UBS Financial Services Inc. and/or UBS International Inc. policies. Each FA will receive a minimum compensation amount determined by the state in which he/she works. This amount is a guaranteed draw against: (1) production payouts and (2) other compensation earned by the FA.

A guaranteed draw is a guaranteed, predetermined lump-sum amount paid to you every month as an advance against your anticipated production payout and fees. In addition to the draw, you also receive a monthly check for production payout (and where applicable, a quarterly check for fees) less the draw already paid. If your production payout and/or fees are equal to or less than the draw, you do not receive a separate check. Sums paid solely to bring your payout before adjustments to the guaranteed minimum are not carried forward into subsequent months, but rather are unrecoverable. Note however, that all authorized adjustments are carried forward and recoverable.

---

[1] UBS, of course, in its sole discretion may also impose other types of discipline including, without limitation, termination of employment, unpaid suspension for one or more working days and/or other forms of written, oral and where lawful, monetary discipline.

For Internal Use Only                                                        27

CONFIDENTIAL                                                  UBS00029

Because certain fees are credited quarterly, in the first month of each quarter, UBS reserves the right to advance against those fees the draw payment for the final months of the quarter in which the fees are earned. For example, fees advanced in January cover the first calendar quarter, January through March. Therefore, for example, the Firm reserves the right to advance the February and March guaranteed, non-recoverable draw, and pay it in January in addition to the guaranteed, non-recoverable draw for January.

*Example 1 (production payout exceeds the draw):*
*Your guaranteed draw is $1,972 per month. In one month you generated payout before adjustments of $10,000. Accordingly, you will receive a production payout of $8,028 ($10,000 - $1,972), less adjustments.*

*Example 2 (production payout less than the draw):*
*Your guaranteed draw is $1,972 per month. In Month 1, you generated payout before adjustments of $1,500. Accordingly, for Month 1, you will not receive a production payout because the draw exceeded your production payout ($1,500 < $1,972). However, in Month 2, you generated payout before adjustments of $12,000. For Month 2, you will receive a production payout of $10,028 ($12,000 - $1,972 draw) less adjustments, as the sum paid to bring your payout to the guaranteed minimum from Month 1 is not carried forward.*

*Example 3 (fees advanced):*
*Your guaranteed draw is $1,972. In January, you are credited fees of $9,000 and you generated production payout of $1,000 for a $10,000 payout before adjustments. Your production payout and 1/3 of your fees offset your January draw, leaving $8,028 ($10,000 – $1,972 draw) less adjustments. UBS reserves the right to offset $3,944 of the remaining 2/3 of credited fees against your February and March draw.*

For Internal Use Only

CONFIDENTIAL

UBS00030

 **UBS**

# FA Compensation Plan Acknowledgement

I have received my copy of the 2007 Financial Advisor Compensation Plan ("Plan")
and understand it is my responsibility to read it and understand its contents. I agree
that I will be bound by the terms of the Plan. I understand that notwithstanding the
Plan, I am and will remain an at-will employee, which means that either I or UBS can
terminate my employment at any time, for any or no reason, with or without
advance notice.

_____

Employee Name

_____

Employee Signature

_____

Date

Please return this signed acknowledgement to your Branch Management team.

LEGAL_US_E # 72440501.1

CONFIDENTIAL

UBS00031



# Financial Advisor
## Compensation Plan



Effective January 2008

CONFIDENTIAL

UBS00032

# Table of Contents

Production-Related Payout ................................................................1

Asset and Credit Line Growth Award ......................................11

Recognition Councils ...................................................................16

Productivity and UBS Length of Service Awards ...................18

UBS PartnerPlus/UBS Financial Advisor
Deferred Award Plan ...................................................................19

Expense Allowance Programs ....................................................23

Length of Service Policy .............................................................25

Arbitration ....................................................................................26

Conclusion .....................................................................................27

For Internal Use Only

CONFIDENTIAL                                                    UBS00033

# Production-Related Payout

Your "production" (sometimes called "gross" production) is the product related revenue credited to you by UBS Financial Services Inc. and/or UBS International Inc. (together, "UBS" or "the firm"). Under this Plan, you will be entitled to receive a "payout" derived from a percentage of your production less lawful adjustments. Adjustments may include, for example, customer fees waived by you; compensation and benefits for a Client Service Associate (CSA) or other employees; the cost of seminars you elect to attend; the costs of certain miscellaneous goods and services; overpayments; charge-backs arising out of a customer or other third party reversing or failing to pay or to close a transaction; certain registration and consulting fees; production draws; transaction-related expenses (including brokerage and clearing fees on commodity products, as described herein); and payments made under the UBS Retirement Enhancement and Transitioning FA programs.

Because your payout is net of adjustments, and not based solely on a percentage of your production, it is not earned until all such adjustments have been made. In addition, you will earn your payout (or other production-related compensation) as long as the underlying transaction(s) comply with governing laws, rules of the self-regulating organizations and firm policies.

Your "payout rates"[1] are the percentages applied to your production to determine your payout before adjustments.

*Example:*



If you desire certain adjustments to be made as set forth in this Plan, UBS may require you to authorize them in writing. UBS will provide the authorization forms/vehicles necessary to carry out your wishes regarding these adjustments.

---

[1] Payout rates vary depending on the product.

For Internal Use Only                                                    1

### Standard Grid

"Standard grid" production generally includes production for all products except insurance and annuity products (see page 7). Your rolling six-month standard grid production determines your applicable payout rate for your current month's standard grid production, as shown in the following chart:

**Standard Grid Rolling**

| Six-Month Production Range | | Monthly Payout Rate |
|---|---|---|
| $ 0 | – $ 68,749 | 28% |
| $ 68,750 | – $ 74,999 | 29% |
| $ 75,000 | – $ 82,499 | 30% |
| $ 82,500 | – $ 89,999 | 31% |
| $ 90,000 | – $ 98,999 | 32% |
| $ 99,000 | – $ 137,499 | 33% |
| $ 137,500 | – $ 149,999 | 34% |
| $ 150,000 | – $ 164,999 | 35% |
| $ 165,000 | – $ 192,499 | 36% |
| $ 192,500 | – $ 199,999 | 37% |
| $ 200,000 | – $ 219,999 | 38% |
| $ 220,000 | – $ 412,499 | 39% |
| $ 412,500 | – $ 499,999 | 40% |
| $ 500,000 | – $ 549,999 | 41% |
| $ 550,000 | – $ 687,499 | 42% |
| $ 687,500 | + | 43% |

*Example:*
*Your last five months' standard grid production totals $185,000 and your current month's standard grid production is $40,000, for a six-month total of $225,000. Your standard grid payout rate for the current month will be 39%.*

### Additional Terms and Conditions:

- Gross production over $2,000,000 during the calendar year will be paid an additional percentage point, excluding the following types of production:
  - Regional Institutional Sales (RIS) production paid at leveled payout rates
  - Production with no payout (e.g., RMA® renewals)
  - Production paid at a 100% payout rate
  - Lending production paid at leveled payout rates
  - CEFS exercise revenue paid at leveled payout rates

- Certain business is paid at leveled payout rates, including:
  - Directed business processed via split FA numbers (e.g., QA) from the Equity desks: standard grid payout rate up to a maximum of 38%.

2                                                              For Internal Use Only

CONFIDENTIAL                                    UBS00035

- Directed business processed via split numbers from the Prime Broker Desk (e.g., IJ): 29%.
- Equity and municipal (excluding negotiated new issue) production in RIS accounts: 29%.
- CEFS exercise revenue: 22%.
- Production generated by Financial Advisors who are capped at a leveled rate of 24%, based on production levels and NYSE length of service (NYSELOS) (see page 10).

• Transactions resulting in production of less than $100 are paid at your applicable grid payout rate, but are not included in your rolling standard grid production for purposes of determining payout rate, with the exception of the following:
- Mutual funds and mutual fund dividend reinvestments
- Trailing commissions
- Fees
- UITs
- Global time deposits
- Certificates of deposit
- Commercial paper
- CODA-SEP, SEP, SIMPLE and 401(k) accounts
- Syndicate offerings
- Auction rate preferreds and auction rate certificates

• Transactions resulting in production of less than $100 are included in your "total production," which is used for purposes of determining your insurance and annuity payout rates, Productivity and UBS Length of Service Awards, and to determine Recognition Council, UBS PartnerPlus℠, and Business Builder Program eligibility.

• RMA® and Business Services Account BSA® renewal fees are included in your production for the purpose of calculating standard grid payout rates; however, you will not receive nor earn any payout related to these items.

• Listed equity and over-the-counter commissions discounted below $50 will automatically be increased to $49.99. For example, a prediscounted ticket of $60 is discounted 50% to $30. The ticket will automatically be increased to $49.99. Option commissions discounted below $35 will automatically be increased to $34.99. Commodity commissions discounted below $30 will automatically be increased to $29.99.

• Payout rates for production generated in RIS accounts are calculated as follows:
- Equity and municipal (excluding muni-negotiated new issue) production: 29%.
- TFI new issue (including APS and ARCs), TFI secondary and muni-negotiated new issue: standard grid minus 10 percentage points

CONFIDENTIAL                                         UBS00036

- Standard TFI sales credit: 60%. The Core RIS FAs, and those with at least $25,000 in standard TFI sales credits, will be eligible to participate in a year-end bonus.

- The payout on business related to ongoing corporate relationships with companies assigned by Corporate Employee Financial Services (CEFS) is as follows:
  - Exercise Revenue (includes revenue from all stock benefit plan transactions, such as ESPP, RSA etc.): 100% of production paid at a 22% leveled rate, not subject to ticket charges.
  - Plan Admin Revenue (revenue derived from CEFS charges to corporate clients for administrative services e.g., Admin Fees): Net payment equal to 10% of the admin revenue for each corporate client will be paid annually at the end of the calendar year, or shortly thereafter. No gross production will be received for these payments. FAs must be employed at the time of payment in order to earn such payments.
  - Reinvestment Revenue: Production is paid at the standard grid payout rate and is subject to ticket charges.

- Brokerage and clearing fees on commodity products are adjusted before the payout rate is applied, unless:
  - The ticket is not discounted,
  - The ticket is $250 or greater and the contract rate is $20 or more, or
  - The ticket is $1,000 or greater and the contract rate is $15 or more.

- Payout rates for referral fees to and from the Global Referral Desk are calculated as follows:
  - For referrals to the Global Referral Desk, FAs receive credit for one-third of the revenue as production credits at a 65% payout rate for four years. Thereafter, the FA receives no further payout related to the referral.
  - For referrals from the Global Referral Desk, FAs will receive credit for two-thirds of the revenue at the standard grid payout rate for four years and credit for 100% of the revenues thereafter.
  - Additional information can be found at the Business Support Overview (InfoNet) under *Administrative/Global Referral Program*.

- A commodity futures ticket, for the purpose of this Compensation Plan, is defined as the closing of an existing position ("a round turn"). Identical contracts (i.e., for the same commodity, side and month) traded on the same exchange and closed out on the same day in the same account are aggregated as one ticket. Identical options on futures contracts (i.e., for the same side, strike price, premium and expiration month) traded on the same exchange and opened on the same day in the same account are aggregated as one ticket; similarly, identical options on futures contracts closed on the same day are aggregated as one ticket.

4

CONFIDENTIAL

UBS00037

- Financial Advisors that have qualified for directed business will receive 75% of the gross sales credits on transactions executed by the Equity Trading Desks in a split FA number (e.g., QA01). Payout rate is standard grid to a maximum of 38%.

- Financial Advisors (FA) can partner with accredited Private Wealth Advisors (PWA); the financial terms of the agreement are:

| Time Period | Gross Production, Assets and Expenses | | Net New Assets and Credit Lines | |
|---|---|---|---|---|
| | Introducing Financial Advisor | Private Wealth Advisor | Introducing Financial Advisor | Private Wealth Advisor |
| First Year | 50% | 50% | 100% | 50% |
| Second Year | 50% | 50% | 50% | 50% |
| Thereafter | 40% | 60% | 40% | 60% |

- FAs will not receive any net payout on equity and option revenue in employee accounts if that employee account receives a discount other than the standard employee discount of 50%. These revenues will count toward total production.

- Production credits and the related payouts on syndicate transactions become earned only after the close of the penalty bid period and upon verification that the client retained the position until that time and that the transaction or transactions complied with applicable laws, rules and policies. Production credits on syndicate transactions will be advanced, but will not be earned until the previously mentioned conditions have been satisfied. If production credits are advanced and the preconditions to earning are not met and/or your employment is terminated, at the firm's discretion, UBS will recoup the unearned syndicate payment in the form of an adjustment to your unearned standard grid payout. If the amount of unearned advances exceeds the amount of your unearned grid payout, you must immediately repay the firm any outstanding unearned advances.

### Ticket Charges

Financial Advisors receive $12 less for all listed equity, over-the-counter (principal and agency) and option trades.

- Transactions with the same security, side, date and account are aggregated as one ticket.

- Transactions covered under the wrap fee in Strategic Advisor and managed accounts are not subject to the ticket charge.

For Internal Use Only                                    5

CONFIDENTIAL                                    UBS00038

- No ticket charge will apply to the following transactions:
  - Equity RIS transactions that are paid at a leveled rate
  - Directed business processed via split FA numbers from the Equity (e.g., QA) and Prime Broker (e.g., IJ) desks that are paid at a leveled rate
  - Production generated by FAs who are capped at a leveled payout rate based on their prior-year production and NYSELOS
  - Exercise revenue on CEFS accounts is paid at a leveled rate of 22%
  - Preferred and convertible transactions (both agency and principal)

- The ticket charge will not result in a payout below zero for any individual transaction.

- A reduced ticket charge may apply to New Financial Advisors (NFAs) in the Development Program. Please refer to the NFA Compensation Plan applicable to you.

**Investment Solutions (IS) Wrap Fees**

- Payout rates for wrap fees in an Investment Solutions managed account program will be the standard grid payout rate plus four percentage points. If 12B-1 fees are credited to Financial Advisors in the program, they are paid at the standard grid rate.

- Products include:
  - Managed Accounts Consulting ("MAC"): Consulting/FA fee only
  - Portfolio Management Program (PMP)
  - Premier Portfolio Management Program (PPM)
  - UBS Selections℠
  - ACCESS℠
  - PACE℠ Multi Advisor
  - PACE℠ Select
  - Institutional Consulting (formerly Prime Asset Consulting)
  - UBS Fiduciary Trust Company: Consulting/FA fee only
  - Private Wealth Solutions: Consulting/FA fee only
  - UBS Strategic Advisor
  - Strategic Wealth Portfolio and Unified Management Account: Consulting/FA fee only
  - UBS Managed Portfolios, which currently includes UBS Managed Portfolio of Global Selections, UBS Managed Portfolio of Mutual Funds, and UBS Managed Portfolio advised by Gradison: Consulting/FA fee only

Only Financial Advisors paid under the Standard Compensation Plan are eligible for this payout. NFAs in the 2007 Compensation Plan are not eligible for this payout.

You may elect to participate in various Investment Solutions programs. Under the terms of these programs, you will receive wrap fees related to accounts participating

CONFIDENTIAL                                                       UBS00039

in such programs. Wrap fees are advances paid to you on expected fees. Wrap fee advances are paid quarterly but are earned incrementally on a pro rata basis based on the number of days that the account remains with the firm during the quarter for which the fees were advanced; provided, however, the wrap fee advances cannot be earned by you for any period after your employment with the firm terminates; regardless of the reason for such termination and regardless of whether the account remains at the firm after your employment terminates. For more information concerning how you are compensated on Investment Solutions programs and products, please refer to summaries and descriptions published on the P&S US intranet site.

Further, if the account terminates prior to the end of the period for which advances were paid, UBS shall recoup any advanced and unearned fees as an adjustment to your production. Similarly, if your employment is terminated for any reason prior to the end of the period for which advances were paid, the firm is authorized to adjust the amount of the unearned advances from your unearned grid payout. If the amount of the unearned advances exceeds the amount of your unearned grid payout, you must immediately repay the firm any outstanding unearned advances

### Insurance and Annuity Grid

Insurance and annuity products have a separate payout rate grid based on both your rolling six-month total production and rolling six-month insurance and annuity production, as shown on the following grid:

| Rolling Six-Month Total Production | Rolling Six-Month Insurance and Annuity Production | | |
|---|---|---|---|
| | $0 – $24,999 | $25,000 – $49,999 | $50,000+ |
| $      0  –  $ 89,999 | 38% | 38% | 38% |
| $ 90,000  –  $149,999 | 38% | 43% | 43% |
| $150,000  + | 38% | 43% | 48% |

- As with payouts for standard grid business, payouts for insurance/annuity products are earned net of adjustments.

- For insurance/annuity production, you will receive the higher of your monthly standard grid rate or your monthly insurance/annuity grid rate.

- Only Financial Advisors paid under the Standard Compensation Plan are eligible for this payout. NFAs in the 2007 Compensation Plan are not eligible for this payout.

*Example:*
*Your last five months' insurance and annuity production totals $35,000 and your current month's insurance and annuity production is $10,000, for a six-month insurance and annuity total of $45,000. Your rolling six-month total production is $225,000, making your payout rate on insurance and annuity production for the current month 43%.*

For Internal Use Only                                                                 7

CONFIDENTIAL                                                          UBS00040

**Lending**

*Credit Lines*
Financial Advisors will receive gross production credits per year on nonpurpose loans booked in a Credit Line account as follows: Net Spread -15 bps (Net Spread is defined as spread over LIBOR). Production credits will be earned only on the drawn portion of the Credit Line for the number of days that the loan is outstanding.

Credit Line production is included in your production for the purpose of calculating standard grid rates but is paid out at a flat rate of 8% for the first $100 million of a single loan balance and 2% for the incremental loan balance exceeding $100 million

- Variable Rate Loans
  Production credits on a variable rate loan (including Premier Variable Credit Line, Prime Credit Line and UBS Financial Services Credit Line) are earned based on the actual net spread for the quarter. Production credits are received at the end of each calendar quarter for that quarter.

  *Example:*
  *A client opens a $1,000,000 Credit Line on March 22, 2008, priced at LIBOR + 150 bps, which remains continuously drawn at the same $1,000,000 through June 21, 2008. The FA will receive a production credit in June 2008 of $3,450.00 ($1,000,000 x 1.35% [Net Spread of 150 bps − 15 bps] ÷ 360 interest days x 92 interest days in the quarter). The payout is $276 ($3,450 x 8%).*

- Fixed Rate Loans
  Production credits on a Premier Fixed Rate Credit Line with a maturity of one year or less are based on projected net spread. The production credit will be received at the end of the month in which the loan was booked.

  If a loan's maturity is greater than one year, the first year's production credit will be received in the month it is booked, and subsequent production credits will be credited on each annual anniversary.

  *Example 1:*
  *A client opens a $1,000,000 Fixed Rate Credit Line priced at LIBOR + 150 bps on January 17, 2008, with a maturity date of January 17, 2009, the FA will receive a $13,687 production credit ($1,000,000 x 135 basis points (1.35%)) ÷ 360 x 365 interest days. The payout is $1,095 ($13,687 x 8%).*

  *Example 2:*
  *If the loan above had a two-year maturity, the FA would be credited with $13,687 in January 2008 and again in January 2009.*

8                                                      For Internal Use Only

CONFIDENTIAL                                           UBS00041

Production credits for variable and fixed rate loans booked during the last four business days of the month will be received in the following month.

FAs are not compensated on purpose (margin) loans.

*Residential Mortgages*
A one-time production credit is received for primary mortgages. It will be credited approximately 30 days after the closing of the loan and paid at a flat rate of 12%.

- Primary Mortgages
  FAs receive a one-time 100 basis point production credit based on the loan amount.

  There are no production credits for standard home equity lines of credit and UBS employee mortgages.

  FAs who finance their own mortgages through UBS Mortgage will receive a $500 rebate check. FAs who meet the definition of Preferred Client will have up to $1,500 of lender fees waived (appraisal, credit report, application fee, tax report).

*Letters of Credit*
Production credits for Letters of Credit are calculated as a percentage of the letter of credit fee, and added to the FA's overall production credit which is paid at the standard grid payout rate.

Please refer to the Lending chapter under the Products Overview (InfoNet) for further information on loan products.

CONFIDENTIAL

UBS00042

**Incremental 1% Payout**

- Production in fee-paying RMAs and Business Services Account BSAs will be paid at the standard grid rate plus one percentage point. Wrap fees processed in a managed account and Strategic Advisor fees are calculated at grid payout rate plus four percentage points and are not eligible for the incremental 1% payout rate.

- The incremental 1% payout rate relative to business generated in RMAs and Business Services Account BSAs with deferred billing will be paid retroactively once the RMA/Business Services Account BSA fee is paid. The payout is not earned unless you are employed by UBS at the time the fee is paid.

- The incremental 1% payout rate will not apply to any account for which the fee is waived.

- The incremental 1% payout rate will be paid to Financial Advisors on the Standard Compensation Plan only. Production in accounts leveled at a fixed payout rate will not receive the incremental 1%.

**Cap Plan Policy**

If you have been with the firm for one full calendar year and you are not being paid under the NFA Compensation Plan, you may be subject to a 24% payout rate on your production, including IS wrap and insurance/annuity business, and no ticket charges will apply to your production. Lending payout rates will still apply. There is no payout on RMA and Business Services Account BSA renewal fees. You will not be eligible for the Asset and Credit Line Growth Award. The Cap Plan applies if:

- Your NYSELOS (see table on page 25) was 5 to 10 years and your prior year's total production for all products was below $200,000.

- Your NYSELOS (see table on page 25) was 11 or more years and your prior year's total production was below $250,000.

If, during the current year, your production exceeds the minimum levels stated above, you will be subject to the regular payout rates (including IS wrap, insurance/annuity and incremental 1%), where permitted, retroactive to January 1. Ticket charges will apply to your production. At that time, you will also become eligible for the Asset and Credit Line Growth Award.

For Internal Use Only

CONFIDENTIAL

UBS00043

# Asset and Credit Line Growth Award

This award measures the combined Net New Asset and Credit Line growth based on year-end results.

- Net New Asset growth is defined as the value of securities and/or cash received into new and existing accounts, offset by the value of securities and/or cash leaving these accounts.

- Credit Line growth is defined as the net change in outstanding Credit Line balances. Note: Paydowns of balances as of 12/31/03 (inception of award) will not be adjusted from the growth calculation in 2004 and thereafter.

The award is calculated on Net New Asset and Credit Lines beginning at $5 million as follows:

| Net New Asset and Credit Line Growth | Award* |
|---|---|
| First $50 million ($5 million minimum) | 15 basis points |
| From $50 million to $100 million | 10 basis points |
| From $100 million to $150 million | 5 basis points |
| From $150 million to $200 million | 2.5 basis points |

- The award is capped at 5% of the Financial Advisor's production.

- RIS, Corporate Cash Management and Prime Brokerage accounts are excluded from the award calculation. The firm reserves the right to exclude other types of institutional accounts in the future.

- Subject to the award definitions and rules set forth herein, 80% of the award is paid in cash by March 15 of the following calendar year (i.e., March 15, 2009); 20% is deferred. The award will be deferred into PartnerPlus for eligible FAs and into the FA Deferred Compensation Plan for FAs who are not eligible for PartnerPlus. As with payouts for standard grid business, Asset and Credit Line Growth Awards are earned net of adjustments.

- Awards totaling less than $3,000 will be paid 100% in cash, by March 15 of the following calendar year.

Each FA is able to track his/her daily Net New Asset/Credit Line activity in the Business Tracking system. Award projections are updated monthly.

* The amount of an award may be adjusted by the firm based upon the Financial Advisor's disciplinary history as well as his/her compliance with firm rules, standards and policies and or the rules and regulations of applicable SROs.

For Internal Use Only

11

CONFIDENTIAL

UBS00044

*Example 1*
*Assumptions:*
    FA has 2008 Net New Asset and Credit Line growth of $12 million.
    FA has 2008 production of $450,000.
    Award is capped at $450,000 x 5% = $22,500.

*Award Calculation:*

| | | |
|---|---|---|
| $12 million @ 15 bps = | | $ 18,000 |
| | Total | $ 18,000 |
| | | |
| Cash Award is $18,000 x 80% = | | $ 14,400 |
| Deferred Award is $18,000 x 20% = | | $  3,600 |

*Example 2*
*Assumptions:*
    FA has 2008 Net New Asset and Credit Line growth of $55 million.
    FA has 2008 production of $1,750,000.
    Award is capped at $1,750,000 x 5% = $87,500.

*Award Calculation:*

| | | |
|---|---|---|
| $50 million @ 15 bps = | | $ 75,000 |
| $5 million @ 10 bps = | | $  5,000 |
| | Total | $ 80,000 |
| | | |
| Cash Award is $80,000 x 80% = | | $ 64,000 |
| Deferred Award is $80,000 x 20% = | | $ 16,000 |

*Example 3*
*Assumptions:*
    FA has 2008 Net New Asset and Credit Line growth of $24 million.
    FA has 2008 production of $600,000.
    Award is capped at $600,000 x 5% = $30,000.

*Award Calculation:*

| | | |
|---|---|---|
| $24 million @ 15 bps = | | $ 36,000 |
| | Total | $ 36,000 |
| | | |
| This FA's award is capped at $30,000. | | |
| Cash Award is $30,000 x 80% = | | $ 24,000 |
| Deferred Award is $30,000 x 20% = | | $  6,000 |

For Internal Use Only

CONFIDENTIAL

UBS00045

**Teams**

Financial Advisors who do all of their production and asset gathering as a team will have the option of electing to participate as a team for purposes of the 2008 Asset and Credit Line Growth award. For teams, the minimum threshold for the award will be multiplied by the number of FAs in the team. The team must achieve the "combined" threshold. Either the entire team qualifies as a whole, or no one qualifies.

For 2008, completed Asset and Credit Line growth team election forms must be submitted by July 15, 2008, and elections are irrevocable.

*Example:*
*A two-person team with a 70/30 split. The minimum threshold for this team is $10,000,000 in Net New Asset and Credit Line Growth (two team members x $5,000,000 min.)*

*If the team has 2008 Net New Asset and Credit Line growth of $10,500,000, and if they were otherwise eligible, they would receive an award of $15,750. FA-1 would receive $11,025 (70%), and FA-2 would receive $4,725 (30%).*

*If the team has 2008 Net New Asset and Credit Line growth of $9,000,000, they would not receive an award. Although FA-1 has Net New Asset and Credit Line growth of $6,300,000 (which exceeds the minimum for an FA who is not part of a team), the team did not meet its goal.*

*The hurdle for the Recognition Council adjustment ($5 million or $12 million) will be calculated in the same way.*

**Award Definitions and Rules**

- All positions in DVP accounts, commodities, and option positions are excluded from the asset calculation.

- Assets must be new to our firm and held here (shown on UBS Financial Services Inc. client statements) on December 31, 2008, to generate credit for the award. New assets held away that are not reflected on aforementioned client statements will not count as new assets. Assets that come into other UBS business units (e.g., Global Asset Management, Hedge Fund Services, Investment Bank) through FA referrals will not count as net new assets. Documented asset referrals to/from booking centers in Wealth Management International will be included/excluded from net new assets.

- Market appreciation/depreciation is not included in the asset calculation.

For Internal Use Only                                                             13

CONFIDENTIAL                                                             UBS00046

- Dividends and interest received are not included in the asset calculation; however, cash out of an account will be offset by dividends and interest received during the year.

- If cash taken out of an account increases margin balances, the cash out will be offset by the margin increase.

- Activity related to assets and credit lines housed in split accounts will be allocated on the same percentage as production splits:
  - If an FA within a split arrangement leaves our firm, the remaining FA(s) becomes fully responsible for the assets and credit lines 12 months after the FA departs. If assets and credit lines leave during the first 12 months, the remaining FA's maximum liability is determined by the split arrangement.
  - If an FA within a split arrangement retires, the remaining FA(s) is fully responsible for all subsequent activity in the account(s).

- An FA becomes FA of record the day that his/her FA number appears on the account:
  - FAs who receive an account from an FA who leaves our firm will not be penalized for assets and credit lines that leave the account during the first 12 months.
  - FAs who receive an account from an active FA are fully responsible for the account and any subsequent activity.

- Qualified Plans (QP) Held Away — the net change for QP business held away with UBS Select providers. These assets are credited/debited at a weighting of 75%. Plans with non-UBS Select providers or programs are not eligible.

- FAs can partner with accredited Private Wealth Advisors (PWA) when there is an appropriate opportunity. The financial terms of the agreement are:

| Time Period | Gross Production, Assets and Expenses | | Net New Assets and Credit Lines | |
|---|---|---|---|---|
| | Introducing Financial Advisor | Private Wealth Advisor | Introducing Financial Advisor | Private Wealth Advisor |
| First Year | 50% | 50% | 100% | 50% |
| Second Year | 50% | 50% | 50% | 50% |
| Thereafter | 40% | 60% | 40% | 60% |

14

For Internal Use Only

CONFIDENTIAL

UBS00047

- Documented asset referrals to/from banking centers in Wealth Management International will be included/excluded from net new assets for the first 12 months of the referral agreement. For example, if an FA refers an account, he or she will receive credit for the assets. If an FA receives a referred account, he or she will not receive net new asset credit.

- Restricted securities are considered new assets in 2008 if they become free to trade or are saleable in 2008. They will be credited automatically when they are moved into a SEG or BOX position. If not, you must notify the FA Compensation Department to get credit for those assets.

- Financial Advisors paid under the Standard FA Compensation Plans and NFAs on the 2002 Compensation Plan are eligible for the award. Recruits become eligible once they have completed 12 months of production at our firm and are paid on the Standard Compensation Plan. NFAs on the 2004 and 2007 Compensation Plans are not eligible for this award. Prorated awards are calculated for FAs who are not eligible for the full 12-month period.

- This award is conditioned upon and rewards continued employment with our firm. Thus, you must be employed by our firm on the payment date to be entitled to receive the cash portion of the award, and on the vesting dates in order to earn and be entitled to the deferred portions. The deferred portion of the Asset and Credit Line Growth Award, along with the related Turbo and Market interest for Financial Advisors, generally vests in 20% increments each January 1 in years 2015 through 2019 (please see discussion on UBS PartnerPlus Plan/UBS Financial Advisor Deferred Award Program beginning on page 19).

CONFIDENTIAL                                                                          UBS00048

# Recognition Councils

There are three Recognition Councils for top-performing Financial Advisors.
A targeted number of qualifiers will be set for each Recognition Council category
as follows:

| Year 2009 Council Level | NYSE Reg Date | 2008 Recognition Council Production Ranking |
|---|---|---|
| Chairman's Council | – | Top 230 FAs |
| President's Council | – | Next 500 FAs |
| Pacesetter | Prior to 7/01 | Next 900 FAs |
| | 7/01 – 6/02 | Top 30 in NYSELOS category |
| | 7/02 – 6/03 | Top 30 in NYSELOS category |
| | 7/03 – 6/04 | Top 30 in NYSELOS category |
| | 7/04 – 6/05 | Top 30 in NYSELOS category |
| | 7/05 – 6/06 | Top 40 in NYSELOS category |
| | 7/06 – 12/08 | Top 40 in NYSELOS category |

Each month, Financial Advisors can review their rankings, along with current
projected production levels for each council.

Hard-dollar production thresholds will be determined and communicated after the
third quarter.

Financial Advisors exceeding the following Asset and Credit Line growth thresholds
will receive an additional credit to their 2008 production only for purposes of
achieving Recognition Council status.

- Financial Advisors with Asset and Credit Line growth of $5,000,000 to
  $11,999,999 will receive a 10% production adjustment.

  or

- Financial Advisors with Asset and Credit Line growth of $12,000,000 or greater
  will receive a 25% production adjustment.

Recruits become eligible for the additional credit once they have completed
12 months of production at UBS.

For Internal Use Only

CONFIDENTIAL                                                   UBS00049

*Example:*

| | Actual Production | Net New Assets and Credit Lines | Production Adjustment % | Dollars | Recognition Council Production |
|---|---|---|---|---|---|
| FA #1 | $ 500,000 | $3,000,000 | 0 | 0 | $500,000 |
| FA #2 | $ 500,000 | $6,000,000 | 10 | $50,000 | $550,000 |
| FA #3 | $ 500,000 | $15,000,000 | 25 | $125,000 | $625,000 |

In addition to production and net new assets and credit lines, the firm may consider the Financial Advisor's disciplinary history as well as his/her compliance with firm rules, standards and policies and/or the rules and regulations of applicable SROs when determining eligibility for Recognition Councils.

CONFIDENTIAL                                          UBS00050

# Productivity and UBS Length of Service Awards

Deferred Productivity and UBS Length of Service Awards* are granted based on your current year's production and are contributed into PartnerPlus.

The 2008 awards will be calculated as follows:

| | NYSE Reg Date | Annual Productivity Award | Annual UBS LOS Award (UBS LOS of three years and above, see table on page 25) |
|---|---|---|---|
| Chairman's Council | – | 2% | 2% |
| President's Council | – | 1% | 2% |
| Pacesetter | Prior to 7/01 | 1% | 1% |
| | 7/01 – 6/02 | 1% | 1% |
| | 7/02 – 6/03 | 1% | 1% |
| | 7/03 – 6/04 | 1% | 1% |
| | 7/04 – 6/05 | 1% | 1% |
| | 7/05 – 6/06 | 1% | – |
| | 7/06 – 12/08 | 1% | – |

- Financial Advisors who are not eligible based on the above schedule but who generate $300,000 in gross production for the 2008 calendar year will be granted a 1% Productivity Award.

- Awards are projected monthly based on year-to-date production and granted annually. Awards granted based on 2008 production, along with the related UBS PartnerPlus Turbo and Market Interest, will generally vest in 20% increments on each January 1 in years 2015 through 2019. (See pages 19 – 22 for details on the UBS PartnerPlus Plan.)

- Productivity and UBS Length of Service (LOS) Awards are granted not only based on productivity, but also continued employment. You must be employed by the firm on the award Vesting dates in order to earn and be entitled to the award.

* Awards may be adjusted by the firm based upon the Financial Advisor's disciplinary history as well as his/her compliance with firm rules, standards and policies and or the rules and regulations of applicable SROs.

18

For Internal Use Only

CONFIDENTIAL

UBS00051

# UBS PartnerPlus/UBS Financial Advisor Deferred Award Plan[*]

**UBS PartnerPlus Plan ("Plan")**

UBS PartnerPlus is a unique wealth accumulation plan designed to provide significant financial rewards to our Financial Advisors.

*Eligibility*
- All 2009 Recognition Council members (based on 2008 production) and all Financial Advisors who generate a minimum of $300,000 in gross production during 2008 will have their 2008 deferred awards credited to UBS PartnerPlus and will be eligible to make a Voluntary Contribution in the year 2009.

*Base Plan*
- Contributions to the PartnerPlus Plan will include the deferred Productivity and UBS Length of Service (LOS) Awards, the deferred portion of the Asset and Credit Line Growth Award and Voluntary Contributions.

- The PartnerPlus Plan will credit interest on a tax-deferred basis, compounded annually at the following rates for each year's contributions:
  – Years 1 – 4 = "Turbo rate," defined as four times the "Market rate"
  – Years 5 – 10 = "Market rate"

**Note:** Currently, the Market rate reflects UBS short-term cost of funds rate, defined as the yield of the offered rate of our 30-day commercial paper, averaged over the number of business days in the month. The maximum Turbo rate is 32%. The maximum Market rate is 8%.

*Voluntary Contributions*
- The Financial Advisor may elect to make pretax Voluntary Contributions of up to 50% of the deferred awards granted, as long as the combined firm and Voluntary Contributions do not exceed $100,000.

*Examples:*

| Annual firm Contributions | Maximum Allowable Voluntary Contributions | Total PartnerPlus Contributions |
|---|---|---|
| $  50,000 | $ 25,000 | $  75,000 |
| $  80,000 | $ 20,000 | $ 100,000 |
| $ 125,000 | $        0 | $ 125,000 |

[*] In the event of a conflict between the summary of the Plans set forth in this document and the Plan Documents, the Plan Documents will control. Capitalized terms herein have the meaning ascribed to them in the applicable Plan Document.

For Internal Use Only                                                    19

CONFIDENTIAL                                                    UBS00052

- The Voluntary Contributions will earn Interest at the Turbo rate during years 1 – 4 and Market rate for years 5 – 10, compounded annually.

- Voluntary Contributions will be deducted monthly from the Financial Advisor's production compensation. Once elected, a Voluntary Contribution cannot be stopped or changed for that calendar year.

*Vesting*
- Contributions to UBS PartnerPlus on or after January 1, 1999:
  – firm Contributions, and Turbo and Market interest earned on firm Contributions, will vest 20% per year, beginning after six years, through year 10.

- Voluntary Contributions vest immediately. Turbo and Market Interest earned on Voluntary Contributions contributed on or after January 1, 1999, will vest 20% per year, beginning after six years, through year 10.

- Firm Contributions and Turbo and Market Interest vest immediately upon death, disability and Qualifying Separation.

IN ORDER TO COMPLY WITH RECENT CHANGES IN THE TAX LAW, THE ELIGIBILITY, PAYMENT AND VESTING RULES FOR A QUALIFYING SEPARATION WILL BE CHANGING IN 2008. IF YOU HAVE A SEPARATION FROM SERVICE IN 2008, YOUR PRIOR QUALIFYING SEPARATION PAYMENT ELECTION (IF ANY) AND THE ELIGIBILITY, PAYMENT AND VESTING RULES FOR A QUALIFYING SEPARATION (AS SET FORTH IN THE 2007 FA COMPENSATION BOOKLET) WILL APPLY.

LATER IN 2008, WE WILL ANNOUNCE THE NEW QUALIFYING SEPARATION RULES AND YOU WILL BE GIVEN AN OPPORTUNITY TO MAKE A NEW QUALIFYING SEPARATION PAYMENT ELECTION, WHICH WILL SUPERSEDE ANY PRIOR ELECTION AND WHICH WILL APPLY FOR SEPARATIONS FROM SERVICE OCCURRING AFTER DECEMBER 31, 2008. WE WILL PROVIDE PARTICIPANTS WITH DETAILED INFORMATION ABOUT THESE CHANGES LATER IN 2008.

For Internal Use Only

CONFIDENTIAL

UBS00053

*In-Service Distributions*
- All vested firm and Voluntary Contributions and related vested Turbo and Market Interest will generally be paid to the Financial Advisor after the 10-year anniversary of each year's contribution.

For detailed information, please refer to the PartnerPlus Brochure on Infonet under *Business Support/Employee and HR/Financial Advisor Compensation/PartnerPlus Plan.*

**UBS Financial Advisor Deferred Award Plan ("Deferred Award Plan")**

*Base Plan*
Contributions to the Deferred Award Plan include NFA deferred awards and the deferred portion of the Asset and Credit Line Growth Award for those Financial Advisors not eligible for the UBS PartnerPlus Plan.

The Deferred Award Plan will credit Interest on a tax-deferred basis, compounded annually at the following rates for each year's contributions:

- Year 1 through 4 = "Turbo rate," defined as four times the "Market rate"

- Years 5 through 10 = "Market rate"

**Note:** Currently, the Market rate reflects UBS short-term cost of funds rate, defined as the yield of the offered rate of our 30-day commercial paper, averaged over the number of business days in the month. The maximum Turbo rate is 32%. The maximum Market rate is 8%.

*Vesting*
Firm Contributions and the related Turbo and Market Interest will vest 20% per year, beginning after six years, through year 10.

*Distributions*
All vested firm Contributions and related vested Turbo and Market Interest will be paid to the Financial Advisor after the 10-year anniversary of each year's Contribution.

For Internal Use Only                                                                 21

CONFIDENTIAL                                                                 UBS00054

**Additional Information Relating to PartnerPlus and the FA Deferred Award Plans**

*Financial Condition of the firm*
- Participants in UBS PartnerPlus/UBS Financial Advisor Deferred Award Plan are "unsecured" creditors of UBS Financial Services Inc., the sponsor of these plans. This means that, in the event of its insolvency, claims of participants would be subordinate to "secured" creditors, if any, and participants' firm and Voluntary Contributions and the Market and Turbo Interest credited thereon would be at risk.

- To help you decide whether to elect to make Voluntary Contributions into UBS PartnerPlus, you may access the current statement of the firm's financial condition at *http://financialservicesinc.ubs.com/staticfiles/pws/adobe/ StatementofFinancialCondition.pdf*.

  UBS AG's annual and interim reports submitted to the Securities and Exchange Commission, which also contain information about our financial condition, may be found at *http://www.ubs.com/1/e/investors/ sec_filings.html*.

Refer to the PartnerPlus Brochure and the PartnerPlus Plan Documents for detailed information not provided in this summary. Copies of the PartnerPlus Brochure and Plan Documents can be found at the Business Support Overview (InfoNet) under *Employee and HR/Financial Advisor Compensation/PartnerPlus Plan*. If there is any difference between this summary and the Plan Document, the Plan Document will govern. Capitalized terms herein have the meanings ascribed to them in the Plan Document.

For Internal Use Only

CONFIDENTIAL

UBS00055

# Expense Allowance Programs

**Pacesetter Expense Allowance Program**

Recognition Council members are eligible for a discretionary expense allowance for the purpose of promoting business. This allowance is generally considered nontaxable; however, certain expenses may be reported as taxable income.

The year 2009 Pacesetter expense allowance granted to each Recognition Council member is as follows:

|  | Pacesetter Expense Allowance |
|---|---|
| Chairman's Circle (Chairman's Council five consecutive years) | $ 10,000 |
| FAs > $3 million in production | $ 10,000 |
| All other Chairman's Council FAs | $ 5,000 |
| President's Council FAs | $ 3,500 |
| Pacesetter (prior to July 2001 NYSE registration date) | $ 2,000 |
| Pacesetter (post-July 2001 NYSE registration date) | $ 1,500 |

Business expenses eligible for reimbursement include, but are not limited to, business meals and entertainment, travel and lodging, computer leasing, subscriptions and seminars.

Refer to the *Expense Reimbursement Programs Guidelines* for additional information. A copy of the Guidelines can be found at the Business Support Overview (InfoNet) under *Employee and HR/Financial Advisor Compensation/Expense Reimbursement Programs.*

**Business Builder Program**

- The Business Builder Program gives eligible Financial Advisors the ability to use their pretax dollars for certain business-related expenses.
  - 2008 Production (generally either September or October year-to-date annualized) of $200,000 or Recognition Council status qualifies a Financial Advisor for the year 2009 Business Builder Program.

- The Business Builder expense allowance is in addition to the Pacesetter expense allowance for Recognition Council members and does not affect the amount of expenses reimbursed under the pacesetter expense allowance.

- Eligible Financial Advisors may elect to receive an expense allowance of up to 2% of their projected production by adjusting pretax compensation in an equal amount.

For Internal Use Only                                                    23

CONFIDENTIAL                                                    UBS00056

*Example:*
| | |
|---|---|
| *2008 October year-to-date production* | *$ 375,000* |
| *Projected 2008 production ($375,000 ÷ 10 x 12)* | *$ 450,000* |
| *Maximum year 2009 compensation adjustment* | |
| *and expense allowance ($450,000 x 2%)* | *$    9,000* |

- The Business Builder expense allowance will be funded through 11 equal monthly pretax adjustments from the production checks, beginning in February. If your net check does not cover the amount of the monthly adjustment, future adjustments will be changed to make up the difference.

- Once an election is made to adjust compensation to fund the Business Builder expense allowance, it cannot be changed or stopped during the year. In addition, in accordance with IRS regulations, any unused expense allowance in the Business Builder account is forfeited.

- Business expenses eligible for reimbursement include, but are not limited to, business meals and entertainment, travel and lodging, computer leasing, subscriptions and seminars. Refer to the *Expense Reimbursement Programs Guidelines* for additional information. A copy can be found at the Business Support Overview (InfoNet) under *Employee and HR/Financial Advisor Compensation/Expense Reimbursement Programs.*

24                                                      For Internal Use Only

CONFIDENTIAL                                              UBS00057

# Length of Service Policy

Your LOS, both in the industry and at UBS, may affect some aspects of the Compensation Plan. Industry LOS is generally determined by your NYSE registration date. UBS LOS is determined by your date of registration with UBS. LOS for the year is calculated each January 1, based on the chart below.

| NYSE or UBS Registration Date | 2007 LOS | 2008 LOS | 2009 LOS |
|---|---|---|---|
| July 1, 2008 – June 30, 2009 | – | – | 0 |
| July 1, 2007 – June 30, 2008 | – | 0 | 1 |
| July 1, 2006 – June 30, 2007 | 0 | 1 | 2 |
| July 1, 2005 – June 30, 2006 | 1 | 2 | 3 |
| July 1, 2004 – June 30, 2005 | 2 | 3 | 4 |
| July 1, 2003 – June 30, 2004 | 3 | 4 | 5 |
| July 1, 2002 – June 30, 2003 | 4 | 5 | 6 |
| July 1, 2001 – June 30, 2002 | 5 | 6 | 7 |
| July 1, 2000 – June 30, 2001 | 6 | 7 | 8 |
| July 1, 1999 – June 30, 2000 | 7 | 8 | 9 |
| July 1, 1998 – June 30, 1999 | 8 | 9 | 10 |
| July 1, 1997 – June 30, 1998 | 9 | 10 | 11 |
| July 1, 1996 – June 30, 1997 | 10 | 11 | 12 |
| July 1, 1995 – June 30, 1996 | 11 | 12 | 13 |
| July 1, 1994 – June 30, 1995 | 12 | 13 | 14 |
| July 1, 1993 – June 30, 1994 | 13 | 14 | 15 |
| July 1, 1992 – June 30, 1993 | 14 | 15 | 16 |
| July 1, 1991 – June 30, 1992 | 15 | 16 | 17 |

CONFIDENTIAL                                                        UBS00058

# Arbitration

With the exception of claims for injunctive relief or the denial of benefits under the firms disability or medical plans, you and UBS agree that, unless prohibited by applicable law, any disputes between you and UBS including claims concerning compensation, benefits or other terms or conditions of employment and termination of employment, or any claims for discrimination, retaliation or harassment, or any other claims whether they arise by statute or otherwise, including but not limited to, claims arising under the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, as amended, The Age Discrimination in Employment Act of 1967, The Worker Adjustment and Retraining Notification Act, The Employee Retirement Income Security Act, The Americans With Disabilities Act, The Equal Pay Act of 1963, The Americans With Disabilities Act of 1990, The Family and Medical Leave Act of 1993, The Sarbanes-Oxley Act, or any other federal, state or local employment or discrimination laws, rules or regulations, including wage and hour laws, will be determined by arbitration as authorized and governed by the arbitration law of the state of New Jersey. Any such arbitration will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA"), except that you may elect to arbitrate discrimination claims under any federal, state or local law (including claims of harassment and retaliation under those laws) before JAMS pursuant to its Employment Arbitration Rules and Procedures and subject to the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness. Subject to the parties' right to appeal or seek vacatur under applicable law, you and UBS agree that the decision of the Arbitrator(s) will be final and binding on the parties and that the Arbitrator(s) is authorized to award whatever remedies would be available to the parties in a court of law. You and UBS further agree that any disputes between you and UBS shall be heard, as set forth above, by FINRA or JAMS* without consolidation of such claims with any other person or entity. By agreeing to the terms of this Compensation Plan, you waive any right to commence, be a party to or an actual or putative class member of any class or collective action arising out of or relating to your employment with UBS or the termination of your employment with UBS.

* Information about JAMS, including its Employment Arbitration Rules and Procedures, can found at *www.jamsadr.com*. If you choose to arbitrate before JAMS, then, where permitted by law, you only shall be responsible for those arbitration fees and costs that you would have been required to bear in a FINRA arbitration.

26                                                                      For Internal Use Only

CONFIDENTIAL                                                             UBS00059

# Conclusion

The Financial Advisor Compensation Plan, effective 1/1/08, summarizes many, but not all, of the elements of your compensation[1]. The continuation of your employment after receipt of this plan and/or acceptance of benefits hereunder shall be deemed your consent to its terms, whether or not you execute the FA Compensation Plan Acknowledgement set forth at the end of this document This Plan is not a promise, an agreement or a contract that your employment is guaranteed or that the policies and practices that are described will always be the same. Except for the arbitration provision on page 26 and the terms and conditions set forth therein, UBS Financial Services Inc. and/or UBS International Inc., in its sole discretion and without notice, may add to, modify, change or rescind any of the policies, practices, procedures or guidelines in whole or in part at any time. In the event of changes, you may be notified via e-mail and/or any such change will be posted on *Business Support Overview (InfoNet)* under *Employee and HR/Financial Advisor Compensation*. UBS also reserves the right to lower your payout rates if you demonstrate negligence or carelessness or otherwise fail to comply with firm rules, standards, practices and policies and/or applicable law, including the rules and regulations of applicable SROs[2]. In addition, you will earn no production or fees on transactions that the firm determines should be reversed, that a customer or other third party fails to pay the firm or consummate or that do not comply fully with the terms of this Plan, all applicable laws, rules and policies, and the rules associated with the specific product then in effect.

Compensation (including but not limited to monthly production payouts and annual awards) is not earned until adjustments are made. Furthermore, compensation is not earned and deferred compensation does not vest unless the transactions comply with governing laws, rules of the self-regulatory organizations and UBS Financial Services Inc. and/or UBS International Inc. policies. Each FA will receive a minimum compensation amount determined by the state in which he/she works. This amount is a guaranteed draw against: (1) production payouts and (2) other compensation earned by the FA.

A guaranteed draw is a guaranteed, predetermined lump-sum amount paid to you every month as an advance against your anticipated production payout and fees. In addition to the draw, you also receive a monthly check for production payout (and where applicable, a quarterly check for fees) less the draw already paid. If your production payout and/or fees are equal to or less than the draw, you do not receive a separate check. Sums paid solely to bring your payout before adjustments to the guaranteed minimum are not carried forward into subsequent months, but rather are unrecoverable. Note, however, that all authorized adjustments are carried forward and recoverable.

[1] For example, referrals between business units may be subject to individual compensation arrangements.

[2] UBS, in its sole discretion, may also impose other types of discipline including, without limitation, termination of employment, unpaid suspension for one or more working days and/or other forms of written, oral and, where lawful, monetary discipline.

CONFIDENTIAL

UBS00060

Unless prohibited by applicable law, upon termination of your employment for any reason, UBS will pay you any compensation earned under this Compensation Plan on the next scheduled production related payout date for its current employees.

Because certain fees are credited quarterly in a draw, in the first month of each quarter, UBS reserves the right to advance against those fees the draw payment for the final months of the quarter in which the fees are earned. For example, fees advanced in January cover the first calendar quarter, January through March. Therefore, for example, the firm reserves the right to advance the February and March guaranteed, nonrecoverable draw, and pay it in January in addition to the guaranteed, nonrecoverable draw for January.

*Example 1*
*(production payout exceeds the draw):*
*Your guaranteed draw is $1,972 per month. In one month you generated payout before adjustments of $10,000. Accordingly, you will receive a production payout of $8,028 ($10,000 - $1,972), less adjustments.*

*Example 2*
*(production payout less than the draw):*
*Your guaranteed draw is $1,972 per month. In Month 1, you generated payout before adjustments of $1,500. Accordingly, for Month 1, you will not receive a production payout because the draw exceeded your production payout ($1,500 < $1,972). However, in Month 2, you generated payout before adjustments of $12,000. For Month 2, you will receive a production payout of $10,028 ($12,000 – $1,972 draw) less adjustments, as the sum paid to bring your payout to the guaranteed minimum from Month 1 is not carried forward.*

*Example 3*
*(fees advanced):*
*Your guaranteed draw is $1,972. In January, you are credited fees of $9,000 and you generated production payout of $1,000 for a $10,000 payout before adjustments. Your production payout and 1/3 of your fees offset your January draw, leaving $8,028 ($10,000 – $1,972 draw) less adjustments. UBS reserves the right to offset $3,944 of the remaining 2/3 of credited fees against your February and March draw.*

28                                                    For Internal Use Only

CONFIDENTIAL                                        UBS00061

 **UBS**

# FA Compensation Plan Acknowledgement

I have received my copy of the Financial Advisor Compensation Plan ("Plan"),
effective 1/1/2008 and understand and agree that I am bound by its terms.

_____

Employee Name

_____

Employee Signature

_____

Date

Please return this signed acknowledgement to your Branch Management team.

LEGAL_US_E # 72440501.1

CONFIDENTIAL

UBS00062

Case 1:12-cv-02147-LGS-JLC   Document 63-3   Filed 05/03/12   Page 1 of 25

 **UBS**

# Financial Advisor
# Compensation Plan

Effective January 2009

For internal use only

CONFIDENTIAL                                UBS00063

Case 1:12-cv-02147-LGS-JLC   Document 63-3   Filed 05/03/12   Page 2 of 25

# Table of Contents

Production Payout ........................................................................... 1

Strategic Objective Awards .......................................................... 8

Recognition Councils ..................................................................... 12

Teams, NFAs and Private Wealth Advisors ............................... 13

UBS PartnerPlus/UBS Financial Advisor Deferred Award Plan ................... 14

Wealth Protection Programs......................................................... 16

Expense Allowance Programs....................................................... 17

Length of Service Policy................................................................ 18

Arbitration ....................................................................................... 19

Conclusion........................................................................................ 20

For internal use only

CONFIDENTIAL

# Production Payout

Your "production" (sometimes called "gross" production) is the product-related revenue credited to you by UBS Financial Services Inc. and/or UBS International Inc. (together, "UBS" or "the firm"). Under this Plan, you will be entitled to receive an earned "payout" derived from a percentage of your production less lawful adjustments. Adjustments may include, for example, customer fees waived by you; compensation and benefits for a Client Service Associate (CSA) or other employees; the cost of seminars you elect to attend; the costs of certain miscellaneous goods and services; overpayments; charge-backs arising out of a customer or other third party reversing or failing to pay or to close a transaction; certain registration and consulting fees; production draws; transaction-related expenses (including brokerage and clearing fees on commodity products, as described herein); and payments made under the UBS Retirement Enhancement and Transitioning Financial Advisor (TFAP) programs.

Because your earned payout is net of adjustments, and not based solely on a percentage of your production, it is not earned until all such adjustments have been made. In addition, you will earn your payout (or other production-related compensation) as long as the underlying transaction(s) comply with governing laws, rules of the self-regulating organizations and firm policies.

Your "payout rates" are the percentages applied to your production (as described herein) to determine your unearned production payout before adjustments.

*Example:*



If you desire certain adjustments to be made as set forth in this Plan, UBS may require you to authorize them in writing. In these instances, UBS will provide the authorization forms/vehicles necessary to carry out your wishes regarding these adjustments.

For internal use only

1

CONFIDENTIAL

UBS00065

## Standard Grid

"Standard grid" production generally includes production for all products. Your trailing 12-month standard grid production determines your applicable payout rate for your current month's standard grid production, as shown in the following chart:

| Trailing 12-month standard grid production From | To | Standard Grid Rate | Wrap/ Insurance/ Annuity Rate |
|---|---|---|---|
| $3m | + | 45% | 48% |
| $1.75m | $2.99m | 44% | 47% |
| $1m | $1.749m | 43% | 46% |
| $750,000 | $999,999 | 42% | 45% |
| $600,000 | $749,999 | 41% | 44% |
| $400,000 | $599,999 | 39% | 42% |
| $300,000 | $399,999 | 35% | 38% |
| $250,000 | $299,999 | 33% | 36% |
| $200,000 | $249,999 | 30% | 33% |
| $0 | $199,999 | 28% | 31% |

## Additional Terms and Conditions

- There will be no payout on equity tickets less than $100 or option tickets less than $50.
- The payout rate for directed business processed via split numbers from the Prime Broker Desk (e.g., IJ) is 29%.
- RMA®, Business Services Account (BSA®), IRA and Basic Account Fees are included in your production for the purpose of calculating standard grid payout rates; however, you will not receive nor earn any payout related to these items.
- Listed equity and over-the-counter commissions discounted below $50 will automatically be increased to $49.99. For example, a pre-discounted ticket of $60 is discounted 50% to $30. The ticket will automatically be increased to $49.99. Option commissions discounted below $35 will automatically be increased to $34.99. Commodity commissions discounted below $30 will automatically be increased to $29.99.
- Payout rates for production generated in RIS and IEG accounts are calculated as follows:
  - Equity and municipal (excluding muni-negotiated new issue) production: 29%.
  - TFI new issue (including APS and ARCs), TFI secondary and muni-negotiated new issue: standard grid minus 10 percentage points.
  - Standard TFI sales credit: 60%. The Core RIS FAs, and those with at least $25,000 in standard TFI sales credits, will be eligible to participate in a year-end discretionary bonus.
  - IEG accounts are paid based on the IEG compensation memo which can be found on the firm's intranet under *P&S WMUS/Transaction Products US/Regional Institutional Sales (RIS) Equities.*
- Production credits on cash balances (FDIC, Money Funds, IDA, Puerto Rico Short-term Investment Funds) of 4 bps (annualized) are subject to grid payout. Credits will be booked monthly based on the average balances of the prior month. Credits will begin in February 2009.
- CEFS Compensation Policies (effective February 1, 2009)
  The payout on business related to ongoing corporate relationships with companies assigned by Corporate Employee Financial Services (CEFS) is as follows:

For internal use only

CONFIDENTIAL

UBS00066

– **Exercise Revenue:** CEFS plan-based transactions (i.e., stock option exercises, stock purchase plan share sales and sales of restricted stock)
– If the CEFS participant does not have a full-service account at UBS with a CEFS FA, FA receives 100% gross with a 22% payout (no ticket adjustment)
– If the CEFS participant has one or more full-service accounts at UBS (in their marketing household) with a CEFS FA, standard grid payout will apply on the exercise account (subject to normal firm ticket adjustment) as long as the household is not otherwise a "small household"
– There will be a three month look back on CEFS plan transactions based on the initial reinvestment account open date

Note: For CEFS participant trades generating $49.99 or less in revenue, there will be no payout earned. This will be true for all CEFS participants, both for those relationships with and without a full-service reinvestment account at UBS. The gross revenue generated on these trades will be included for purposes of calculating gross production, deferred awards and recognition clubs.

– **Plan Admin Revenue** (revenue derived from CEFS charges to corporate clients for administrative services, e.g., Admin Fees)
– Net payment equal to 10% of the admin revenue for each corporate client will be paid annually at the end of the calendar year, or shortly thereafter. No gross production will be credited for these payments. FAs must be employed at the time of payment in order to earn or receive such payments.

Note: CEFS home office will continue to maintain sole discretion in determining which corporate fees are eligible. For example, the foregoing may not apply if the Lead FA and CEFS mutually agree to be aggressive on pricing (i.e., deviate from standard corporate client and participant fee structures) to win a new prospective corporate client or retain an existing corporate client. Any such change to standard pricing will be mutually agreed upon between CEFS and the Lead FA prior to offering to the corporate client and implementing.

– **Reinvestment Revenue:** Production is subject to the standard grid payout rate (subject to normal firm ticket adjustments).
• Commodity and Futures
– The payout rate for Commodities and Futures Business is a flat 30% rate (or grid rate if it is lower than 30%).
– Brokerage and clearing fees on commodity products are adjusted before the payout rate is applied, unless:
– The ticket is not discounted
– The ticket is $250 or greater and the contract rate is $20 or more
– The ticket is $1,000 or greater and the contract rate is $15 or more
– A commodity futures ticket, for the purpose of this Compensation Plan, is defined as the closing of an existing position ("a round turn"). Identical contracts (i.e., for the same commodity, side and month) traded on the same exchange and closed out on the same day in the same account are aggregated as one ticket. Identical options on futures contracts (i.e., for the same side, strike price, premium and expiration month) traded on the same exchange and opened on the same day in the same account are aggregated as one ticket; similarly, identical options on futures contracts closed on the same day are aggregated as one ticket.
• Payout rates for referral fees to and from the Global Referral Desk are calculated as follows:
– For referrals to the Global Referral Desk, FAs receive credit for one-third of the revenue as production credits at a 65% payout rate for four years. Thereafter, the FA receives no further payout related to the referral.
– For referrals from the Global Referral Desk, FAs will receive credit for two-thirds of the revenue at the standard grid payout rate for four years and credit for 100% of the revenues thereafter for as long as the referral program remains as is.
– Additional information can be found by visiting *goto/globalreferrals*.
• Financial Advisors that have qualified for directed business will be credited 75% of the gross sales credits on transactions executed by the Equity Trading Desks in a split FA number (e.g., QA01). Payout rate is standard grid to a maximum of 38%

CONFIDENTIAL

UBS00067

- Financial Advisors (FA) can partner with accredited Private Wealth Advisors (PWA); the financial terms of the arrangement are:

### Gross Production, Assets and Expenses

|  | Introducing Wealth Advisor | Private Wealth Advisor |
|---|---|---|
| First Year | 50% | 50% |
| Second Year | 50% | 50% |
| Thereafter | 40% | 60% |

### Net New Assets and Credit Lines

|  | Introducing Wealth Advisor | Private Wealth Advisor |
|---|---|---|
| First Year | 100% | 50% |
| Second Year | 50% | 50% |
| Thereafter | 40% | 60% |

- FAs will not receive nor earn any payout on equity and option production in employee accounts if that employee account receives a discount other than the standard employee discount of 50%. These revenues will count toward total production.
- Production credits and the potential related payouts on syndicate transactions become earned only after the close of the penalty bid period and upon verification that the client retained the position until that time and that the transaction or transactions complied with applicable laws, rules and policies. Production credits on syndicate transactions will be advanced, but will not be earned until the previously mentioned conditions have been satisfied. If production credits are advanced and the preconditions to earning are not met and/or your employment is terminated, at the firm's discretion, UBS will recoup the unearned syndicate payment in the form of an adjustment to your unearned standard grid payout. If the amount of unearned advances exceeds the amount of your unearned grid payout, you must immediately repay the firm any outstanding unearned advances.

### Ticket Adjustments

Financial Advisors receive $12 less for all listed equity, over-the-counter (principal and agency) and option trades.

- Transactions with the same security, side, date and account are aggregated as one ticket.
- Transactions covered under the wrap fee in Strategic Advisor and managed accounts are not subject to the ticket adjustment.
- No ticket adjustment will apply to the following transactions:
  – Equity RIS transactions with a leveled payout rate
  – Directed business processed via split FA numbers from the Equity (e.g., QA) and Prime Broker (e.g., IJ) desks with a leveled payout rate
  – Production generated by FAs who are capped at a leveled payout rate based on their prior-year production and NYSELOS
  – Exercise revenue on CEFS accounts with a leveled payout rate of 22%
  – Preferred and convertible transactions (both agency and principal)
- The ticket adjustment will not result in a payout below zero for any individual transaction.
- A reduced ticket adjustment may apply to New Financial Advisors (NFAs) in the Development Program. Please refer to the NFA Compensation Plan applicable to you.

### Investment Solutions (IS) Wrap Fees

- Payout rates for wrap fees in an Investment Solutions managed account program will be the standard grid payout rate plus three percentage points. If 12B-1 fees are credited to Financial Advisors in the program, the standard grid rates will apply.
- Products include:
  – Managed Accounts Consulting ("MAC"): Consulting/FA fee only
  – Portfolio Management Program (PMP)
  – Premier Portfolio Management Program (PPM)
  – UBS Selections℠
  – ACCESS℠
  – PACE℠ Multi Advisor
  – PACE℠ Select
  – Institutional Consulting (formerly Prime Asset Consulting)
  – UBS Fiduciary Trust Company: Consulting/ FA fee only

4

For internal use only

‒ Private Wealth Solutions℠: Consulting/FA fee only
‒ UBS Strategic Advisor
‒ Strategic Wealth Portfolio and Unified Management Account: Consulting/FA fee only
‒ UBS Managed Portfolios, which currently includes UBS Managed Portfolio of Global Selections, UBS Managed Portfolio of Mutual Funds, and UBS Managed Portfolio advised by Gradison: Consulting/FA fee only

Only Financial Advisors subject to this Compensation Plan are eligible for this payout. NFAs in the 2007 Compensation Plan are not eligible for this payout.

You may elect to participate in various Investment Solutions programs. Under the terms of these programs, you will be advanced wrap fees related to accounts participating in such programs. Wrap fees are advances paid to you on expected fees. Wrap fee advances are paid quarterly but are earned incrementally on a pro rata basis based on the number of days that the account remains with the firm during the quarter for which the fees were advanced; however, the wrap fee advances cannot be earned by you for any period after your employment with the firm terminates, regardless of the reason for such termination and regardless of whether the account remains at the firm after your employment terminates. For more information concerning how you are compensated on Investment Solutions programs and products, please refer to summaries and descriptions published on the P&S US intranet site.

Further, if the account terminates prior to the end of the period for which advances were made, UBS shall recoup any advanced and unearned fees as an adjustment to your production. Similarly, if your employment is terminated for any reason prior to the end of the period for which advances were made, you authorize the firm to adjust the amount of the unearned advances from your unearned grid payout. If the amount of the unearned advances exceeds the amount of your unearned grid payout, you must immediately repay the firm any outstanding unearned advances.

## Lending
*Credit Lines*

Financial Advisors will receive gross production credits per year on nonpurpose loans booked in a Credit Line account as follows: Net Spread -20 bps (Net Spread is defined as spread over LIBOR). For loans with higher risk (i.e., single stock), the production credit will be based on the spread less 20 bps, less an additional risk cost calculation. Production will be credited only on the drawn portion of the Credit Line for the number of days that the loan is outstanding.

Credit Line production is included in your production for the purpose of calculating standard grid rates with a flat payout rate of 8.5% for the first $100 million of a single loan balance and 2% for the incremental loan balance exceeding $100 million.

• Variable Rate Loans
  Production credits on a variable rate loan (including Premier Variable Credit Line, Prime Credit Line and UBS Financial Services Credit Line) are credited based on the actual net spread for the quarter. Production is credited at the end of each calendar quarter for that quarter.

  *Example:*
  *A client opens a $1,000,000 Credit Line on March 22, 2009, priced at LIBOR+155 bps, which remains continuously drawn at the same $1,000,000 through June 21, 2009. The FA will receive a production credit in June 2009 of $3,450.00 ($1,000,000 x 1.35% (Net Spread of 155 bps − 20 bps) ÷ 360 interest days x 92 interest days in the quarter). The unearned production payout is $293.25 ($3,450 x 8.5%).*

• Fixed Rate Loans
  Production credits on a Premier Fixed Rate Credit Line with a maturity of one year or less are based on projected net spread. The production will be credited at the end of the month in which the loan was booked.

  If a loan's maturity is greater than one year, the first year's production credit will be received in the month it is booked, and subsequent production credits will be credited on each annual anniversary.

CONFIDENTIAL

UBS00069

*Example 1:*
*A client opens a $1,000,000 Fixed Rate Credit Line priced at LIBOR + 155 bps on January 17, 2009, with a maturity date of January 17, 2010, the FA will receive a $13,687 production credit ($1,000,000 x 135 basis points (1.35%)) ÷ 360 x 365 interest days. The unearned production payout is $1163.40 ($13,687 x 8.5%).*

*Example 2:*
*If the loan above had a two-year maturity, the FA would be credited with $13,687 in January 2009 and again in January 2010.*

Production credits for variable and fixed rate loans booked during the last four business days of the month will be credited in the following month.

FAs receive no production credit and are not compensated on purpose (margin) loans.

*Residential Mortgages*
A one-time production credit is received in the amount of 100 bps, based on loan amount, approximately 30 days after the closing of the loan with a flat payout rate of 12%.

Employees who finance their mortgage through UBS Mortgage have the ability to reduce the closing costs associated with the loan by an amount equal to 50 basis points of the loan. Employees who meet the definition of Preferred Client will have up to $1,500 of lender fees waived (appraisal, credit report, application fee, tax report). You can only receive one of the two benefits just mentioned.

Example 1 (Employee Loan): If you take a $400,000 mortgage that has no origination fee (a zero point quote), you will receive the interest rate that is quoted to clients; however, we will also take 50 basis points, or $2,000, and apply that toward your closing costs. Or, you can use the initial $2,000 to buy down the interest rate on your mortgage.

Example 2 (Employee Loan): If you take a $400,000 mortgage with a lower rate at a cost of 1 point, or $4,000, we will reduce that point to ½ point, giving you a savings of $2,000.

*Letters of Credit*
Production credits for Letters of Credit are calculated as a percentage of the letter of credit fee and added to the FA's overall production credit which is paid at the standard grid payout rate.

Please refer to the *Products & Services WM Americas* section of the firm's intranet for further information on loan products.

**Cap Plan Policy**
The Cap Plan Policy applies if you have been with the firm for at least one full calendar year, your NYSE LOS is 8 years or more (per the chart on page 18) and your prior year's production is less than $250,000. Under the Cap Plan, you will be subject to a 20% payout on all business (including wrap fees, insurance and annuities).

- Small ticket and small household policies will apply
- Lending payout rules apply (e.g., 8.5% payout on Credit Line)
- No payout on RMA/BSA/IRA/Basic Account Fees

If, during the current year, your year to date production exceeds $250,000, you will receive a one time payment equal to the difference between what you actually received and what you would have received for the year under the standard plan had your payout not been subject to the cap.

You will be eligible for the Asset and Credit Line Growth Award but will not be eligible for other Strategic Objective Awards while capped.

**Small Household Policy**
Generally, there will be no compensation on households (based on "marketing household" as defined by the firm) with less than $50,000 in assets. Impacted households will be identified quarterly (e.g., June 30 for the 3rd quarter). At the end of each month, the account base will be reviewed and any households which become eligible for compensation will be removed and will be included for the remainder of that quarter. In addition, FAs will receive retroactive credit for the month the household(s) became eligible.

For internal use only

CONFIDENTIAL

UBS00070

Households are subject to this policy if the oldest account in the household has been open for at least 12 months.

Marketing households that contain any of the following accounts will be excluded from this policy:
- DVP
- RIS
- Business Services Account (BSA)
- Prime Broker accounts housed in the IJ wire code
- Corporate Cash
- Commodity/Futures
- Employee
- Corporate ERISA Plans (e.g., 401(k), Keogh…)
- UBS Trust Company and UBS Trust Designated Trustee Services
- CEFS Plan-related

The following production will receive a payout regardless of the size of the household:

- The wrap fee for managed accounts under a wrap fee and any trails related to the wrap program
- Insurance and annuity transactions and trails

Please note that any production related to the small households which does not generate a payout will not count toward driving the grid, Recognition Council, or Strategic Objective Awards.

**Error Grid Reduction Policy**
Beginning in July 2009, based on second quarter results, FAs generating errors (positive or negative) in excess of those noted in the chart below will have their grid rate reduced as indicated. Error rate is defined as the trailing three-month errors (in absolute dollars) over trailing three-month production.

| Error Rate | Grid Rate Reduction* | Timing*** |
|---|---|---|
| >1.0% ≤ 2.5% | -2% | Following Quarter |
| >2.5% ≤ 5.0% | -3% | Following Quarter |
| >5.0% ≤ 7.5% | -6% | Following Quarter |
| >7.5% ≤ 10.0% | -8% | Following Quarter |
| >10.0% | Minimum -10%² | On Going** |

\* Grid reduction on compensable production
\** Management discretion
\*** Following quarter is defined as the quarter commencing immediately after OR within one or two months of the end of the quarter reviewed to determine the error rate.

If the FA has a dollar error rate less than one percent but generates errors in more than .5% of his/her tickets during the quarter, the FA will be subject to a one percent grid reduction in the following quarter. This will be effective January 2010.

In addition to any grid reduction that may be implemented hereunder, the firm reserves the right to impose further discipline upon any FA, up to and including termination.

This policy will not affect the amount of your required minimum monthly draw.

*Examples:*
John's production for Q2 2009 is $200,000. During that quarter, he has two errors totaling $1,200. Since the error rate is less than one percent of production, there will be no impact to his grid in the following quarter.

Sue's production for Q2 2009 is $120,000 and she had $4,800 in errors (one $2,400 positive error and one $2,400 negative error. Four percent error rate). Her grid rate for the following quarter will be reduced by three points.

Frank's production for Q2 2009 is $120,000 and he had $7,000 in negative errors (5.8% error rate). His grid rate for the following quarter will be reduced by six points.

7

CONFIDENTIAL

UBS00071

# Strategic Objective Awards

**Asset and Credit Line Growth Award**
The firm grants an award based on net new assets and credit line growth based on year-end results.

- Net New Asset growth is defined as the value of securities and/or cash received into new and existing accounts offset by the value of securities and/or cash leaving these accounts.
- Credit Line growth is defined as the net change in outstanding Credit Line balances. Note: Paydowns of balances as of 12/31/03 (inception of award) will not be adjusted from the growth calculation in 2004 and thereafter.

The award is calculated on Net New Asset and Credit Lines beginning at $5 million as follows:

| Net New Asset and Credit Line Growth | Award[1] |
|---|---|
| First $50 million ($5 million minimum) | 15 basis points |
| From $50 million to $100 million | 10 basis points |
| From $100 million to $150 million | 5 basis points |
| From $150 million to $200 million | 2.5 basis points |
| $200 million + | 1 basis point |

- The award is capped at 5% of the Financial Advisor's production. For FAs that hit the 5% cap, the firm will carryover excess net new assets for one year.
- RIS, Corporate Cash Management and Prime Brokerage (IJ) accounts are excluded from the award calculation. The firm reserves the right to exclude other types of institutional accounts in the future.
- Subject to the award definitions and rules set forth herein, 50% of the award is paid in cash by March 15 of the following calendar year (i.e., March 15, 2010); 50% is deferred. As with payouts for production related business, Asset and Credit Line Growth Awards are earned net of adjustments.

Each FA is able to track his/her daily Net New Asset/ Credit Line activity in the Business Analysis system. Award projections are updated monthly.

*Example 1*
FA has 2009 Net New Asset and Credit Line growth of $12 million. FA has 2009 production of $450,000.
Award is capped at $450,000 x 5% = $22,500.

*Award Calculation:*

| | | |
|---|---|---|
| $12 million @ 15 bps = | | $ 18,000 |
| | Total | $ 18,000 |
| Cash Award is $18,000 x 50% = | | $ 9,000 |
| Deferred Award is $18,000 x 50% = | | $ 9,000 |

*Example 2*
FA has 2009 Net New Asset and Credit Line growth of $55 million. FA has 2009 production of $1,750,000.
Award is capped at $1,750,000 x 5% = $ 87,500.

*Award Calculation:*

| | | |
|---|---|---|
| $50 million @ 15 bps = | | $ 75,000 |
| $5 million @ 10 bps = | | $ 5,000 |
| | Total | $ 80,000 |
| Cash Award is $80,000 x 50% = | | $ 40,000 |
| Deferred Award is $80,000 x 50% = | | $ 40,000 |

*Example 3*
FA has 2009 Net New Asset and Credit Line growth of $24 million. FA has 2009 production of $600,000.
Award is capped at $600,000 x 5% = $ 30,000.

*Award Calculation:*

| | | |
|---|---|---|
| $24 million @ 15 bps = | | $ 36,000 |
| | Total | $ 36,000 |

This FA's award is capped at $30,000 based on $20 million in Net New Assets. $4 million will be carried over into 2010.

| | |
|---|---|
| Cash Award is $30,000 x 50% = | $ 15,000 |
| Deferred Award is $30,000 x 50% = | $ 15,000 |

---

[1] The amount of an award may be adjusted by the firm based upon the Financial Advisor's disciplinary history as well as his/her compliance with firm rules, standards and policies and or the rules and regulations of applicable SROs.

For internal use only

CONFIDENTIAL

UBS00072

**Award Definitions and Rules**
- All positions in DVP accounts, commodities, and option positions are excluded from the asset calculation.
- Assets must be new to our firm and held here (shown on UBS Financial Services Inc. client statements) on December 31, 2009, to generate credit for the award. New assets held away that are not reflected on aforementioned client statements will not count as new assets. Assets that come into other UBS business units (e.g., Global Asset Management, Hedge Fund Services, Investment Bank) through FA referrals will not count as Net New Assets. Documented asset referrals to/from booking centers in Wealth Management International will be included/excluded from Net New Assets. Assets reflected on the UBS statement as a "courtesy" are not included in Net New Assets.
- Market appreciation/depreciation is not included in the asset calculation.
- Dividends and interest received are not included in the asset calculation; however, cash out of an account will be offset by dividends and interest received during the year.
- If cash taken out of an account increases margin balances, the cash out will be offset by the margin increase.
- Activity related to assets and credit lines housed in split accounts will be allocated on the same percentage as production splits:
  - If an FA within a split arrangement leaves our firm, the remaining FA(s) becomes fully responsible for the assets and Credit Lines 12 months after the FA departs. If assets and Credit Lines leave during the first 12 months, the remaining FA's maximum liability is determined by the split arrangement.
  - If an FA within a split arrangement retires, the remaining FA(s) is fully responsible for all subsequent activity in the account(s).
- An FA becomes FA of record the day that his/her FA number appears on the account:
  - FAs who receive an account from an FA who leaves our firm will not be penalized for assets and Credit Lines that leave the account during the first 12 months.
  - FAs who receive an account from an active FA are fully responsible for the account and any subsequent activity.

- Qualified Plans (QP) Held Away—the net change for QP business held away with UBS Select providers. These assets are credited/debited at a weighting of 75%. Plans with non-UBS Select providers or programs are not eligible.
- FAs can partner with accredited Private Wealth Advisors (PWA) when there is an appropriate opportunity. The financial terms of the agreement are:

| Time Period | Gross Production, Assets and Expenses | | Net New Assets and Credit Lines | |
|---|---|---|---|---|
| | Introducing Financial Advisor | Private Wealth Advisor | Introducing Financial Advisor | Private Wealth Advisor |
| First Year | 50% | 50% | 100% | 50% |
| Second Year | 50% | 50% | 50% | 50% |
| Thereafter | 40% | 60% | 40% | 60% |

- Documented asset referrals to/from banking centers in Wealth Management International will be included/excluded from Net New Assets for the first 12 months of the referral agreement. For example, if an FA refers an account, he or she will receive credit for the assets. If an FA receives a referred account, he or she will not receive net new asset credit.
- Restricted securities are considered new assets in 2009 if they become free to trade or are saleable in 2009. They will be credited automatically when they are moved into a SEG or BOX position. If not, you must notify the FA Compensation Department to get credit for those assets.
- For 2009, FAs will receive a Net New Asset credit equal to 50% of the value of assets moving to the investment center.
- Reassignment of departed FA's account are subject to the firm's Account Reassignment Policies.
- Financial Advisors paid under the Standard FA Compensation Plans and NFAs on the 2002 Compensation Plan are eligible for the award. Recruits become eligible once they have completed 12 months of production at our firm and are paid on the Standard Compensation Plan. NFAs on the 2004 and 2007 Compensation Plans are not eligible for this award. Prorated awards are calculated for FAs who are not eligible for the full 12-month period.

CONFIDENTIAL

UBS00073

- The firm reserves the right to exclude certain assets if it decides, in its sole and absolute discretion, that inclusion of such assets is inconsistent with the spirit of the award.
- This award is conditioned upon and rewards continued employment with our firm. Thus, you must be employed by our firm on the payment date to be entitled to receive the cash portion of the award, and on the vesting dates in order to earn and be entitled to the deferred portions.

**Productivity and UBS Length of Service Awards**
Deferred Productivity and UBS Length of Service Awards[1] are granted based on your current year's production.

The 2009 awards will be calculated as follows:

**Productivity & UBS Length of Service Awards**

| | | UBS LOS Award | | |
|---|---|---|---|---|
| 2009 Production | Productivity Award | LOS 5 – 9 yrs. | or | LOS 10 yrs. + |
| $3m+ | 4% | 1% | | 2% |
| $1.75m – $2.9m | 3% | 1% | | 2% |
| $1m – $1.749m | 2% | 1% | | 2% |
| $600k – $999k | 1% | 1% | | 1% |
| $400k – $599k | 1% | 0% | | 0% |

- FAs that do not qualify for awards based on the chart above but achieve Pacesetter will be eligible for a one percent productivity award and one percent UBS Length of Service Award (if UBS LOS qualifications are met).
- Awards are projected monthly based on year-to-date production and granted annually.
- Revenues subject to the small household policy will not be included when determining this award.
- Productivity and UBS Length of Service (LOS) Awards are granted not only based on productivity, but also continued employment. You must be employed by the firm on the award vesting dates in order to earn and be entitled to the award.

**Recurring Revenue Award**
The Recurring Revenue Award provides FAs the potential to earn a deferred award[2] of up to two percent of recurring revenues as follows:

- one percent awarded on recurring revenue if recurring revenue is greater than 75% of production. FAs must be employed (and producing) by 7/1/09 to be eligible to earn this award for 2009.
- one percent awarded on recurring revenue if recurring revenue growth from prior year is 25% or greater. FAs must be employed and producing prior to July 1, 2008, to be eligible to earn the 2009 award. For FAs hired between January 1, 2008, and June 30, 2008, their 2008 production will be annualized to determine the 2008 recurring revenues for comparison to 2009.

Recurring revenue is defined as wrap fees, Credit Lines, and trails on mutual funds, insurance, annuities and cash/money market balances.

Revenues subject to the small household policy will not be included when determining this award.

**Summary of Strategic Objective Awards**
The Strategic Objective Awards will be allocated as follows:

| | | Deferred Awards | |
|---|---|---|---|
| | Cash | PartnerPlus/ FA Deferred Award Plans | Restricted Equity |
| Productivity Award | – | 50% | 50% |
| UBS LOS Award | – | 50% | 50% |
| Asset and Credit Line Growth Award | 50% | 25% | 25% |
| Recurring Revenue Award | – | 50% | 50% |

- The PartnerPlus/FA Deferred Award Plan portion of the awards will continue to vest 20% each year beginning after year 6 through year 10.

---

[1] The amount of an award may be adjusted by the firm based upon the Financial Advisor's disciplinary history as well as his/her compliance with firm rules, standards and policies and or the rules and regulations of applicable SROs.

[2] Awards may be adjusted by the firm based upon the Financial Advisor's disciplinary history as well as his/her compliance with firm rules, standards and policies and or the rules and regulations of applicable SROs.

10                                                                                    For internal use only

CONFIDENTIAL                                                                    UBS00074

- The restricted equity portion will vest 100% after year six.
- If the restricted equity component is less than $1,000, it will be paid in cash instead of restricted equity.
- The restricted equity awards will be governed by the plan rules in effect at the time of the award.
- These awards are conditioned upon and recognize continued employment with the firm. Thus, FAs must be employed by the firm on the payment date to be entitled to earn and receive the cash portion of the award and on the vesting dates to earn and receive be entitled to the deferred portions.

- Certain eligible FAs received cash advances versus the projected restricted equity portion of the awards for years 2009 – 2012 and the eventual SOAs will be reduced by the amount of the advance related to each year.

For internal use only

11

CONFIDENTIAL

UBS00075

# Recognition Councils

There are three Recognition Councils at UBS for top-performing Financial Advisors. A targeted number of qualifiers will be set for each Recognition Council category as follows:

| Year 2010 Council Level | NYSE Reg Date | 2009 Recognition Council Production Ranking |
|---|---|---|
| Chairman's Council | | Top 230 FAs |
| President's Council | | Next 500 FAs |
| Pacesetter Council: | | |
| | Prior to 7/02 | Next 900 FAs |
| | 7/02 – 6/03 | Top 30 in NYSE LOS category |
| | 7/03 – 6/04 | Top 30 in NYSE LOS category |
| | 7/04 – 6/05 | Top 30 in NYSE LOS category |
| | 7/05 – 6/06 | Top 30 in NYSE LOS category |
| | 7/06 – 6/07 | Top 40 in NYSE LOS category |
| | 7/07 – 12/09 | Top 40 in NYSE LOS category |

Each month, Financial Advisors can review their rankings, along with current projected production levels for each council. Hard-dollar production thresholds will be determined and communicated after the third quarter.

Financial Advisors exceeding the following Asset and Credit Line growth thresholds will receive an additional credit to their 2009 production only for purposes of achieving Recognition Council status:

- Financial Advisors with Asset and Credit Line growth of $5,000,000 to $11,999,999 will receive a 10% production adjustment or;

- Financial Advisors with Asset and Credit Line growth of $12,000,000 or greater will receive a 25% production adjustment.

Recruits become eligible for the additional credit once they have completed 12 months of production at UBS.

Production related to the small households which do not generate a payout will not count for Recognition Council.

*Example:*

| | Actual Production | Net New Assets and Credit Lines | % | Dollars | Recognition Council Production |
|---|---|---|---|---|---|
| FA #1 | $ 500,000 | $ 3,000,000 | 0 | 0 | $ 500,000 |
| FA #2 | $ 500,000 | $ 6,000,000 | 10 | $ 50,000 | $ 550,000 |
| FA #3 | $ 500,000 | $ 15,000,000 | 25 | $125,000 | $ 625,000 |

In addition to production and net new assets and credit lines, the firm may consider the Financial Advisor's disciplinary history as well as his/her compliance with firm rules, standards and policies and/or the rules and regulations of applicable SROs when determining eligibility for Recognition Councils.

For internal use only

CONFIDENTIAL

UBS00076

# UBS Teams Program, New Financial Advisors, and Private Wealth Advisors

UBS supports the development of teams, New Financial Advisors and Private Wealth Advisors. Separate plans for these participants exist that modify certain components of this plan.

CONFIDENTIAL

UBS00077

# UBS PartnerPlus/UBS Financial Advisor Deferred Award Plan

**PartnerPlus Plan ("Plan")**
UBS PartnerPlus is a unique wealth accumulation plan designed to provide significant financial rewards to eligible FAs.[3]

*Eligibility*
All 2010 Recognition Council members (based on 2009 production) and all Financial Advisors who generate a minimum of $400,000 in gross production during 2009 will have a portion of their 2009 deferred awards credited to UBS PartnerPlus and will be eligible to make a Voluntary Contribution in the year 2010.

*Base Plan*
- Contributions to the PartnerPlus Plan may include a portion of the Productivity and UBS Length of Service (LOS) Awards, a portion of the Asset and Credit Line Growth Award, Recurring Revenue Award and Voluntary Contributions.
- The PartnerPlus Plan will credit interest on a tax-deferred basis, compounded annually at the following rates for each year's contributions:
  – Years 1 – 4 = "Turbo rate," defined as four times the "Market rate"
  – Years 5 – 10 = "Market rate"

**Note:** Currently, the Market rate reflects UBS short-term cost of funds rate, defined as the yield of the offered rate of our 30-day commercial paper, averaged over the number of business days in the month. The maximum Turbo rate is 20%. The maximum Market rate is 8%.

*Voluntary Contributions*
FAs may be eligible to make pretax Voluntary Contributions of up to 50% of the total deferred awards granted, as long as the combined deferred awards and Voluntary Contributions do not exceed $100,000.

Examples:

| Total Deferred Awards | Maximum Allowable Voluntary Contributions |
|---|---|
| $ 50,000 | $ 25,000 |
| $ 80,000 | $ 20,000 |
| $ 125,000 | $ 0 |

- The Voluntary Contributions will earn interest at the Turbo rate during years 1 – 4 and Market rate for years 5 – 10, compounded annually.
- Voluntary Contributions will be deducted monthly from the Financial Advisor's production compensation. Once elected, a Voluntary Contribution cannot be stopped or changed for that calendar year.

*Vesting*
- Firm Contributions contributed to UBS PartnerPlus on or after January 1, 1999, and Turbo and Market interest earned on firm contributions, will vest 20% per year, beginning after six years, through year 10.
- Voluntary Contributions vest immediately. Turbo and Market interest earned on Voluntary Contributions contributed on or after January 1, 1999, will vest 20% per year, beginning after six years, through year 10.
- Firm Contributions and Turbo and Market interest vest immediately upon death or disability and are eligible for continued vesting upon a Qualifying Separation.

*In-Service Distributions*
- All vested firm and Voluntary Contributions and related vested Turbo and Market interest will generally be paid to the Financial Advisor after the 10-year anniversary of each year's contribution.

For detailed information, please refer to the PartnerPlus Plan Document on the firm's intranet under *Personal/HR / My HR Location – USA / FA/NFA Compensation / PartnerPlus Plan.*

---

[3] In the event of a conflict between the summary of the Plans set forth in this document and the Plan Documents, the Plan Documents will control. Capitalized terms herein have the meaning ascribed to them in the applicable Plan Document.

14

For internal use only

CONFIDENTIAL

UBS00078

**UBS Financial Advisor Deferred Award Plan ("Deferred Award Plan")**
*Base Plan*
Contributions to the Deferred Award Plan include NFA deferred awards and the deferred portion of the Asset and Credit Line Growth Award and recurring revenue award for those Financial Advisors not eligible for the UBS PartnerPlus Plan.

The Deferred Award Plan will credit interest on a tax-deferred basis, compounded annually at the following rates for each year's contributions:

- Year 1 through 4 = "Turbo rate," defined as four times the "Market rate"
- Years 5 through 10 = "Market rate"

**Note:** Currently, the Market rate reflects UBS's short-term cost of funds rate, defined as the yield of the offered rate of our 30-day commercial paper, averaged over the number of business days in the month. The maximum Turbo rate is 20%. The maximum Market rate is 8%.

*Vesting*
- Firm Contributions and the related Turbo and Market interest will vest 20% per year, beginning after six years, through year 10.
- Firm contributions and Turbo and Market interest vest immediately upon death or disability (as defined in the Financial Advisor Deferred Award Program plan document) and are eligible for continued vesting upon a Qualifying Separation.

*Distributions*
All vested firm Contributions and related vested Turbo and Market interest will be paid to the Financial Advisor after the 10-year anniversary of each year's Contribution.

**Additional Information Relating to PartnerPlus and the FA Deferred Award Plans**
*Financial Condition of the firm*
- Participants in UBS PartnerPlus/UBS Financial Advisor Deferred Award Plan are "unsecured" creditors of UBS Financial Services Inc., the sponsor of these plans. This means that, in the event of its insolvency, claims of participants would be subordinate to "secured" creditors, if any, and participants' firm and Voluntary Contributions and the Market and Turbo interest credited thereon would be at risk.
- The PartnerPlus Offering Memorandum, which is available to FAs eligible to participate in the PartnerPlus Plan, describes in greater detail the terms of the Plan applicable to Voluntary Contributions. You should carefully review the entire PartnerPlus Offering Memorandum, including each exhibit, before deciding whether to make a Voluntary Contribution. The PartnerPlus Offering Memorandum may be found at *http://financialservicesinc.ubs.com/staticfiles/pws/adobe/StatementofFinancialCondition.pdf.*

UBS AG's annual and interim reports submitted to the Securities and Exchange Commission, which also contain information about our financial condition, may be found at *http://www.ubs.com/1/e/investors/ sec_filings.html.*

Refer to the PartnerPlus Brochure and the PartnerPlus Plan Documents for detailed information not provided in this summary. Copies of the PartnerPlus Brochure and Plan Documents can be found on the firm's intranet under *Personal/HR / My HR Location – USA / FA/NFA Compensation / PartnerPlus Plan.* If there is any difference between this summary and the Plan Document, the Plan Document will govern. Capitalized terms herein have the meanings ascribed to them in the Plan Document.

CONFIDENTIAL

# Wealth Protection Programs

**Transitioning Financial Advisor Program**
The Transitioning Financial Advisor Program enables qualified Financial Advisors leaving the business to smoothly transition client accounts to other Financial Advisors and continue to receive compensation from those accounts for up to five more years.

Generally, transitioning FAs must meet the following criteria:

- Have a partnership with one or more FAs for over one year
- 10 years of continuous UBS employment
- Transitioning FA must have a minimum trailing 12-month gross production of $200,000 and a minimum of $25m in total assets

Transition percentage is based on firm LOS, % Wrap fee production & Total Assets (maximum 180%)

Transitioning FA Highlights
- Ability to receive an advance payment (max. 25%)
- To assist in the book transition, FAs may be eligible to remain as active employees for up to two years
- Transition payout applied over time frame to include pre- and post-retirement

- Survivor Benefits (Transitioning FA not covered by "Financial Advisor Survivor Benefit" program described below)

Receiving FA Highlights
- Credit for 100% of Gross Production, Net New Assets and Assets Under Management
- Net production will be adjusted over the term of the arrangement to a maximum of 100 percentage points of the transition percentage
- Potential to earn annual five percent bonuses (totaling 25 percentage points over the life of the agreement) for growing the book

Other Details
- Both Transitioning and Receiving FA must be in good Legal and Compliance standing
- Transition payout rate applied to the actual production generated over five years
- Both Transitioning and Receiving FA must execute agreements prepared by the firm
- For further details, please refer to the Transitioning Financial Advisor Program brochure located in the *FA/NFA Compensation* section of the firm's intranet.

**Transitioning Financial Advisor Program**

| UBS LOS | % of Prod. | | % Wrap | % of Prod. | | Total Assets (In Millions) | % of Prod. | | Deal Range UBS LOS | % of Prod. |
|---------|-----------|---|--------|-----------|---|---------------------------|-----------|---|-------------------|-----------|
| 10 – 14 yrs. | 30% | | 0 – 9.99% | 0% | | $   0 – $ 19.99 | 0% | | 10 – 14 yrs. | 30 to 150% |
| 15 – 19 yrs. | 40% | | 10 – 19.99% | 10% | | $ 20 – $ 39.99 | 10% | | 15 – 19 yrs. | 40 to 160% |
| 20 – 24 yrs. | 50% | + | 20 – 29.99% | 30% | + | $ 40 – $ 79.99 | 20% | = | 20 – 24 yrs. | 50 to 170% |
| 25 yrs.+ | 60% | | 30 – 39.99% | 40% | | $ 80 – $ 99.99 | 30% | | 25 yrs.+ | 60 to 180% |
| | | | 40 – 59.99% | 50% | | $100 – $149.99 | 40% | | | |
| | | | 60%+ | 60% | | $150 – $199.99 | 50% | | | |
| | | | | | | $ 200+ | 60% | | | |

**Financial Advisor Survivor Benefit**
The Financial Advisor Survivor Benefit is a corporate-paid benefit that provides financial protection to an FA's beneficiary in the event he/she passes away while still producing for the firm. In the event of death, the plan pays the beneficiary 75% of 12-month's gross production. For the initial rollout of the program, the 12-month period will be defined as October 2007 through September 2008, updated annually.

To be eligible, FA's must have a minimum production of $500,000 and have completed three years of continuous service with the firm immediately prior to death. The maximum payout is $2.5 million. The payout will be made to the beneficiary in two taxable payments over two years. Recipients of the accounts previously serviced by the FA will be subject to a payout rate of grid - 15 on the transitioned book for three years.

16                                                                                   For internal use only

# Expense Allowance Programs

**Pacesetter Expense Allowance Program**
Recognition Council members are eligible for a discretionary expense allowance for the purpose of promoting business. This allowance is generally considered nontaxable; however, certain expenses may be reported as taxable income.

The year 2010 Pacesetter expense allowance granted to each Recognition Council member is as follows:

|  | Pacesetter Expense Allowance |
|---|---|
| Chairman's Circle (Chairman's Council five consecutive years) | $ 10,000 |
| FAs > $3 million in production | $ 10,000 |
| All other Chairman's Council FAs | $ 5,000 |
| President's Council FAs | $ 3,500 |
| Pacesetter (prior to July 2002 NYSE registration date) | $ 2,000 |
| Pacesetter (post-July 2002 NYSE registration date) | $ 1,500 |

Business expenses eligible for reimbursement include, but are not limited to, business meals and entertainment, travel and lodging, computer leasing, subscriptions and seminars.

Refer to the *Expense Reimbursement Programs Guidelines* for additional information. A copy of the Guidelines can be found on the firm's intranet under *Personal/HR / My HR Location – USA / FA/ NFA Compensation / 2009 Expense Reimbursement Programs.*

**Business Builder Program**
- The Business Builder Program gives eligible Financial Advisors the ability to use their pretax dollars for certain business-related expenses. Eligible Financial Advisors may elect to receive an expense allowance of up to two percent of their projected production by adjusting pretax compensation in an equal amount.

- FAs can elect to participate in the program when the window opens during the 4th quarter. 2009 allowances are based on 2008 production (generally either September or October year-to-date annualized) of $200,000 or Recognition Council status.
- Recruits can enroll in the Business Builder Program within 30 days of their hire date.
- The Business Builder expense allowance is in addition to the Pacesetter expense allowance for Recognition Council members and does not affect the amount of expenses reimbursed under the Pacesetter expense allowance.

*Example:*

| | |
|---|---|
| *2008 October year-to-date production* | $  375,000 |
| *Projected 2008 production ($375,000 ÷ 10 x 12)* | $  450,000 |
| *Maximum year 2009 compensation adjustment and expense allowance ($450,000 x 2%)* | $      9,000 |

- The Business Builder expense allowance will be funded through 11 equal monthly pretax adjustments from the production checks, beginning in February. If your net check does not cover the amount of the monthly adjustment, future adjustments will be changed to make up the difference.
- Once an election is made to adjust compensation to fund the Business Builder expense allowance, it cannot be changed or stopped during the year. In addition, in accordance with IRS regulations, any unused expense allowance in the Business Builder account is forfeited.
- Business expenses eligible for reimbursement include, but are not limited to, business meals and entertainment, travel and lodging, computer leasing, subscriptions and seminars. Refer to the Expense Reimbursement Programs Guidelines for additional information. A copy can be found on the firm's intranet under *Personal/HR / My HR Location – USA / FA/NFA Compensation / 2009 Expense Reimbursement Programs.*

CONFIDENTIAL

UBS00081

# Length of Service Policy

Your LOS, both in the industry and at UBS, may affect some aspects of the Compensation Plan. Industry LOS is generally determined by your NYSE registration date. UBS LOS is determined by your date of registration with UBS. LOS for the year is calculated each January 1, based on the chart below.

| NYSE or UBS Registration Date | 2008 LOS | 2009 LOS | 2010 LOS |
|---|---|---|---|
| July 1, 2009 – June 30, 2010 | — | — | 0 |
| July 1, 2008 – June 30, 2009 | — | 0 | 1 |
| July 1, 2007 – June 30, 2008 | 0 | 1 | 2 |
| July 1, 2006 – June 30, 2007 | 1 | 2 | 3 |
| July 1, 2005 – June 30, 2006 | 2 | 3 | 4 |
| July 1, 2004 – June 30, 2005 | 3 | 4 | 5 |
| July 1, 2003 – June 30, 2004 | 4 | 5 | 6 |
| July 1, 2002 – June 30, 2003 | 5 | 6 | 7 |
| July 1, 2001 – June 30, 2002 | 6 | 7 | 8 |
| July 1, 2000 – June 30, 2001 | 7 | 8 | 9 |
| July 1, 1999 – June 30, 2000 | 8 | 9 | 10 |
| July 1, 1998 – June 30, 1999 | 9 | 10 | 11 |
| July 1, 1997 – June 30, 1998 | 10 | 11 | 12 |
| July 1, 1996 – June 30, 1997 | 11 | 12 | 13 |
| July 1, 1995 – June 30, 1996 | 12 | 13 | 14 |
| July 1, 1994 – June 30, 1995 | 13 | 14 | 15 |
| July 1, 1993 – June 30, 1994 | 14 | 15 | 16 |
| July 1, 1992 – June 30, 1993 | 15 | 16 | 17 |

For internal use only

CONFIDENTIAL

UBS00082

# Arbitration

With the exception of claims for injunctive relief or the denial of benefits under the firm's disability or medical plans, you and UBS agree that, unless prohibited by applicable law, any disputes between you and UBS including claims concerning compensation, benefits or other terms or conditions of employment and termination of employment, or any claims for discrimination, retaliation or harassment, or any other claims whether they arise by statute or otherwise, including but not limited to, claims arising under the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, as amended, The Age Discrimination in Employment Act of 1967, The Worker Adjustment and Retraining Notification Act, The Employee Retirement Income Security Act, The Americans With Disabilities Act, The Equal Pay Act of 1963, The Americans With Disabilities Act of 1990, The Family and Medical Leave Act of 1993, The Sarbanes-Oxley Act, or any other federal, state or local employment or discrimination laws, rules or regulations, including wage and hour laws, will be determined by arbitration as authorized and governed by the arbitration law of the state of New Jersey. Any such arbitration will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA"), except that you may elect to arbitrate discrimination claims under any federal, state or local law (including claims of harassment and retaliation under those laws) before JAMS pursuant to its Employment Arbitration Rules

and Procedures and subject to the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness. Subject to the parties' right to appeal or seek vacatur under applicable law, you and UBS agree that the decision of the Arbitrator(s) will be final and binding on the parties and that the Arbitrator(s) is authorized to award whatever remedies would be available to the parties in a court of law. You and UBS further agree that any disputes between you and UBS shall be heard, as set forth above, by FINRA or JAMS[4] without consolidation of such claims with any other person or entity. By agreeing to the terms of this Compensation Plan to the fullest extent permitted by law, you waive any right to commence, be a party to or an actual or putative class member of any class or collective action arising out of or relating to your employment with UBS or the termination of your employment with UBS. Notwithstanding anything to the contrary herein, you and UBS further agree that if, for any reason, the waiver of your right to commence a class or collective proceeding within or outside of an arbitration proceeding is found to be unenforceable by a court of competent jurisdiction, the agreement to arbitrate contained in this Compensation Plan shall no longer apply and any class or collective claim shall be filed, litigated and adjudicated in a court of competent jurisdiction, and not in arbitration.

---

[4] Information about JAMS, including its Employment Arbitration Rules and Procedures, can be found at *www.jamsadr.com*. If you choose to arbitrate before JAMS, then, where permitted by law, you only shall be responsible for those arbitration fees and costs that you would have been required to bear in a FINRA arbitration.

For internal use only

CONFIDENTIAL

UBS00083

# Conclusion

The Financial Advisor Compensation Plan, effective 1/1/09, summarizes many, but not all, of the elements of your compensation.[5] The continuation of your employment after receipt of this plan and/or acceptance of benefits hereunder shall be deemed your consent and agreement to its terms, whether or not you execute the FA Compensation Plan Acknowledgement set forth at the end of this document. This Plan is not a promise, an agreement or a contract that your employment is guaranteed or that the policies and practices that are described will always be the same. Except for the arbitration provision on page 18 and the terms and conditions set forth therein, UBS Financial Services Inc. and/or UBS International Inc., in its sole discretion and without notice, may add to, modify, change or rescind any of the policies, practices, procedures or guidelines in whole or in part at any time. In the event of changes, you may be notified via e-mail and/or any such change will be posted on the firm's intranet under *Personal/ HR / My HR Location – USA / FA/NFA Compensation*. UBS also reserves the right to lower your payout rates if you demonstrate negligence or carelessness or otherwise fail to comply with firm rules, standards, practices and policies and/or applicable law, including the rules and regulations of applicable SROs.[6] In addition, you will earn no production or fees on transactions that the firm determines should be reversed, that a customer or other third party fails to pay the firm or consummate or that do not comply fully with the terms of this Plan, all applicable laws, rules and policies, and the rules associated with the specific product then in effect.

Compensation (including but not limited to monthly production payouts and annual awards) is not earned until adjustments are made. Furthermore, compensation is not earned and deferred compensation is not earned and does not vest unless the transactions comply with governing laws, rules of the self-regulatory organizations and UBS Financial

Services Inc. and/or UBS International Inc. policies. Each FA will receive a minimum compensation amount determined by the state in which he/she works. This amount is a guaranteed draw against: (1) unearned production payouts and (2) other compensation earned by the FA.

A guaranteed draw is a guaranteed, predetermined lump-sum amount paid to you every month as an advance against your anticipated unearned production payout including fees. In addition to the draw, you also receive a monthly check for unearned production payout (and where applicable, a quarterly check for fees) less the draw already paid and less adjustments. If your unearned production payout including fees is equal to or less than the draw, you do not receive a separate check. Sums paid solely to bring your unearned production payout to the guaranteed minimum are not carried forward into subsequent months, but rather are unrecoverable. Note, however, that all authorized adjustments are carried forward and recoverable.

Unless prohibited by applicable law, upon termination of your employment for any reason, UBS will pay you any compensation earned under this Compensation Plan on the next scheduled production related payout date for its current employees.

Because certain fees are credited quarterly in a draw, in the first month of each quarter, UBS reserves the right to advance against those fees the draw payment for the final months of the quarter in which the fees are earned. For example, fees advanced in January and paid in February cover the first calendar quarter, January through March. Therefore, for example, the firm reserves the right to advance the February and March guaranteed, nonrecoverable draw, and pay it in January in addition to the guaranteed, nonrecoverable draw for January.

---

[5] For example, referrals between business units may be subject to individual compensation arrangements.

[6] UBS, in its sole discretion, may also impose other types of discipline including, without limitation, termination of employment, unpaid suspension for one or more working days and/or other forms of written, oral and, where lawful, monetary discipline.

20

For internal use only

CONFIDENTIAL

UBS00084

*Example 1*
*(unearned production payout exceeds the draw):*

*Your guaranteed draw is $1,972 per month.
In one month you generated unearned production
payout of $10,000. Accordingly, you will receive
$8,028 ($10,000 − $1,972), less adjustments.*

*Example 2*
*(unearned production payout less than the draw):*

*Your guaranteed draw is $1,972 per month. In
Month 1, you generated unearned production payout
of $1,500. Accordingly, for Month 1, you will not
receive earned payout because the draw exceeded
your unearned production payout ($1,500 < $1,972).*

*However, in Month 2, you generated unearned
production payout of $12,000. For Month 2, you
will receive $10,028 ($12,000 − $1,972 draw) less
adjustments, as the sum paid to bring your unearned
production payout to the guaranteed minimum from
Month 1 is not carried forward.*

*Example 3*
*(fees advanced):*

*Your guaranteed draw is $1,972. In January, you are
credited fees of $9,000 and you generated unearned
production payout of $1,000 for a total of $10,000
in unearned production payouts. Your unearned
production payouts offset your January draw, leaving
$8,028 ($10,000 − $1,972 draw) less adjustments.*

*UBS reserves the right to offset $3,944 of the
remaining ⅔ of credited fees against your
February and March draw.*

For internal use only

21

CONFIDENTIAL

UBS00085

A-106

This page intentionally left blank

CONFIDENTIAL

UBS00086

A-107

 **UBS**

# FA Compensation Plan Acknowledgement

I have received my copy of the Financial Advisor Compensation Plan ("Plan"), effective 1/1/2009 and understand and agree that I am bound by its terms.

_____

Employee Name

_____

Employee Signature

_____

Date

Please return this signed acknowledgement to your Branch Management team.

For internal use only

23

CONFIDENTIAL

UBS00087

**UBS**

# Financial Advisor
## Compensation Plan



For internal use only

CONFIDENTIAL

# Table of Contents

Production Payout ................................................................. 1

Strategic Objective Awards ...................................................... 8

Recognition Councils ............................................................ 12

Teams, NFAs and Private Wealth Advisors ...................................... 13

UBS PartnerPlus/UBS Financial Advisor Deferred Award Plan ..................... 14

Wealth Protection Programs ..................................................... 16

Expense Allowance Programs ..................................................... 18

Length of Service Policy ....................................................... 19

Arbitration .................................................................... 20

Conclusion ..................................................................... 21

For internal use only

CONFIDENTIAL

UBS 00089

# Production Payout

Your "production" (sometimes called "gross" production) is the product-related revenue credited to you by Wealth Management Americas ("UBS" or "the firm"). Under this Plan, you will be entitled to receive an earned "payout" derived from a percentage of your production less lawful adjustments. Adjustments may include, for example, customer fees waived by you; compensation and benefits for a Client Service Associate (CSA) or other employees; the cost of seminars you elect to attend; the costs of certain miscellaneous goods and services; overpayments; charge-backs arising out of a customer or other third party reversing or failing to pay or to close a transaction; certain registration and consulting fees; production draws; transaction-related expenses (including brokerage and clearing fees on commodity products, as described herein); and payments made under the UBS Retirement Enhancement and Transitioning Financial Advisor (TFAP) programs.

Because your earned payout is net of adjustments, and not based solely on a percentage of your production, it is not earned until all such adjustments have been made. In addition, you will earn your payout (or other production-related compensation) as long as the underlying transaction(s) comply with governing laws, rules of the self-regulating organizations and firm policies.

Your "payout rates" are the percentages applied to your production (as described herein) to determine your unearned production payout before adjustments

*Example*

| Monthly Production | X | Applicable Payout Rates | = | Unearned Production Payout | – | Adjustments | = | Earned Payout |

If you desire certain adjustments to be made as set forth in this Plan, UBS may require you to authorize them in writing. In these instances, UBS will provide the authorization forms/vehicles necessary to carry out your wishes regarding these adjustments.

For internal use only

1

CONFIDENTIAL

UBS 00090

**Standard Grid**

"Standard grid" production generally includes production for all products. Your trailing 12-month standard grid production determines your applicable payout rate for your current month's standard grid production, as shown in the following chart:

| Trailing 12-month standard grid production | | Standard Grid Rate | Wrap/ Insurance/ Annuity Rate |
|---|---|---|---|
| From | To | | |
| $3m | + | 45% | 48% |
| $1.75m | $2.99m | 44% | 47% |
| $1m | $1.749m | 43% | 46% |
| $750,000 | $999,999 | 42% | 45% |
| $600,000 | $749,999 | 41% | 44% |
| $400,000 | $599,999 | 39% | 42% |
| $300,000 | $399,999 | 35% | 38% |
| $250,000 | $299,999 | 33% | 36% |
| $200,000 | $249,999 | 30% | 33% |
| $0 | $199,999 | 28% | 31% |

**Additional Terms and Conditions**

- There will be no payout on equity tickets less than $100 or option tickets less than $50.
- The payout rate for directed business processed via split numbers from the Prime Broker Desk (e.g., IJ) is 29%.
- RMA®, Business Services Account (BSA®), IRA and Basic Account Fees are included in your production for the purpose of calculating standard grid payout rates; however, you will not receive nor earn any payout related to these items.
- Listed equity and over-the-counter commissions discounted below $50 will automatically be increased to $49.99. For example, a pre-discounted ticket of $60 is discounted 50% to $30. The ticket will automatically be increased to $49.99. Option commissions discounted below $35 will automatically be increased to $34.99. Commodity commissions discounted below $30 will automatically be increased to $29.99.
- Payout rates for production generated in RIS and IEG accounts are calculated as follows:
  - Equity and municipal (excluding muni-negotiated new issue) production: 29%.
  - TFI new issue (including APS and ARCs), TFI secondary and muni-negotiated new issue: standard grid minus 10 percentage points.
  - Standard TFI sales credit: 60%. The Core RIS FAs, and those with at least $25,000 in standard TFI sales credits, will be eligible to participate in a year-end discretionary bonus.
  - IEG accounts are paid based on the IEG compensation memo which can be found on the firm's intranet under *P&S WMUS/ Transaction Products US/Regional Institutional Sales (RIS) Equities.*
- Production credits on bank sweep/money fund balances (FDIC, Money Funds, IDA, Puerto Rico Short-term Investment Funds) of 4 bps (annualized) are subject to grid payout. Credits will be booked monthly based on the average balances of the prior month.
- CEFS Compensation Policies-
  The payout on business related to ongoing corporate relationships with companies assigned by Corporate Employee Financial Services (CEFS) is as follows:

CONFIDENTIAL                                                      UBS 00091

- **Exercise Revenue**: CEFS plan-based transactions (i.e., stock option exercises, stock purchase plan share sales and sales of restricted stock).
- If the CEFS participant does not have a full-service account at UBS with a CEFS FA, FA receives 100% gross with a 22% payout (no ticket adjustment).
- If the CEFS participant has one or more full-service accounts at UBS (in their marketing household) with a CEFS FA, standard grid payout will apply on the exercise account (subject to normal firm ticket adjustment) as long as the household is not otherwise a "small household".
- There will be a three-month look back on CEFS plan transactions based on the initial reinvestment account open date.

Note: For CEFS participant trades generating $49.99 or less in revenue, there will be no payout earned. This will be true for all CEFS participants, both for those relationships with and without a full-service reinvestment account at UBS. The gross revenue generated on these trades will be included for purposes of calculating gross production, deferred awards and recognition council.

- **Plan Admin Revenue** (revenue derived from CEFS charges to corporate clients for administrative services, e.g., Admin Fees)
- Net payment equal to 10% of the admin revenue for each corporate client will be paid annually at the end of the calendar year, or shortly thereafter. No gross production will be credited for these payments. FAs must be employed at the time of payment in order to earn or receive such payments.

Note: CEFS home office will continue to maintain sole discretion in determining which corporate fees are eligible. For example, the foregoing may not apply if the Lead FA and CEFS mutually agree to be aggressive on pricing (i.e., deviate from standard corporate client and participant fee structures) to win a new prospective corporate client or retain an existing corporate client. Any such change to standard pricing will be mutually agreed upon between CEFS and the Lead FA prior to offering to the corporate client and implementing.

- **Reinvestment Revenue:** Production is subject to the standard grid payout rate (subject to normal firm ticket adjustments).
- CEFS supports the partnering of Lead Financial Advisors with Reinvestment FAs (Network FA). When the Reinvestment FA opens a retail account with a CEFS participant, the Reinvestment FA will split the Gross Production with the Lead FA 70% / 30% respectively.

**Note:** Three years after a CEFS Corporate Client leaves UBS, the Reinvestment FA and Lead FA split arrangement will be modified to 90% / 10% respectively.

- Commodity and Futures
  - The payout rate for Commodities and Futures Business is a flat 30% rate (or grid rate if it is lower than 30%).
  - Brokerage and clearing fees on commodity products are adjusted before the payout rate is applied, unless:
    - The ticket is not discounted
    - The ticket is $250 or greater and the contract rate is $20 or more
    - The ticket is $1,000 or greater and the contract rate is $15 or more
  - A commodity futures ticket, for the purpose of this Compensation Plan, is defined as the closing of an existing position ("a round turn"). Identical contracts (i.e., for the same commodity, side and month) traded on the same exchange and closed out on the same day in the same account are aggregated as one ticket. Identical options on futures contracts (i.e., for the same side, strike price, premium and expiration month) traded on the same exchange and opened on the same day in the same account are aggregated as one ticket; similarly, identical options on futures contracts closed on the same day are aggregated as one ticket.

- Payout rates for referral fees to and from the Global Referral Desk are calculated as follows:
  - For referrals to the Global Referral Desk, FAs receive credit for one-third of the revenue as production credits at a 65% payout rate for four years. Thereafter, the FA receives no further payout related to the referral.

CONFIDENTIAL                                                           UBS 00092

— For referrals from the Global Referral Desk, FAs will receive credit for two-thirds of the revenue at the standard grid payout rate for four years and credit for 100% of the revenues thereafter for as long as the referral program remains as is.
— Additional information can be found by visiting *goto/globalreferrals*.

- Financial Advisors that have qualified for directed business will be credited 75% of the gross sales credits on transactions executed by the Equity Trading Desks in a split FA number (e.g., QA01). Payout rate is standard grid to a maximum of 38%.

- Financial Advisors (FA) can partner with accredited Private Wealth Advisors (PWA); the financial terms of the arrangement are:

| Gross Production, Assets and Expenses | Introducing Financial Advisor | Private Wealth Advisor |
|---|---|---|
| First Year | 50% | 50% |
| Second Year | 50% | 50% |
| Thereafter | 40% | 60% |

| Net New Assets and Credit Lines | Introducing Financial Advisor | Private Wealth Advisor |
|---|---|---|
| First Year | 100% | 50% |
| Second Year | 50% | 50% |
| Thereafter | 40% | 60% |

- FAs will not receive nor earn any payout on equity and option production in employee accounts if that employee account receives a discount other than the standard employee discount of 50%. These revenues will count toward total production.

- Production credits and the potential related payouts on syndicate transactions become earned only after the close of the penalty bid period and upon verification that the client retained the position until that time and that the transaction or transactions complied with applicable laws, rules and policies. Production credits on syndicate transactions will be advanced, but will not be earned until the previously mentioned conditions have been satisfied. If production credits are advanced and the pre-conditions to earning are not met and/or your employment is terminated, at the firm's discretion, UBS will recoup the unearned syndicate payment in the form of an adjustment to your unearned standard grid payout. If the amount

of unearned advances exceeds the amount of your unearned grid payout, you must immediately repay the firm any outstanding unearned advances.

**Ticket Adjustments**
Financial Advisors receive $12 less for all listed equity, over-the-counter (principal and agency) and option trades.

- Transactions with the same security, side, date and account are aggregated as one ticket.
- Transactions covered under the wrap fee in Strategic Advisor and managed accounts are not subject to the ticket adjustment.
- No ticket adjustment will apply to the following transactions:
  — Equity RIS transactions with a leveled payout rate
  — Directed business processed via split FA numbers from the Equity (e.g., QA) and Prime Broker (e.g., IJ) desks with a leveled payout rate
  — Production generated by FAs who are capped at a leveled payout rate based on their prior-year production and NYSELOS
  — Exercise revenue on CEFS accounts with a leveled payout rate of 22%
  — Preferred and convertible transactions (both agency and principal)
- The ticket adjustment will not result in a payout below zero for any individual transaction.
- A reduced ticket adjustment may apply to New Financial Advisors (NFAs) in the Development Program. Please refer to the NFA Compensation Plan applicable to you.

**Investment Solutions (IS) Wrap/Advisory Fees**
- Payout rates for wrap/advisory fees in an Investment Solutions managed account program will be the standard grid payout rate plus three percentage points. If 12B-1 fees are credited to Financial Advisors in the program, the standard grid rates will apply.
- Products include:
  — Managed Accounts Consulting ("MAC"): Consulting/FA fee only
  — Portfolio Management Program (PMP)
  — Premier Portfolio Management Program (PPM)
  — UBS Selections℠
  — ACCESS℠
  — PACE℠ Multi Advisor
  — PACE℠ Select
  — Institutional Consulting (formerly Prime Asset Consulting)
  — UBS Fiduciary Trust Company: Consulting/FA fee only

4

For internal use only

CONFIDENTIAL

- Private Wealth Solutions℠: Consulting/FA fee only
- UBS Strategic Advisor
- Strategic Wealth Portfolio and Unified Management Account: Consulting/FA fee only
- UBS Managed Portfolios, which currently includes UBS Managed Portfolio of Global Selections, UBS Managed Portfolio of Mutual Funds, and UBS Managed Portfolio advised by Gradison: Consulting/FA fee only

Only Financial Advisors subject to this Compensation Plan are eligible for this payout. NFAs in the 2007 Compensation Plan are not eligible for this payout.

**Monthly Production Credits (Advisory Fees)**
All initial and quarterly fees ("Advisory Fees") billed through the firm's managed accounts billing system ("MAB" system) will be credited on a monthly basis according to the following rules:

- Clients pay Advisory Fees in quarterly payments ("Quarterly Advisory Fee"). Monthly production credits for each month during the quarter covered by the Quarterly Advisory Fee reflect the number of days in each respective month the account remained with the firm, determined as follows: (Quarterly Advisory Fee *divided by* # of days in quarter) *multiplied* by number of days in the month the account remained with the firm.

- In the month of November (each year), the firm will advance you a net production credit advance for the projected payout relating to the anticipated December fee revenue for that year.

  - If the preconditions to earning the advanced November production credits are not met (see below), UBS will recoup the unearned payment in the form of an adjustment to your unearned standard grid payout. If the amount of unearned advances exceeds the amount of your unearned grid payout, you must immediately repay the firm any outstanding unearned advances.

- Notwithstanding the above, in order to earn a monthly production credit, you must be the FA of record for the account on the monthly settlement date (as reflected in Business Analysis) for the particular month. That is, if your employment terminates for any reason prior to the settlement date, you are not entitled to a production credit for that month or any month thereafter, irrespective of whether the account remains with the firm. Instead, the FA of record on the client account on

the settlement date of the month will be deemed to have earned the monthly production credit for that month.

There may be certain advisory fees not billed through the MAB system that the firm advances to an FA. Such fees are earned incrementally on a pro rata basis based on the number of days that the account remains with the firm during the period for which the fees were collected; however, the advisory fee production cannot be earned by an FA for any period after the FA's employment with the firm terminates, regardless of the reason for such termination and regardless of whether the account remains at the firm after the FA's employment terminates.

If an account for which fees were advanced leaves the firm or the FA leaves the firm, UBS will recoup any unearned advance in the form of an adjustment to the FA's unearned standard grid payout. If the amount of the unearned advance exceeds the amount of the FA's unearned grid payout, or the FA has no payout because he/she has left the firm, the FA must immediately repay the firm any outstanding unearned advances.

**Lending**
*Credit Lines*
Financial Advisors will receive gross production credits per year on non-purpose loans booked in a Credit Line account as follows: Net Spread -20 bps (Net Spread is defined as spread over LIBOR). For loans with higher risk (i.e., single stock), the production credit will be based on the spread less 20 bps, less an additional risk cost calculation, as determined in the sole and absolute discretion of the firm. Production will be credited only on the drawn portion of the Credit Line for the number of days that the loan is outstanding.

Credit Line production is included in your production for the purpose of calculating standard grid rates with a flat payout rate of 8.5% for the first $100 million of a single loan balance and 2% for the incremental loan balance exceeding $100 million.

- Variable Rate Loans
  Production credits on a variable rate loan (including Premier Variable Credit Line, Prime Credit Line and UBS Financial Services Credit Line) are credited based on the actual net spread for the quarter. Production is credited at the end of each calendar quarter for that quarter.

*Example:*
*A client opens a $1,000,000 Credit Line on March 22, 2010, priced at LIBOR+155 bps, which remains*

For internal use only

5

*continuously drawn at the same $1,000,000 through June 21, 2010. The FA will receive a production credit in June 2010 of $3,450.00 ($1,000,000 x 1.35% (Net Spread of 155 bps − 20 bps) ÷ 360 interest days x 92 interest days in the quarter). The unearned production payout is $293.25 ($3,450 x 8.5%).*

- Fixed Rate Loans
  Production credits on a Premier Fixed Rate Credit Line with a maturity of one year or less are based on projected net spread. The production will be credited at the end of the month in which the loan was booked.

  If a loan's maturity is greater than one year, the first year's production credit will be received in the month it is booked, and subsequent production credits will be credited on each annual anniversary.

  *Example 1:*
  *A client opens a $1,000,000 Fixed Rate Credit Line priced at LIBOR + 155 bps on January 17, 2010, with a maturity date of January 17, 2011, the FA will receive a $13,687 production credit ($1,000,000 x 135 basis points (1.35%)) ÷ 360 x 365 interest days. The unearned production payout is $1,163.40 ($13,687 x 8.5%).*

  *Example 2:*
  *If the loan above had a two-year maturity, the FA would be credited with $13,687 in January 2010 and again in January 2011.*

Production credits for variable and fixed rate loans booked during the last four business days of the month will be credited in the following month.

*Margin*
FAs receive no production credit and are not compensated on purpose (margin) loans.

*Residential Mortgages*
FAs are credited with a one-time production credit that varies based on the number of loan referrals that have funded, per FA number, in the year. For the first three funded loans, the production credit is 50 basis points. For the fourth loan forward, the production credit is 75 basis points. There is no retroactive adjustment on the first three loans.

Example 1: FA originates one $500k mortgage
If FA originates a $500k mortgage; FA will receive a production credit in the amount of $2,500 ($500,000 * 50 basis points) which will be paid at the FAs standard grid rate.

Example 2:  FA originates four $1M mortgages
If FA originates four $1 million mortgages; FA will receive production credit for the first three loans in the amount of $15,000 ($3,000,000 * 50 basis points), the fourth loan will generate a production credit in the amount of $7,500 ($1,000,000 * 75 basis points). All production will be paid at the FAs standard grid rate.

*Employee Mortgages*
Employees who finance their mortgage through UBS Mortgage have the ability to reduce the closing costs associated with the loan by an amount equal to 50 basis points of the loan.  FAs receive production credit but are not compensated on employee mortgages.

Example 1:  Employee Loan
For a $500,000 mortgage that has no origination fee (a zero point quote), you will receive the same interest rate that is quoted to clients; however, we will also take 50 basis points, or $2,500, and apply that toward your closing costs. Or, you can use the initial $2,500 to buy down the interest rate on your mortgage.

All eligible mortgages closed since January 1, 2010 are subject to the new compensation plan. Starting mid-May, the compensation system will be updated to reflect the 2010 mortgage compensation plan and a one-time "catch-up" payment will be made to reflect incremental net payout on mortgages closed since January 1, 2010.

*Letters of Credit*
Production credits for Letters of Credit are calculated as a percentage of the letter of credit fee and added to the FA's overall production credit which is paid at the standard grid payout rate.
Please refer to the *Products & Services WM Americas* section of the firm's intranet for further information on loan products.

**Cap Plan Policy**
The 2010 Cap Plan Policy applies to FAs hired prior to 1/1/09, with a NYSELOS of 8 years or more (per LOS policy in FA Compensation Plan) and with 2009 production of less than $250,000 or a June 30, 2010 trailing 12 of less than $300,000.  Under the Cap Plan, the FA will be subject to a 20% payout on all business (including wrap fees, insurance and annuities), except:
- Small ticket and small household policies will apply.
- Credit Line payout rules apply (e.g., 8.5% payout on Credit Line)
- No payout on RMA/BSA/IRA/ Basic Account Fees

6

CONFIDENTIAL

FAs on the Cap Plan will need to produce $300,000 in 2010 to uncap. If uncapped, FAs will receive a one-time payment equal to the difference between what was actually received in 2010 and what would have been received under the standard plan had the payout not been capped.

FAs will be eligible for the Asset and Credit Line Growth Award but will not be eligible for other Strategic Objective Awards while capped.
This policy applies to all FAs including those on Signature Teams.

**Small Household Policy**
Generally, there will be no compensation on households (based on "marketing household" as defined by the firm) with less than $50,000 in assets. Impacted households will be identified quarterly (e.g., June 30 for the 3rd quarter). At the end of each month, the account base will be reviewed and any households which become eligible for compensation will be removed and will be included for the remainder of that quarter. In addition, FAs will receive retroactive credit for the month the household(s) became eligible.

Households are subject to this policy if the oldest account in the household has been open for at least 12 months.

Marketing households that contain any of the following accounts will be excluded from this policy:

- DVP
- RIS
- Business Services Account (BSA)
- Prime Broker accounts housed in the IJ wire code
- Corporate Cash
- Commodity/Futures
- Employee
- Corporate ERISA Plans (e.g., 401(k), Keogh…)
- UBS Trust Company and UBS Trust Designated Trustee Services
- CEFS Plan-related

The following production will receive a payout regardless of the size of the household:

- The wrap fee for managed accounts under a wrap fee and any trails related to the wrap program.

- Insurance and annuity transactions and trails.

Please note that any production related to the small households which does not generate a payout will not count toward driving the grid, Recognition Council, or Strategic Objective Awards.

**Error Grid Reduction Policy**
FAs generating errors (positive or negative) in excess of those noted in the chart below will have their grid rate reduced as indicated. Error rate is defined as the trailing three-month errors (negative errors and 25% of positive errors) over trailing three-month production.

| Error Rate | Grid Rate Reduction[1] | Timing[3] |
|---|---|---|
| >1.0% ≤ 2.5% | -2% points | Following Quarter |
| >2.5% ≤ 5.0% | -3% points | Following Quarter |
| >5.0% ≤ 7.5% | -6% points | Following Quarter |
| >7.5% ≤ 10.0% | -8% points | Following Quarter |
| >10.0% | Minimum -10% points[2] | Following Quarter[2] |

In addition to any grid reduction that may be implemented hereunder, the firm reserves the right to impose further discipline upon any FA, up to and including termination.

This policy will not affect the amount of your required minimum monthly draw.

*Examples:*
John's production for Q2 2010 is $200,000. During that quarter, he has two negative errors totaling $1,200. Since the error rate is less than one percent of production, there will be no impact to his grid in the following quarter.

Sue's production for Q2 2010 is $120,000 and she had $4,800 in errors (one $10,000 positive error counted at 25% ($2,500) and one $2,300 negative error). This would result in a four percent error rate for the quarter. Her grid rate for the following quarter will be reduced by three points.

Frank's production for Q2 2010 is $120,000 and he had $7,000 in negative errors (5.8% error rate). His grid rate for the following quarter will be reduced by six points.

[1] Grid reduction on compensable production (capped at 110% of error amount used to determine the reduction)
[2] Management discretion on grid rate reduction and number of quarters the pay out is impacted.
[3] Following quarter is defined as the quarter commencing immediately after or within one or two months of the end of the quarter reviewed to determine the error rate.

CONFIDENTIAL                                                           UBS 00096

# Strategic Objective Awards

**Asset and Credit Line Growth Award[1]**

The firm grants an award based on net new assets and credit line growth based on year-end results.

- Net New Asset growth is defined as the value of securities and/or cash received into new and existing accounts offset by the value of securities and/or cash leaving these accounts.
- Credit Line growth is defined as the net change in outstanding Credit Line balances. Note: Paydowns of balances as of 12/31/03 (inception of award) will not be adjusted from the growth calculation in 2004 and thereafter.

The award is calculated on Net New Asset and Credit Lines beginning at $5 million as follows:

| Net New Asset and Credit Line Growth | Award[1] |
|---|---|
| First $50 million ($5 million minimum) | 15 basis points |
| From $50 million to $100 million | 10 basis points |
| From $100 million to $150 million | 5 basis points |
| From $150 million to $200 million | 2.5 basis points |
| $200 million + | 1 basis point |

- Not withstanding the foregoing, the award is capped at 5% of the Financial Advisor's production. For FAs that hit the 5% cap in 2009, the firm will carryover excess net new assets to 2010.
- RIS, Corporate Cash Management and Prime Brokerage (IJ) accounts are excluded from the award calculation. The firm reserves the right to exclude other types of institutional accounts in the future.
- Subject to the award definitions and rules set forth herein, 50% of the award is paid in cash by March 15 of the following calendar year (i.e., March 15, 2011); 50% is deferred. As with payouts for production related business, Asset and Credit Line Growth Awards are not earned until adjustments are taken into account.

Each FA is able to track his/her daily Net New Asset/Credit Line activity in the Business Analysis system. Award projections are updated monthly.

*Example 1*

FA has 2010 Net New Asset and Credit Line growth of $12 million. FA has 2010 production of $450,000. Award is capped at $450,000 x 5% = $22,500.

*Award Calculation*

| | | |
|---|---|---|
| $12 million @ 15 bps | = | $ 18,000 |
| | Total | $ 18,000 |
| Cash Award is $18,000 x 50% | = | $ 9,000 |
| Deferred Award is $18,000 x 50% | = | $ 9,000 |

*Example 2*

FA has 2010 Net New Asset and Credit Line growth of $55 million. FA has 2010 production of $1,750,000. Award is capped at $1,750,000 x 5% = $ 87,500.

*Award Calculation*

| | | |
|---|---|---|
| $50 million @ 15 bps | = | $ 75,000 |
| $5 million @ 10 bps | = | $ 5,000 |
| | Total | $ 80,000 |
| Cash Award is $80,000 x 50% | = | $ 40,000 |
| Deferred Award is $80,000 x 50% | = | $ 40,000 |

*Example 3*

FA has 2010 Net New Asset and Credit Line growth of $24 million. FA has 2010 production of $600,000. Award is capped at $600,000 x 5% = $ 30,000.

*Award Calculation*

| | | |
|---|---|---|
| $24 million @ 15 bps | = | $ 36,000 |
| | Total | $ 36,000 |

This FA's award is capped at $30,000 which is the equivalent of 15bps on $20 million in Net New Assets.
Cash Award is $30,000 x 50% = $ 15,000
Deferred Award is $30,000 x 50% = $ 15,000

---

[1] The amount of an award may be adjusted by the firm based upon the Financial Advisor's disciplinary history as well as his/her compliance with firm rules, standards and policies and or the rules and regulations of applicable SROs.

CONFIDENTIAL                                                                              UBS 00097

## Award Definitions and Rules

- All positions in DVP accounts, commodities, and option positions are excluded from the asset calculation.
- Assets must be new to our firm and held here (shown on UBS Financial Services Inc. client statements) on December 31, 2010, to generate credit for the award. New assets held away that are not reflected on aforementioned client statements will not count as new assets. Assets that come into other UBS business units (e.g., Global Asset Management, Hedge Fund Services, Investment Bank) through FA referrals will not count as Net New Assets. Documented asset referrals to/from banking centers in Wealth Management International will be included/excluded from Net New Assets, at the sole and absolute discretion of the firm. Assets reflected on the UBS statement as a "courtesy" are not included in Net New Assets.
- Market appreciation/depreciation is not included in the asset calculation.
- Dividends and interest received are not included in the asset calculation; however, cash out of an account will be offset by dividends and interest received during the year.
- If cash taken out of an account increases margin balances, the cash out will be offset by the margin increase.
- Activity related to assets and credit lines housed in split accounts will be allocated on the same percentage as production splits:
  - If an FA with a split arrangement leaves the firm, the remaining FA(s) becomes fully responsible for the assets and Credit Lines 12 months after the FA departs. If assets and Credit Lines leave during the first 12 months, the remaining FA's maximum liability is determined by the split arrangement.
  - If an FA with a split arrangement retires and the remaining FA keeps the account(s), the remaining FA(s) is fully responsible for all subsequent activity in the account(s).
- An FA becomes FA of record the day that his/her FA number appears on the account:
  - FAs who receive an account from an FA who leaves our firm will not be penalized for assets and Credit Lines that leave the account during the first 12 months.
  - FAs who receive an account from an active FA are fully responsible for the account and any subsequent activity.

- Qualified Plans (QP) Held Away—the net change for QP business held away with UBS Select providers. These assets are credited/debited at a weighting of 75%. Plans with non-UBS Select providers or programs are not eligible.
- FAs can partner with accredited Private Wealth Advisors (PWA) when there is an appropriate opportunity. The financial terms of the agreement are:

| Time Period | Gross Production, Assets and Expenses | | Net New Assets and Credit Lines | |
| --- | --- | --- | --- | --- |
| | Introducing Financial Advisor | Private Wealth Advisor | Introducing Financial Advisor | Private Wealth Advisor |
| First Year | 50% | 50% | 100% | 50% |
| Second Year | 50% | 50% | 50% | 50% |
| There-a'ter | 40% | 60% | 40% | 60% |

- Documented asset referrals to/from banking centers in Wealth Management International will be included/excluded from Net New Assets (at the sole and absolute discretion of the firm) for the first 12 months of the referral agreement. For example, if an FA refers an account, he or she will receive credit for the assets. If an FA receives a referred account, he or she will not receive net new asset credit.
- Restricted securities are considered new assets in 2010 if they become free to trade or are saleable in 2010. They will be credited automatically when they are moved into a SEG or BOX position. If not, you must notify the FA Compensation Department to get credit for those assets.
- For 2010, FAs will receive a Net New Asset credit equal to 50% of the value of assets moving to the investment center.
- Reassignment of departed FA's account are subject to the firm's Account Reassignment Policies.
- Financial Advisors paid under the Standard FA Compensation Plan are eligible for the award. Recruits become eligible once they have completed 12 months of production at our firm and are paid on the Standard Compensation Plan. NFAs on the 2004 and 2007 Compensation Plans are not eligible for this award. Prorated awards are calculated for FAs who are not eligible for the full 12-month period.

CONFIDENTIAL

UBS 00098

- The firm reserves the right to exclude certain assets if it decides, in its sole and absolute discretion, that inclusion of such assets is inconsistent with the spirit of the award.

- This award is conditioned upon and rewards continued employment with our firm. Thus, you must be employed by the firm as a Financial Advisor on the payment date to be entitled to receive the cash portion of the award, and on the vesting dates in order to earn and be entitled to the deferred portions.

**Productivity and UBS Length of Service Awards**
Deferred Productivity and UBS Length of Service Awards[1] are granted based on your current year's production.

The 2010 awards will be calculated as follows:

| Production & UBS Length of Service Awards | | | |
|---|---|---|---|
| | | UBS LOS Award | |
| 2010 Production | Productivity Award | LOS 5 – 10 yrs. | or LOS 10 yrs. + |
| $3m+ | 4% | 1% | 2% |
| $1.75m – $2.9m | 3% | 1% | 2% |
| $1m – $1.749m | 2% | 1% | 2% |
| $600k – $999k | 1% | 1% | 1% |
| $400k – $599k | 1% | 0% | 0% |

- FAs that do not qualify for awards based on the chart above but achieve Pacesetter will be eligible for a one percent productivity award and one percent UBS Length of Service Award (if UBS LOS qualifications are met).
- Awards are projected monthly based on year-to-date production and granted annually.
- Revenues subject to the small household policy will not be included when determining this award.
- Productivity and UBS Length of Service (LOS) Awards are granted not only based on productivity, but also continued employment. You must be employed by the firm on the award vesting dates in order to earn and be entitled to the award.

**Recurring Revenue Award**
The Recurring Revenue Award[1] provides FAs the potential to earn a deferred award of up to two percent of recurring revenues as follows:

- One percent awarded on recurring revenue if recurring revenue is greater than 75% of production. FAs must be employed (and producing) by 7/1/10 to be eligible to earn this award for 2010.

- One percent awarded on recurring revenue if recurring revenue growth from prior year is 25% or greater. FAs must be employed and producing prior to July 1, 2009, to be eligible to earn the 2010 award. For FAs hired between January 1, 2009, and June 30, 2009, their 2009 production will be annualized to determine the 2009 recurring revenues for comparison to 2010.

Recurring revenue is defined as wrap fees, Credit Lines, and trails on mutual funds, insurance, annuities and cash/money market balances. Revenues subject to the small household policy will not be included when determining this award.
- Awards are projected monthly based on year-to-date production and granted annually.

This award is conditioned upon and rewards continued employment with our firm. Thus, you must be employed by our firm on the award grant and on the vesting dates in order to earn and be entitled to the award.

**Summary of Strategic Objective Awards**
The Strategic Objective Awards will be allocated as follows:

| | | Deferred Awards | |
|---|---|---|---|
| | Cash | PartnerPlus/ FA Deferred Award Plans | Restricted Equity |
| Productivity Award | - | 50% | 50% |
| UBS LOS Award | - | 50% | 50% |
| Asset and Credit Line Growth Award | 50% | 25% | 25% |
| Recurring Revenue Award | - | 50% | 50% |

---

[1] The amount of an award may be adjusted by the firm based upon the Financial Advisor's disciplinary history as well as his/her compliance with firm rules, standards and policies and or the rules and regulations of applicable SROs.

10

For internal use only

CONFIDENTIAL

UBS 00099

- The PartnerPlus/FA Deferred Award Plan portion of the awards will vest 20% each year beginning after year 6 through year 10 and will be governed by and subject to the terms and provisions of the PartnerPlus/FA Deferred Award Plan.
- If the PartnerPlus/FA Deferred Award component is less than $250, it will be paid in cash by March 15 of the following calendar year.
- The restricted equity portion will vest 100% after year six, subject to the provisions of the applicable plan rules in effect.
- If the restricted equity component is less than $1,000, it will be paid in cash instead of restricted equity, no later than March 15 of the following calendar year.
- The restricted equity awards, including vesting, will be governed by (and subject to the provisions of) the plan rules in effect at the time of the award.
- These awards are conditioned upon and recognize continued employment with the firm. Thus, FAs must be employed by the firm on the payment date to be entitled to earn and receive the cash portion of the award and on the vesting dates to earn and receive the deferred portions.

**Strategic Objective Advance**
- Certain eligible FAs received cash advances versus the projected restricted equity portion of the awards for years 2009 – 2012 and the eventual restricted equity portion of the Strategic Objective Awards will be reduced by the amount of the advance related to each year.

**GrowthPlus**
- Certain FAs are eligible for the GrowthPlus program. It is an 8 year award program that credits FAs with 2% to 9% of their eligible production annually. The program includes up to 4 cash distributions. Eligibility is based on Firm LOS and production levels. There is a separate plan for New Financial Advisors.

For more details regarding GrowthPlus, please refer to the FA Compensation section of the UBS intranet at WM Americas/Human Resources/ Working at UBS/FA&NFA Compensation.

CONFIDENTIAL

UBS 00100

# Recognition Councils

There are three Recognition Councils at UBS for top-performing Financial Advisors. A targeted number of qualifiers will be set for each Recognition Council category as follows:

| Year 2011 Council Level | NYSE Reg Date | 2010 Recognition Council Production Ranking |
|---|---|---|
| Chairman's Council | | Top 230 FAs |
| President's Council | | Next 500 FAs |
| Pacesetter Council: | | |
| | Prior to 7/03 | Next 700 FAs |
| | 7/03 – 6/05 | Top 50 in NYSE LOS category |
| | 7/05 – 6/07 | Top 40 in NYSE LOS category |
| | 7/07 – 12/10 | Top 30 in NYSE LOS category |

Each month, Financial Advisors can review their rankings, along with current projected production levels for each council  Hard-dollar production thresholds will be determined and communicated after the third quarter.

Production related to the small households which do not generate a payout will not count for Recognition Council.

In addition to production, the firm may consider the Financial Advisor's disciplinary history as well as his/her compliance with firm rules, standards and policies and/or the rules and regulations of applicable SROs when determining eligibility for Recognition Councils.

12

For internal use only

CONFIDENTIAL

UBS 00101

# Teams, NFAs and Private Wealth Advisors

UBS supports the development of teams, New Financial Advisors and Private Wealth Advisors. Separate plans for these participants exist that modify certain components of this plan.

CONFIDENTIAL                                           UBS 00102

# UBS PartnerPlus/UBS Financial Advisor Deferred Award Plan

**PartnerPlus Plan ("Plan")** [1]

UBS PartnerPlus is a unique wealth accumulation plan designed to provide significant financial rewards to eligible FAs.

*Eligibility*

All 2011 Recognition Council members (based on 2010 production) and all Financial Advisors who generate a minimum of $400,000 in gross production during 2010 will have a portion of their 2010 deferred awards credited to UBS PartnerPlus and will be eligible to make a Voluntary Contribution in the year 2011.

*Base Plan*

- Contributions to the PartnerPlus Plan may include a portion of the Productivity and UBS Length of Service (LOS) Awards, a portion of the Asset and Credit Line Growth Award, Recurring Revenue Award and Voluntary Contributions.
- The PartnerPlus Plan will credit interest on a tax-deferred basis, compounded annually at the following rates for each year's contributions:
  - Years 1 – 4 = "Turbo rate," defined as four times the "Market rate"
  - Years 5 – 10 = "Market rate"

**Note**: Currently, the Market rate reflects UBS short-term cost of funds rate, defined as the yield of the offered rate of our 30-day commercial paper, averaged over the number of business days in the month. The maximum Turbo rate is 20%. The maximum Market rate is 8%.

*Voluntary Contributions*

FAs may be eligible to make pretax Voluntary Contributions of up to 50% of the total deferred awards granted, as long as the combined deferred awards and Voluntary Contributions do not exceed $100,000.

*Examples:*

| Total Deferred Awards | Maximum Allowable Voluntary Contributions |
|---|---|
| $50,000 | $25,000 |
| $80,000 | $20,000 |
| $125,000 | $0 |

- The Voluntary Contributions will earn interest at the Turbo rate during years 1 – 4 and Market rate for years 5 – 10, compounded annually.
- Voluntary Contributions will be deducted monthly from the Financial Advisor's production compensation. Once elected, a Voluntary Contribution cannot be stopped or changed for that calendar year.

*Vesting*

- Firm Contributions contributed to UBS PartnerPlus and Turbo and Market interest earned on firm contributions, will vest 20% per year, beginning after six years, through year 10.
- Voluntary Contributions vest immediately. Turbo and Market interest earned on Voluntary Contributions will vest 20% per year, beginning after six years, through year 10.
- Firm Contributions and Turbo and Market interest vest immediately upon death or disability and are eligible for continued vesting upon a Qualifying Separation.

*In-Service Distributions*

- All vested firm and Voluntary Contributions and related vested Turbo and Market interest will generally be paid to the Financial Advisor after the 10-year anniversary of each year's contribution.

For detailed information, please refer to the PartnerPlus Plan Document in the *FA/NFA Compensation* section of the firm's intranet.

---

[1]  In the event of a conflict between the summary of the Plans set forth in this document and the Plan Documents, the Plan Documents will control. Capitalized terms herein have the meaning ascribed to them in the applicable Plan Document.

For internal use only

CONFIDENTIAL

**UBS Financial Advisor Deferred Award Plan ("Deferred Award Plan")** [2]

*Base Plan*
Contributions to the Deferred Award Plan include the deferred portion of the Asset and Credit Line Growth Award and recurring revenue award for those Financial Advisors not eligible for the UBS PartnerPlus Plan.

The Deferred Award Plan will credit interest on a tax-deferred basis, compounded annually at the following rates for each year's contributions:

- Year 1 through 4 = "Turbo rate," defined as four times the "Market rate"
- Years 5 through 10 = "Market rate"

**Note:** Currently, the Market rate reflects UBS's short-term cost of funds rate, defined as the yield of the offered rate of our 30-day commercial paper, averaged over the number of business days in the month. The maximum Turbo rate is 20%. The maximum Market rate is 8%.

*Vesting*
- Firm Contributions and the related Turbo and Market interest will vest 20% per year, beginning after six years, through year 10.
- Firm contributions and Turbo and Market interest vest immediately upon death or disability (as defined in the Financial Advisor Deferred Award Program plan document) and are eligible for continued vesting upon a Qualifying Separation.

*In-Service Distributions*
All vested firm Contributions and related vested Turbo and Market interest will be paid to the Financial Advisor after the 10-year anniversary of each year's Contribution.

**Additional Information Relating to PartnerPlus and the FA Deferred Award Plans**
*Financial Condition of the firm*
- Participants in UBS PartnerPlus and UBS Financial Advisor Deferred Award Plans are "unsecured" creditors of UBS Financial Services Inc., the sponsor of these plans. This means that, in the event of its insolvency, claims of participants would be subordinate to "secured" creditors, if any, and participants' firm and Voluntary Contributions and the Market and Turbo interest credited thereon would be at risk.
- The PartnerPlus Offering Memorandum, which is available to FAs eligible to participate in the PartnerPlus Plan, describes in greater detail the terms of the Plan applicable to Voluntary Contributions. You should carefully review the entire PartnerPlus Offering Memorandum, including each exhibit, before deciding whether to make a Voluntary Contribution. The PartnerPlus Offering Memorandum may be found *at http:// financialservicesinc.ubs.com/ staticfiles/pws/adobe/StatementofFinancial Condition.pdf.*

UBS AG's annual and interim reports submitted to the Securities and Exchange Commission, which also contain information about our financial condition, may be found *at http://www.ubs. com/1/e/investors/ sec_filings.html.*

Refer to the PartnerPlus Brochure and the PartnerPlus Plan Documents for detailed information not provided in this summary. Copies of the PartnerPlus Brochure and Plan Documents can be found in the *FA/NFA Compensation* section of the firm's intranet. If there is any difference between this summary and the Plan Document, the Plan Document will govern. Capitalized terms herein have the meanings ascribed to them in the Plan Document.

---

[2]  In the event of a conflict between the summary of the Plans set forth in this document and the Plan Documents, the Plan Documents will control. Capitalized terms herein have the meaning ascribed to them in the applicable Plan Document.

CONFIDENTIAL

UBS 00104

A-125

# Wealth Protection Programs

**Transitioning Financial Advisor Program**
The Transitioning Financial Advisor Program enables qualified Financial Advisors leaving the business to smoothly transition client accounts to other Financial Advisors and continue to receive compensation from those accounts for up to five more years, subject to the terms and conditions of the Transitioning Financial Advisor documents.

Generally, transitioning FAs must meet the following criteria in order to be eligible to receive the full benefits of the TFAP:
- Have a partnership with one or more FAs for over one year. Partnership must be on all accounts to be transitioned.
- 10 years of continuous UBS employment
- Transitioning FA must have a minimum trailing 12-month gross production of $200,000 and a minimum of $25m in total assets

Transition percentage is based on firm LOS, % Wrap fee production & Total Assets (maximum 180% - see table below).

Transitioning FA Highlights
- Ability to receive an advance payment (max. 25%)
- To assist in the book transition, FAs may be eligible to remain as active employees for up to two years
- Transition payout applied over time frame to include pre- and post-separation from employment periods.
- Payments based on actual production during program.

- Survivor Benefits (Transitioning FA not covered by "Financial Advisor Survivor Benefit" program described below)

Receiving FA Highlights
- Credit for 100% of Gross Production, Net New Assets and Assets Under Control
- Net production will be adjusted over the term of the arrangement to a maximum of 100 percentage points of the transition percentage
- Potential to earn annual five percent bonuses (totaling 25 percentage points over the life of the agreement) for growing the book

Other Details
- Both Transitioning and Receiving FA must be in good Legal and Compliance standing.
- Transition payout rate applied to the actual production generated over five years.
- Both Transitioning and Receiving FA must execute agreements prepared by the firm.
- Production that is either non-compensable (e.g. small household, small ticket, account fees (RMA, BSA, IRA)) or paid at a flat rate (e.g. credit lines) will not be included when determining the payout to the Transitioning FA.
- For further details, please refer to the Transitioning Financial Advisor Program brochure located in the *FA/NFA Compensation* section of the firm's intranet.

### Transitioning Financial Advisor Program

| UBS LOS | % of Prod. | % Wrap | % of Prod. | Total Assets (In Millions) | % of Prod. | | Deal Range UBS LOS | % of Prod. |
|---|---|---|---|---|---|---|---|---|
| 10 – 14 yrs. | 30% | 0 – 9.99% | 0% | $ 0 – $ 19.99 | 0% | | 10 – 14 yrs. | 30 to 150% |
| 15 – 19 yrs. | 40% | 10 – 19.99% | 10% | $ 20 – $ 39.99 | 10% | | 15 – 19 yrs. | 40 to 160% |
| 20 – 24 yrs. | 50% | 20 – 29.99% | 30% | $ 40 – $ 79.99 | 20% | | 20 – 24 yrs. | 50 to 170% |
| 25 yrs. + | 60% + | 30 – 39.99% | 40% + | $ 80 – $ 99.99 | 30% = | | 25 yrs.+ | 60 to 180% |
| | | 40 – 59.99% | 50% | $ 100 – $ 149.99 | 40% | | | |
| | | 60%+ | 60% | $ 150 – $ 199.99 | 50% | | | |
| | | | | $ 200+ | 60% | | | |

For internal use only

CONFIDENTIAL

UBS 00105

**Financial Advisor Survivor Benefit**

The Financial Advisor Survivor Benefit is a corporate-paid benefit that provides financial protection to an FA's beneficiary in the event he/she passes away while still producing for the firm. In the event of death, the plan pays the beneficiary 75% of 12-month's gross production (determined 12/31 of prior year). The maximum payout is $2.5 million. The payout will be made to the beneficiary in two taxable payments over two years.

To be eligible, FA's must have a minimum production of $500,000 and have completed three years of continuous service with the firm immediately prior to death. Recipients of the accounts previously serviced by the FA will be subject to a payout rate of grid - 15 on the transitioned book for three years.

- The above is a summary of the Financial Advisor Survivor Benefit Plan document.  For more detailed information, please refer to the plan document located in the WM Americas section, Human Resources/Working at UBS/FA/NFA Compensation section of the firm's intranet.  In the event of a conflict between the above summary of the Financial Advisor Survivor Benefit Plan document and the plan document it self, the plan document will control.

CONFIDENTIAL

UBS 00106

# Expense Allowance Programs

**Pacesetter Expense Allowance Program**
Recognition Council members are eligible for a discretionary expense allowance for the purpose of promoting business. This allowance is generally considered nontaxable; however, certain expenses may be reported as taxable income.

The year 2010 Pacesetter expense allowance granted to each Recognition Council member is as follows:

|  | Pacesetter Expense Allowance |
|---|---|
| Chairman's Circle (Chairman's Council five consecutive years) | $10,000 |
| FAs > $3 million in production | $10,000 |
| All other Chairman's Council FAs | $5,000 |
| President's Council FAs | $3,500 |
| Pacesetter (prior to July 2003 NYSE registration date) | $2,000 |
| Pacesetter (post-July 2003 NYSE registration date) | $1,500 |

Business expenses eligible for reimbursement include, but are not limited to, business meals and entertainment, travel and lodging, computer leasing, subscriptions and seminars.

**Business Builder Program**
Business Builder is a mandatory program in which adjustments are made to the standard grid rate applicable to you in anticipation of business expenses to be incurred during the year. Generally, Business Builder is available to pay for extra services and business expenses (beyond the essential services that UBS provides) on a pre-tax basis.

- **Baseline Mandatory Grid Reduction**
Financial Advisors with 2009 production of at least $300,000 are subject to the following 2010 *Baseline Mandatory Grid Reduction*.

| Prior Year's Production | Mandatory Current Year Grid Adjustment |
|---|---|
| $2MM+ | 10 bps |
| $750K - $1.99M | 15 bps |
| $300K – $749K | 20 bps |
| < $300K | 0 bps |

For 2010, your *Business Builder* expense allowance will be based on an adjustment to your Grid and credited monthly from March through December. Reimbursements under the program cannot exceed the amounts available.

- **Business Plan Development Amount**
In addition, Branch Managers will determine the appropriate "Add-On" Grid Reduction based on the review of the business plan and business mix for their Financial Advisors.

The minimum BOM Add-On is 25 bps. BOMs can also select add-ons in the following increments: 25, 50, 75, 100 and 150 bps. Chairman and $5MM producers only are eligible for a 250 bps or 350 bps Business Builder grid reduction based on Branch Manager determination (using the business plan).

When determining the "Add on", the Branch Manager will consider such factors as your business plan for the coming year, location, production goals, past performance and the historical level of expenses of the branch. The Branch Manager will also consider other relevant factors including input from you. This decision is subject to review by UBS's Human Resources Department. The decision of the Branch Manager (as approved by UBS's Human Resources Department) is final and binding on you.

**General**
Refer to the Pacesetter and Business Builder Brochures and the Pacesetter and Business Builder Plan Documents for detailed information not provided in this summary. Copies of the Brochures and Plan Documents can be found in the firm's intranet in the WM Americas section in Human Resources/Working at UBS/FA/NFA Compensation. If there is any difference between this summary and the Plan Document, the Plan Document will govern. Capitalized terms herein have the meanings ascribed to them in the Plan Document.

CONFIDENTIAL                                          UBS 00107

A-128

# Length of Service Policy

Your LOS, both in the industry and at UBS, may affect some aspects of the Compensation Plan. Industry LOS is generally determined by your NYSE registration date. UBS LOS is determined by your date of registration with UBS. LOS for the year is calculated each January 1, based on the chart below.

| NYSE or UBS Registration Date | 2009 LOS | 2010 LOS | 2011 LOS |
|---|---|---|---|
| July 1, 2010 – June 30, 2011 | – | – | 0 |
| July 1, 2009 – June 30, 2010 | – | – | 1 |
| July 1, 2008 – June 30, 2009 | 0 | 1 | 2 |
| July 1, 2007 – June 30, 2008 | 1 | 2 | 3 |
| July 1, 2006 – June 30, 2007 | 2 | 3 | 4 |
| July 1, 2005 – June 30, 2006 | 3 | 4 | 5 |
| July 1, 2004 – June 30, 2005 | 4 | 5 | 6 |
| July 1, 2003 – June 30, 2004 | 5 | 6 | 7 |
| July 1, 2002 – June 30, 2003 | 6 | 7 | 8 |
| July 1, 2001 – June 30, 2002 | 7 | 8 | 9 |
| July 1, 2000 – June 30, 2001 | 8 | 9 | 10 |
| July 1, 1999 – June 30, 2000 | 9 | 10 | 11 |
| July 1, 1998 – June 30, 1999 | 10 | 11 | 12 |
| July 1, 1997 – June 30, 1998 | 11 | 12 | 13 |
| July 1, 1996 – June 30, 1997 | 12 | 13 | 14 |
| July 1, 1995 – June 30, 1996 | 13 | 14 | 15 |
| July 1, 1994 – June 30, 1995 | 14 | 15 | 16 |
| July 1, 1993 – June 30, 1994 | 15 | 16 | 17 |
| July 1, 1992 – June 30, 1993 | 16 | 17 | 18 |
| July 1, 1991 – June 30, 1992 | 17 | 18 | 19 |
| July 1, 1990 – June 30, 1991 | 18 | 19 | 20 |
| July 1, 1989 – June 30, 1990 | 19 | 20 | 21 |
| July 1, 1988 – June 30, 1989 | 20 | 21 | 22 |
| July 1, 1987 – June 30, 1988 | 21 | 22 | 23 |
| July 1, 1986 – June 30, 1987 | 22 | 23 | 24 |
| July 1, 1985 – June 30, 1986 | 23 | 24 | 25 |
| July 1, 1984 – June 30, 1985 | 24 | 25 | 26 |

CONFIDENTIAL                                                UBS 00108

# Arbitration

With the exception of claims for injunctive relief or the denial of benefits under the firm's disability or medical plans, you and UBS agree that, unless prohibited by applicable law, any disputes between you and UBS including claims concerning compensation, benefits or other terms or conditions of employment and termination of employment, or any claims for discrimination, retaliation or harassment, or any other claims whether they arise by statute or otherwise, including but not limited to, claims arising under the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, as amended, The Age Discrimination in Employment Act of 1967, The Worker Adjustment and Retraining Notification Act, The Employee Retirement Income Security Act, The Americans With Disabilities Act, The Equal Pay Act of 1963, The Americans With Disabilities Act of 1990, The Family and Medical Leave Act of 1993, The Sarbanes-Oxley Act, or any other federal, state or local employment or discrimination laws, rules or regulations, including wage and hour laws, will be determined by arbitration as authorized and governed by the arbitration law of the state of New Jersey. Any such arbitration will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA"), except that you may elect to arbitrate discrimination claims under any federal, state or local law (including claims of harassment and retaliation under those laws) before JAMS pursuant to its Employment Arbitration Rules and Procedures and subject to the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness. Subject to the parties' right to appeal or seek vacatur under applicable law, you and UBS agree that the decision of the Arbitrator(s) will be final and binding on the parties and that the Arbitrator(s) is authorized to award whatever remedies would be available to the parties in a court of law. You and UBS further agree that any disputes between you and UBS shall be heard, as set forth above, by FINRA or JAMS[1] without consolidation of such claims with any other person or entity. By agreeing to the terms of this Compensation Plan to the fullest extent permitted by law, you waive any right to commence, be a party to or an actual or putative class member of any class or collective action arising out of or relating to your employment with UBS or the termination of your employment with UBS. Notwithstanding anything to the contrary herein, you and UBS further agree that if, for any reason, the waiver of your right to commence a class or collective proceeding within or outside of an arbitration proceeding is found to be unenforceable by a court of competent jurisdiction, the agreement to arbitrate contained in this Compensation Plan shall no longer apply and any class or collective claim shall be filed, litigated and adjudicated in a court of competent jurisdiction, and not in arbitration.

---

[1] Information about JAMS, including its Employment Arbitration Rules and Procedures, can be found at www.jamsadr.com. If you choose to arbitrate before JAMS, then, where permitted by law, you only shall be responsible for those arbitration fees and costs that you would have been required to bear in a FINRA arbitration.

For internal use only

CONFIDENTIAL                                                                              UBS 00109

A-130

# Conclusion

The Financial Advisor Compensation Plan, effective 1/1/10, summarizes many, but not all, of the elements of your compensation.[1] The continuation of your employment after receipt of this plan and/or acceptance of benefits hereunder shall be deemed your consent and agreement to its terms. This Plan is not a promise, an agreement or a contract that your employment is guaranteed or that the policies and practices that are described will always be the same. Except for the arbitration provision on page 19 and the terms and conditions set forth therein, UBS Wealth Management Americas, in its sole discretion and without notice, may add to, modify, change or rescind any of the policies, practices, procedures or guidelines in whole or in part at any time. In the event of changes, you may be notified via e-mail and/or any such change will be posted on the firm's intranet under *Personal/ HR / My HR Location – USA / FA/NFA Compensation*. UBS also reserves the right , in its sole and absolute discretion, to lower payout rates in general, or for specific FAs if they demonstrate negligence or carelessness or otherwise fail to comply with firm rules, standards, practices and policies and/or applicable law, including the rules and regulations of applicable SROs.[2] In addition, the FA will not earn production or fees on transactions that the firm determines should be reversed, that a customer or other third party fails to pay the firm or consummate or that do not comply fully with the terms of this Plan, all applicable laws, rules and policies, and the rules associated with the specific product then in effect.

Compensation (including but not limited to monthly production payouts and annual awards) is not earned until adjustments are made. Furthermore, compensation is not earned and deferred compensation is not earned and does not vest unless the transactions comply with governing laws, rules of the self-regulatory organizations and UBS Wealth Management Americas policies. Each FA will receive a minimum compensation amount determined by the state in which he/she works. This amount is a guaranteed draw against: (1) unearned production payouts and (2) other compensation earned by the FA.

A guaranteed draw is a guaranteed, predetermined lump-sum amount paid to you every month as an advance against your anticipated unearned production payout including fees. In addition to the draw, you also receive a monthly check for earned payout. If your earned production payout is equal to or less than the draw, you do not receive a separate check. Sums paid solely to bring your earned payout to the guaranteed minimum are not carried forward into subsequent months, but rather are unrecoverable. Note, however, that all authorized adjustments are carried forward and recoverable (including draw amounts that exceed the guaranteed minimum amount).

Compensation under this Compensation Plan is paid on a monthly basis, unless deferred as set forth herein. Unless prohibited by applicable law, upon termination of your employment for any reason, UBS will pay you any compensation earned under this Compensation Plan on the next scheduled production related payout date for its current employees.  Unless otherwise stated in this Compensation Plan, in order for an FA to earn production compensation on revenue, such revenue must be posted to the FA's number on or before the last business day of the month following the FA's termination. .

---

[1] For example, referrals between business units may be subject to individual compensation arrangements.
[2] UBS, in its sole discretion, may also impose other types of discipline including, without limitation, termination of employment, unpaid suspension for one or more working days and/or other forms of written, oral and, where lawful, monetary discipline

CONFIDENTIAL                                                                    UBS 00110

✧ UBS

# FA Compensation Plan Acknowledgement

I have received my copy of the 2007 Financial Advisor Compensation Plan ("Plan") and understand it is my responsibility to read it and understand its contents. I agree that I will be bound by the terms of the Plan. I understand that notwithstanding the Plan, I am and will remain an at-will employee, which means that either I or UBS can terminate my employment at any time, for any or no reason, with or without advance notice.

_Eliot Cohen_
Employee Name

_[signature]_
Employee Signature

_4/3/7_
Date

Please return this signed acknowledgement to your Branch Management team.

LEGAL_US_E # 72440501.1

CONFIDENTIAL

UBS 12563



❄ UBS

432003104

SHOEMAKER, C

# FA Compensation Plan
# Acknowledgement

I have received my copy of the 2007 Financial Advisor Compensation Plan ("Plan") and understand it is my responsibility to read it and understand its contents. I agree that I will be bound by the terms of the Plan. I understand that notwithstanding the Plan, I am and will remain an at-will employee, which means that either I or UBS can terminate my employment at any time, for any or no reason, with or without advance notice.

_Charles Shoemaker_

**Employee Name**

_[signature]_

**Employee Signature**

_April 8 2007_

**Date**

Please return this signed acknowledgement to your Branch Management team.

CONFIDENTIAL

UBS 09929

 **UBS**

43193337

# FA Compensation Plan Acknowledgement

I have received my copy of the 2007 Financial Advisor Compensation Plan ("Plan") and understand it is my responsibility to read it and understand its contents. I agree that I will be bound by the terms of the Plan. I understand that notwithstanding the Plan, I am and will remain an at-will employee, which means that either I or UBS can terminate my employment at any time, for any or no reason, with or without advance notice.

Philip J. Ricasata
Employee Name

_Philip J. Ricasata_
Employee Signature

4-2-07
Date

Please return this signed acknowledgement to your Branch Management team.

LEGAL_US_E # 72440501.1

UBS 10525

 UBS

# FA Compensation Plan Acknowledgement

*A*

*43193337*

I have received my copy of the Financial Advisor Compensation Plan ("Plan"), effective 1/1/2008 and understand and agree that I am bound by its terms.

PHILIP J. RICASATA
Employee Name

*Philip J. Ricasata*
Employee Signature

6-25-08
Date

Please return this signed acknowledgement to your Branch Management team.

LEGAL_US_E # 72440501.1

CONFIDENTIAL

UBS 10526

A-135

 **UBS**

JO Ventura, CA

# FA Compensation Plan Acknowledgement

I have received my copy of the Financial Advisor Compensation Plan ("Plan"), effective 1/1/2009 and understand and agree that I am bound by its terms.

_____ PHILIP J. RICASATA _____
Employee Name

_____ [signature] _____
Employee Signature

_____ 6-29-09 _____
Date

Please return this signed acknowledgement to your Branch Management team.

For internal use only                                          23

※ UBS

**FA Compensation Plan Acknowledgement**

43223158

I have received my copy of the 2007 Financial Advisor Compensation Plan ("Plan") and understand it is my responsibility to read it and understand its contents. I agree that I will be bound by the terms of the Plan. I understand that notwithstanding the Plan, I am and will remain an at-will employee, which means that either I or UBS can terminate my employment at any time, for any or no reason, with or without advance notice.

Stan Sklenar
_____
Employee Name

_____
Employee Signature

4.2.07
_____
Date

Please return this signed acknowledgement to your Branch Management team.

04/30/07  13:27 FAX 213 253 5482      WESTERN DIVISION                    ☑007

CONFIDENTIAL                                                                UBS 10838

05/01/07   15:29 FAX 213 253 5462          WESTERN DIVISION                          ☑002

UBS FINANCIAL SRVS        Fax:14159546791          May  1 2007  15:38      P.02

**UBS**

43223175

# FA Compensation Plan
# Acknowledgement

I have received my copy of the 2007 Financial Advisor Compensation Plan ("Plan") and understand it is my responsibility to read it and understand its contents. I agree that I will be bound by the terms of the Plan. I understand that notwithstanding the Plan, I am and will remain an at-will employee, which means that either I or UBS can terminate my employment at any time, for any or no reason, with or without advance notice.

David Hake
Employee Name

[signature]
Employee Signature

4/30/07
Date

Please return this signed acknowledgement to your Branch Management team.

Because certain fees are credited quarterly, in the first month of each quarter, UBS reserves the right to advance against those fees the draw payment for the final months of the quarter in which the fees are earned. For example, fees advanced in January cover the first calendar quarter, January through March. Therefore, for example, the Firm reserves the right to advance the February and March guaranteed, non-recoverable draw, and pay it in January in addition to the guaranteed, non-recoverable draw for January.

*Example 1 (production payout exceeds the draw):*
Your guaranteed draw is $1,972 per month. In one month you generated payout before adjustments of $10,000. Accordingly, you will receive a production payout of $8,028 ($10,000 - $1,972), less adjustments.

*Example 2 (production payout less than the draw):*
Your guaranteed draw is $1,972 per month. In Month 1, you generated payout before adjustments of $1,500. Accordingly for Month 1, you will not receive a production payout because the draw exceeded your production payout ($1,500 < $1,972). However, in Month 2, you generated payout before adjustments of $12,000. For Month 2, you will receive a production payout of $10,028 ($12,000 - $1,972 draw) less adjustments, as the sum paid to bring your payout to the guaranteed minimum from Month 1 is not carried forward.

*Example 3 (fees advanced):*
Your guaranteed draw is $1,972. In January you are credited fees of $3,000 and you generated production payout of $1,000 for a $74,000 payout before adjustments. Your production payout and 1/3 of your fees offset your January draw, leaving $8,028 ($10,000 - $1,972 draw) less adjustments. UBS reserves the right to collect $3,944 of the remaining 2/3 of credited fees against your February and March draw.

**USB 15101**

**CONFIDENTIAL**

4 3233175

T08

❋ UBS

# FA Compensation Plan Acknowledgement

I have received my copy of the Financial Advisor Compensation Plan ("Plan"),
effective 1/1/2008 and understand and agree that I am bound by its terms.

David Nathan Hale
Employee Name

Employee Signature

7/7/08
Date

Please return this signed acknowledgement to your Branch Management team.

                    USB 15098

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ELIOT COHEN, PHILIP RICASATA and CHARLES SHOEMAKER, on behalf of themselves and all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UBS FINANCIAL SERVICES, INC. and UBS AG, | ) ) ) |
| Defendants. | ) ) ) |

Case No. 1:12-CV-02147 (BSJ) (JLC)

**DECLARATION OF**
**ROBERT ABRAMS**

1.      I am Of Counsel to the law firm of Wolf Haldenstein Adler Freeman & Herz LLP with offices at 270 Madison Avenue, New York, New York 10016, attorneys for plaintiffs in this matter. I am fully familiar with the facts and circumstances surrounding this litigation, and I submit this Declaration in support of Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion To Compel Arbitration And Stay This Action.

2.      Attached hereto as Exhibit A is a true and correct copy of the Securities and Exchange Commission's Release No. 34-66774, Notice of Filing of Amendment No. 1 and Order Granting Accelerated Approval of a Proposed Rule Change.

3.      Attached hereto as Exhibit B is a true and correct copy of Regulatory Notice 12-28, Securities and Exchange Commission approval of amendments to FINRA Rule 13204 concerning Collective Action Claims.

4.      Attached hereto as Exhibit C is a true and correct copy of *Department of Enforcement v. Charles Schwab & Company, Inc.*, Disciplinary Proceeding No. 2011029760201 (Feb.1, 2012).

689957

5.      Attached hereto as Exhibit D is a true and correct copy of a spreadsheet showing the calculation of damages for each of the five Plaintiffs in this litigation. The information concerning annual compensation, vacation and time frame was obtained from the Plaintiffs' Declarations filed herewith. The calculations followed the legal requirements outlined by Plaintiffs' counsel in the *LaVoice* litigation. *LaVoice v. UBS*, 11-cv-2308 (BSJ), Dkt. No. 26 at 1-3. The second page of that spreadsheet shows the calculation of costs for each of the Plaintiffs to travel from their homes in California to New York for FINRA arbitrations.

6.      Attached hereto as Exhibit E is a true and correct copy of three NASD/FINRA reports on FLSA arbitration cases involving financial advisors and their employers. These exhibits show the nature of the claims and the arbitration outcome; the size of the awards to the claimants; the attorney fees awarded; the fees charged; and the number of arbitration sessions held. This information forms part of the basis for Plaintiffs' estimates of the costs of FINRA arbitration and the likely outcomes.

7.      Attached hereto as Exhibit F is a true and correct copy of the Affidavit of James L. Bicksler in Support of Opposition to Motion to Compel Arbitration. *LaVoice v. UBS*, 11-cv-2308 (BSJ), Dkt. No. 19.

I declare under penalty of perjury that the foregoing is true and accurate.


Dated: New York, New York
       June 8, 2012

Robert Abrams (7559 RA)


689957

A-141

# EXHIBIT A

# Regulatory Notice

# 12-28

## Collective Action Claims

### SEC Approves Amendments to Rule 13204 of the Industry Code to Preclude Collective Action Claims from Being Arbitrated Under the Code

**Effective Date: July 9, 2012**

### Executive Summary

The SEC approved amendments to FINRA Rule 13204 of the Code of Arbitration Procedure for Industry Disputes (Industry Code) to preclude collective action claims by employees of FINRA member firms under the Fair Labor Standards Act (FLSA),[1] the Age Discrimination in Employment Act (ADEA)[2] or the Equal Pay Act of 1963 (EPA)[3] from being arbitrated under the Industry Code.[4]

The amendments are effective on July 9, 2012, for any claims that are part of a certified or putative collective action under the FLSA, ADEA or EPA. The text of the amendments is set forth in Attachment A.

Questions concerning this *Notice* should be directed to:

► Kenneth L. Andrichik, Senior Vice President, Chief Counsel and Director of Mediation and Strategy, Dispute Resolution, at (212) 858-3915 or *ken.andrichik@finra.org*; or

► Mignon McLemore, Assistant Chief Counsel, Dispute Resolution, at (202) 728-8151 or *mignon.mclemore@finra.org*.

### Background and Discussion

The Code of Arbitration Procedure for Customer Disputes (Customer Code) and the Industry Code (together, Codes) prohibit a claim that is part of a class action from being arbitrated in FINRA's Dispute Resolution forum.[5] Specifically, the class action rules provide that any claim that is based upon the same facts and law, and involves the same defendants as in a court-certified class action or a putative class action, shall not be arbitrated, unless the party bringing the claim files with FINRA one of the following:

### June 2012

**Notice Type**
► Rule Amendment

**Suggested Routing**
► Compliance
► Legal
► Registered Representatives

**Key Topics**
► Arbitration
► Code of Arbitration Procedure
► Collective Action
► Industry Code

**Referenced Rules & Notices**
► Rule 13204



**FINBA**
Financial Industry Regulatory Authority

1

## 12-28 | June 2012

- ▶ a copy of a notice filed with the court in which the class action is pending that the party will not participate in the class action or in any recovery that may result from the class action, or has withdrawn from the class according to any conditions set by the court; or
- ▶ a notice that the party will not participate in the class action or in any recovery that may result from the class action.[6]

FINRA issued an interpretive letter (FINRA letter) in 1999 that stated that its class action rules should include collective action claims brought under the FLSA and, thus, considered these claims ineligible for arbitration in its forum.[7] Despite that interpretation, a district court decision found that an FLSA collective action is not a class action for purposes of Rule 13204 of the Industry Code and compelled arbitration of the claim in FINRA's dispute resolution forum.[8] FINRA is, therefore, amending Rule 13204 of the Industry Code to preclude expressly collective actions from being arbitrated in its dispute resolution forum.[9]

Under the amendments, Rule 13204(b)(1) provides that collective action claims under the FLSA, the ADEA or the EPA may not be arbitrated under the Code.

Second, Rule 13204(b)(2) states that any claim that involves similarly-situated[10] plaintiffs against the same defendants, such as a court-certified collective action or a putative collective action,[11] or that is ordered by a court for collective action at a forum not sponsored by a self-regulatory organization, shall not be arbitrated under the Code, if the party bringing the claim has opted-in to the collective action. Thus, under the rule, if an associated person opts in to a collective action, that person would be precluded from arbitrating the same claims in FINRA's arbitration forum.

Third, Rule 13204(b)(3) provides that the director will refer to a panel any dispute as to whether a claim is part of a collective action, unless a party asks the court or other forum hearing the collective action to resolve the dispute within 10 days of receiving notice that the director has decided to refer the dispute to a panel. The rule gives arbitrators the authority to decide disputes about whether a claim is part of a collective action, unless a court or other forum resolves the dispute.

Finally, Rule 13204(b)(4) prohibits a member firm or associated person from enforcing an agreement to arbitrate in this forum against a member of a certified or putative collective action with respect to any claim that is the subject of the certified or putative collective action until either the collective certification is denied or the group is decertified. This rule clarifies that the existence of a certified or putative collective action nullifies any pre-dispute arbitration agreements with respect to claims involving that collective action. If, however, a court denies a plaintiff's request to certify a collective action or the court decertifies the collective action, the pre-dispute arbitration agreement would be enforceable.

## Effective Date Provisions

The amendments are effective on July 9, 2012, for any claims that are part of a certified or putative collective action under the FLSA, ADEA or EPA.

June 2012 | **12-28**

## Endnotes

1. *See* 29 U.S.C. § 201 *et seq.*

2. *See* 29 U.S.C. §§ 621 *et seq.* The relief provisions of the ADEA incorporate Section 16 of the FLSA, which outlines the penalties for violations of the statute, and state that the ADEA shall be enforced by the "powers, remedies and procedures" of the FLSA. *See* 29 U.S.C. § 626(b).

3. *See* 29 U.S.C. § 206(d). The EPA, which is part of FLSA as amended, is administered and enforced by the United States Equal Employment Opportunity Commission. The relief provisions of the EPA also incorporate Section 16 of the FLSA.

4. *See* Securities Exchange Act Rel. No. 66774 (April 9, 2012), 77 FR 22374 (April 13, 2012) (Notice of Filing of Amendment No. 1 and Order Granting Accelerated Approval of a Proposed Rule Change as Modified by Amendment No. 1, Amending Rule 13024 of the Code of Arbitration Procedure for Industry Disputes To Preclude Collective Action Claims From Being Arbitrated) (File No. SR-FINRA-2011-075).

5. *See* Rule 12204 of the Customer Code and Rule 13204 of the Industry Code (class action rules).

6. In its April 2012 Approval Order, the SEC states that "Rule 13204 of the Industry Code generally provides that any claim that is based upon the same facts and law, and involves the same defendants as in a court-certified class action or a putative class action, shall not be arbitrated." *See supra* note 4 at p. 22374. FINRA notes that, under its class action rules, claims based on the same facts and law and involving the same defendants may be arbitrated in FINRA's forum provided that the party bringing the claims meets certain criteria. *See supra* note 5.

7. *See, e.g., FINRA Interpretive Letter to Cliff Palefsky, Esq.,* dated Sept. 21, 1999.

8. *Hugo Gomez et al. v. Brill Securities, Inc. et al.,* No. 10 Civ. 3503, 2010 U.S. Dist. LEXIS 118162 (S.D.N.Y. Nov. 2, 2010); *see also Velez v. Perrin Holden & Davenport Capital Corp., Nelson Braff, Jody Eisenman and Perter Hoffman,* No. 10 Civ. 3735, 2011 U.S. Dist. LEXIS 16678 (S.D.N.Y. Feb. 3, 2011).

9. The Customer Code would not be amended because, for the FLSA, ADEA or EPA to apply, there must be an employment relationship between an employer and employee. See U.S. Department of Labor, *"What does the Fair Labor Standards Act require?",* elaws—Fair Labor Standards Act Advisor.

10. The FLSA statute uses the term "similarly-situated" to describe the type of plaintiffs who file a collective action claim. *See* 29 U.S.C. § 216(b).

11. Before a collective action is certified, courts often refer to the case as a *putative* collective action.

© 2012 FINRA. All rights reserved. FINRA and other trademarks of the Financial Industry Regulatory Authority, Inc. may not be used without permission. *Regulatory Notices* attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

**12-28** | June 2012

## ATTACHMENT A

New language is underlined; deleted language is in brackets.

**Code of Arbitration Procedure for Industry Disputes**

**Industry Code**

**13204.  Class Action <u>& Collective Action</u> Claims**

<u>(a)  Class Actions</u>

<u>(1)</u> Class action claims may not be arbitrated under the Code.

<u>(2)</u> Any claim that is based upon the same facts and law, and involves the same defendants as in a court-certified class action or a putative class action, or that is ordered by a court for class-wide arbitration at a forum not sponsored by a self-regulatory organization, shall not be arbitrated under the Code, unless the party bringing the claim files with FINRA one of the following:

<u>(i)</u> a copy of a notice filed with the court in which the class action is pending that the party will not participate in the class action or in any recovery that may result from the class action, or has withdrawn from the class according to any conditions set by the court; or

<u>(ii)</u> a notice that the party will not participate in the class action or in any recovery that may result from the class action.

<u>(3)</u> The Director will refer to a panel any dispute as to whether a claim is part of a class action, unless a party asks the court hearing the class action to resolve the dispute within 10 days of receiving notice that the Director has decided to refer the dispute to a panel.

<u>(4)</u> A member or associated person may not enforce any arbitration agreement against a member of a certified or putative class action with respect to any claim that is the subject of the certified or putative class action until:

- The class certification is denied;
- The class is decertified;
- The member of the certified or putative class is excluded from the class by the court; or
- The member of the certified or putative class elects not to participate in the class or withdraws from the class according to conditions set by the court, if any.

Regulatory Notice

**(b)  Collective Actions**

(1)  Collective action claims under the Fair Labor Standards Act, the Age Discrimination in Employment Act, or the Equal Pay Act of 1963 may not be arbitrated under the Code.

(2)  Any claim that involves plaintiffs who are similarly-situated against the same defendants as in a court-certified collective action or a putative collective action, or that is ordered by a court for collective action at a forum not sponsored by a self-regulatory organization, shall not be arbitrated under the Code, if the party bringing the claim has opted-in to the collective action.

(3)  The Director will refer to a panel any dispute as to whether a claim is part of a collective action, unless a party asks the court or other forum hearing the collective action to resolve the dispute within 10 days of receiving notice that the Director has decided to refer the dispute to a panel.

(4)  A member or associated person may not enforce an agreement to arbitrate in this forum against a member of a certified or putative collective action with respect to any claim that is the subject of the certified or putative collective action until the collective action certification is denied or the collective action is decertified.

[This] These subparagraphs do[es] not otherwise affect the enforceability of any rights under the Code or any other agreement.

# EXHIBIT B



DCO, which is subject to regulation by the CFTC under the CEA. This rule change is being made according to regulations promulgated by the CFTC, which were previously subject to notice and comment. Not approving this request on an accelerated basis would have a significant impact on CME's operations as a DCO.

The Commission finds good cause for approving the proposed rule change prior to the 30th day after the date of publication of notice in the **Federal Register** because the proposed rule change allows CME to implement the regulations of another federal regulatory agency, the CFTC, in accordance with those regulations' effective date.

## V. Conclusion

*It is therefore ordered,* pursuant to Section 19(b)(2) of the Act, that the proposed rule change (SR–CME–2012– 09) is approved on an accelerated basis.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[8]

**Kevin M. O'Neill,**
*Deputy Secretary.*
[FR Doc. 2012–8879 Filed 4–12–12; 8:45 am]
**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–66774; File No. SR–FINRA– 2011–075]**

**Self-Regulatory Organizations; Financial Industry Regulatory Authority, Inc.; Notice of Filing of Amendment No. 1 and Order Granting Accelerated Approval of a Proposed Rule Change, as Modified by Amendment No. 1, Amending Rule 13024 of the Code of Arbitration Procedure for Industry Disputes To Preclude Collective Action Claims From Being Arbitrated**

April 9, 2012.

### I. Introduction

On December 22, 2011, the Financial Industry Regulatory Authority, Inc. ("FINRA") filed with the Securities and Exchange Commission ("SEC" or "Commission"), pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Exchange Act")[1] and Rule 19b–4 thereunder,[2] a proposal to amend Rule 13204 of the Code of Arbitration Procedure for Industry Disputes ("Industry Code") to preclude collective action claims by employees of FINRA

members under the Fair Labor Standards Act (FLSA), the Age Discrimination in Employment Act (ADEA), or the Equal Pay Act of 1963 (EPA) from being arbitrated under the Industry Code. Specifically, the proposal would, among other things, (1) State that collective action claims under the FLSA, the ADEA, or the EPA may not be arbitrated under the Code; (2) provide that any claim involving similarly situated plaintiffs against the same defendants, such as a court-certified collective action or a putative collective action, would not be arbitrated in FINRA's arbitration forum; (3) give arbitrators the authority to decide disputes about whether a claim is part of a collective action; and (4) prohibit a member firm or associated person from enforcing any arbitration agreement against a member of a certified or putative collective action with respect to any claim that is the subject of the certified or putative collective action until either the collective certification is denied or the group is decertified.

The proposed rule change was published for comment in the **Federal Register** on January 11, 2012.[3] The Commission received two comments on the proposed rule change.[4] On March 29, 2012, FINRA filed a response to comments and a partial amendment to the proposed rule change ("Amendment No. 1").[5] The Commission is publishing this notice and order to solicit comment on Amendment No. 1 and to approve the proposed rule change, as modified by Amendment No. 1, on an accelerated basis.

### II. Description of Proposed Rule Change

As stated in the Notice, Rule 13204 of the Industry Code generally provides that any claim that is based upon the

same facts and law, and involves the same defendants as in a court-certified class action or a putative class action, shall not be arbitrated. The Notice also stated that in 1999 FINRA issued an Interpretive Letter stating that its class action rules should include collective action claims brought under the FLSA and, therefore, considered these claims ineligible for arbitration in its forum.[6] However, as described in the Notice, the United States District Court for the Southern District of New York found that an FLSA collective action is not a class action for purposes of Rule 13204 of the Industry Code and compelled arbitration of such claims in FINRA's dispute resolution forum.[7]

In response to the court's finding, FINRA is proposing to amend Rule 13204 to preclude collective action claims from being arbitrated in FINRA's forum under the Industry Code. The proposed amendments to Rule 13204, would separate Rule 13204 into two sections: subparagraph (a) for class actions, and subparagraph (b) for collective actions. Subparagraph (a) would be titled, "Class Actions," and re-numbered. Subparagraph (b) would be titled, "Collective Actions," and would contain four subparagraphs.

Proposed subparagraph (b)(1) would state that collective action claims under the FLSA, the ADEA, or the EPA may not be arbitrated under the Industry Code.

Under proposed subparagraph (b)(2), any claim that involves plaintiffs who are similarly-situated against the same defendants as in a court-certified collective action or a putative collective action, or that is ordered by a court for collective action at a forum not sponsored by a self-regulatory organization, would not be arbitrated under the Industry Code, if the party bringing the claim has opted in to the collective action.

Under proposed subparagraph (b)(3), as originally proposed, the Director would have referred to a panel any dispute as to whether a claim is part of a collective action, unless a party asked the court hearing the collective action to resolve the dispute within 10 days of receiving notice that the Director has decided to refer the dispute to a panel. Amendment No. 1, however, would permit a party to ask any forum (not just a court) hearing the collective action to resolve the dispute within the specified time.

[8] 17 CFR 200.30–3(a)(12).
[1] 15 U.S.C. 78s(b)(1).
[2] 17 CFR 240.19b–4.

[3] *See* Exchange Act Release No. 66109 (Jan. 5, 2012), 77 FR 1773 (Jan. 11, 2012) (Notice of Filing of Proposed Rule Change to Amend the Code of Arbitration Procedure for Industry Disputes to Preclude Collective Action Claims from Being Arbitrated) ("Notice"). The comment period closed on February 1, 2012.
[4] *See* Letter from Kevin M. Carroll, Managing Director and Associate General Counsel, Securities Industry and Financial Markets Association, dated February 1, 2012 ("SIFMA Letter"); and letter from Jill I. Gross, Director, Edward Pekarek, Assistant Director, and Genavieve Shingle, Student Intern, Investor Rights Clinic at Pace Law School, dated February 1, 2012 ("PIRC Letter"). Comment letters are available at *http://www.sec.gov.*
[5] *See* Letter from Mignon McLemore, Assistant Chief Counsel, FINRA, FINRA Dispute Resolution, to Elizabeth M. Murphy, Secretary, SEC, dated March 28, 2012 ("Response to Comments No. 1 and Partial Amendment No. 1"). The text of Response to Comments No. 1 and Partial Amendment No. 1 is available on FINRA's Web site at *http:// www.finra.org,* at the principal office of FINRA, and on the Commission's Web site at *http:// www.sec.gov.*

[6] *See* Notice (citing FINRA Interpretive Letter to Cliff Palefsky, Esq., dated September 21, 1999).
[7] *Id.* (citing *Hugo Gomez et al.* v. *Brill Securities, Inc. et al.,* No. 10 Civ. 3535, 2010 U.S. Dist. LEXIS 118162 (S.D.N.Y. Nov. 2, 2010)).

Federal Register / Vol. 77, No. 72 / Friday, April 13, 2012 / Notices

Subparagraph (b)(4), as originally proposed, would have provided that a member or associated person may not enforce any arbitration agreement against a member of a certified or putative collective action with respect to any claim that is the subject of the certified or putative collective action until the collective action certification is denied or the collective action is decertified. Amendment No. 1, however, would specify that subparagraph (b)(4) would apply only to agreements to arbitrate in the FINRA forum, thus not affecting agreements to arbitrate in fora other than FINRA's.

### III. Summary of Comment Letters

As stated above, the proposed rule change was published for comment in the **Federal Register** on January 11, 2012, and the comment period closed on February 1, 2012. The Commission received two comment letters in response to the proposed rule change. On March 28, 2012, FINRA responded to the comments and filed Amendment No. 1 to the proposed rule change.

The PIRC Letter strongly supported the proposed rule change.

The SIFMA Letter did not object to the proposed rule change, but recommended certain revisions to certain language in proposed subparagraph (b). First, SIFMA recommended modifying proposed subparagraph (b)(2) to replace the phrase, "Any claim that involves plaintiffs who are similarly situated against the same defendants as in a court-certified collective action or a putative collection action," with, "Any claim that is the subject of a certified or putative collective action." SIFMA argued that FINRA's proposed language could be misconstrued to include multi-party litigation outside of the collective action context. SIFMA suggested that its proposed change would clarify FINRA's intent to limit the application of the proposed rule to collective actions.

In its Response to Comments No. 1, FINRA declined to amend its proposed subparagraph (b)(2) as SIFMA suggested. FINRA stated that the revision is unnecessary because as proposed the rule already clarifies its applicability to only those parties who opt in to a collective action; furthermore, as proposed the rule would preclude those claims from being arbitrated in FINRA's forum only, and would not preclude their being arbitrated in other fora. FINRA also declined to remove the term "similarly situated" from proposed subparagraph (b)(2) as SIFMA suggested because the term is consistent with language used in the FLSA to describe party plaintiffs in

collective actions under the statute,[8] and the term helps define the parties to whom the proposal would apply.

Second, SIFMA recommended modifying proposed subparagraphs (b)(3) and (b)(4) to limit their scope to FINRA arbitration. Specifically, SIFMA recommended modifying proposed subparagraph (b)(3) by replacing "the court hearing the collective action" with "the court or other forum hearing the collective action." SIFMA stated that this change would clarify that arbitration fora, other than FINRA's forum, accept collective action claims. Similarly, SIFMA recommended modifying proposed subparagraph (b)(4) by replacing "may not enforce any arbitration agreement" with "may not enforce an agreement to arbitrate in this forum." SIFMA stated that this change would clarify that under the proposed rule agreements to arbitrate collective action claims in arbitration fora other than FINRA would remain valid and enforceable.

FINRA agreed to amend proposed subparagraphs (b)(3) and (b)(4) as SIFMA recommended. FINRA stated that it made these changes because the proposed rule is designed to prohibit collective action claims from being arbitrated in its forum only; FINRA members and their employees may, however, agree to address collective action claims either by filing them in a court of competent jurisdiction or by arbitrating them in other arbitration fora.

### IV. Commission's Findings

The Commission has carefully considered the proposed rule change, the comments received, FINRA's Response to Comments No. 1, and Amendment No. 1. The Commission finds that the proposed rule change, as amended, is consistent with the requirements of the Exchange Act, and the rules and regulations thereunder that are applicable to a national securities association.[9] In particular, the Commission finds that the proposal is consistent with Section 15A(b)(6) of the Act,[10] which requires, among other things, that the rules of a national securities association be designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in

general, protect investors and the public interest.

The proposed rule change, as amended, would facilitate the efficient resolution of collective actions under the FLSA, ADEA, or the EPA, as courts have established procedures to manage these types of representative actions. It also would preserve access to courts for these types of claims for employees of FINRA members.

The Commission believes that FINRA has responded adequately to SIFMA's comments recommending revisions to certain language in proposed subparagraphs (b)(2), (b)(3) and (b)(4) to the proposed rule by explaining, among other things, why it is proposing to revise proposed subparagraphs (b)(3) and (b)(4), but is not proposing to revise subparagraph (b)(2). In response to SIFMA's comments, FINRA proposed to amend proposed subparagraphs (b)(3) and (b)(4) to acknowledge that arbitration fora other than FINRA's dispute resolution forum accept collective action claims. FINRA has suitably explained its reasons for declining to amend proposed subparagraph (b)(2) as SIFMA recommended.

### V. Accelerated Approval

The Commission finds good cause, pursuant to Section 19(b)(2) of the Act[11] for approving the proposed rule change, as modified by Amendment No. 1, prior to the 30th day after publication of Amendment No. 1 in the **Federal Register**. The changes proposed in Amendment No. 1 revised proposed subparagraphs (b)(3) and (b)(4) in response to specific concerns raised by SIFMA. The amendment addresses these concerns by clarifying that arbitration fora, other than FINRA's forum, accept collective action claims, and that under the proposed rule agreements to arbitrate collective action claims in arbitration fora other than FINRA would remain valid and enforceable.

Accordingly, the Commission finds that good cause exists to approve the proposal, as modified by Amendment No. 1, on an accelerated basis.

### VI. Solicitation of Comments

Interested persons are invited to submit written data, views and arguments concerning the foregoing, including whether Amendment No. 1 to the proposed rule change is consistent with the Act. Comments may be submitted by any of the following methods:

---

[8] *See* 29 U.S.C. 216(b).

[9] In approving this proposed rule change, the Commission notes that it has considered the proposed rule's impact on efficiency, competition, and capital formation. 15 U.S.C. 78c(f).

[10] 15 U.S.C. 78o–3(b)(6).

---

[11] 15 U.S.C. 78s(b)(2).

**22376** **Federal Register** / Vol. 77, No. 72 / Friday, April 13, 2012 / Notices

*Electronic Comments*

• Use the Commission's Internet comment form (*http://www.sec.gov/rules/sro.shtml*); or

• Send an email to *rule-comments@sec.gov*. Please include File Number SR–FINRA–2011–075 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Elizabeth M. Murphy, Secretary, Securities and Exchange Commission, 100 F Street NE., Washington, DC 20549–1090.

All submissions should refer to File Number SR–FINRA–2011–075. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's Internet Web site (*http://www.sec.gov/rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for Web site viewing and printing in the Commission's Public Reference Room, 100 F Street NE., Washington, DC 20549, on official business days between the hours of 10 a.m. and 3 p.m. Copies of such filing also will be available for inspection and copying at the principal office of FINRA. All comments received will be posted without change; the Commission does not edit personal identifying information from submissions. You should submit only information that you wish to make available publicly. All submissions should refer to File Number SR–FINRA–2011–075 and should be submitted on or before May 4, 2012.

**VII. Conclusion**

*It is therefore ordered,* pursuant to Section 19(b)(2) of the Act,[12] that the proposed rule change (SR–FINRA–2011–075), as modified by Amendment No. 1, be, and hereby is, approved on an accelerated basis.

[12] 15 U.S.C. 78s(b)(2).

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[13]

**Kevin M. O'Neill,**
*Deputy Secretary.*

[FR Doc. 2012–8880 Filed 4–12–12; 8:45 am]

**BILLING CODE 8011–01–P**

---

**DEPARTMENT OF STATE**

[Public Notice 7845]

**Culturally Significant Objects Imported for Exhibition Determinations: "Ellsworth Kelly: Plant Drawings"**

**SUMMARY:** Notice is hereby given of the following determinations: Pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.*; 22 U.S.C. 6501 note, *et seq.*), Delegation of Authority No. 234 of October 1, 1999, and Delegation of Authority No. 236–3 of August 28, 2000, I hereby determine that the object to be included in the exhibition "Ellsworth Kelly: Plant Drawings," imported from abroad for temporary exhibition within the United States, is of cultural significance. The object is imported pursuant to a loan agreement with the foreign owners or custodians. I also determine that the exhibition or display of the exhibit object at The Metropolitan Museum of Art, New York, New York from on or about June 5, 2012, until on or about September 3, 2012, and at possible additional exhibitions or venues yet to be determined, is in the national interest. I have ordered that Public Notice of these Determinations be published in the Federal Register.

**FOR FURTHER INFORMATION CONTACT:** For further information, including a list of the exhibit objects, contact Ona M. Hahs, Attorney-Adviser, Office of the Legal Adviser, U.S. Department of State (telephone: 202–632–6473). The mailing address is U.S. Department of State, SA–5, L/PD, Fifth Floor (Suite 5H03), Washington, DC 20522–0505.

Dated: April 9, 2012.

**Ann Stock,**
*Assistant Secretary, Bureau of Educational and Cultural Affairs, Department of State.*

[FR Doc. 2012–8925 Filed 4–12–12; 8:45 am]

**BILLING CODE 4710–05–P**

[13] 17 CFR 200.30–3(a)(12).

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

[Docket No. FAA–2012–0233]

**Airport Improvement Program (AIP) Grant Assurances**

**AGENCY:** Federal Aviation Administration (FAA).

**ACTION:** Notice of modification of Airport Improvement Program grant assurances; opportunity to comment.

**SUMMARY:** On February 14, 2012, the FAA Modernization and Reform Act of 2012 was signed into law (Pub. L. 112–95). Provisions contained in this law necessitate modifications to five grant assurances.

**DATES:** The effective date the modifications to the grant assurances is April 13, 2012. The FAA will consider comments on the modifications to the grant assurances. If necessary, any appropriate revisions resulting from the comments received will be adopted as of the date of a subsequent publication in the Federal Register. Comments must be submitted on or before May 14, 2012.

**ADDRESSES:** You may send comments [identified by Docket Number FAA–2012–0233] using any of the following methods:

• *Government-wide rulemaking web site:* Go to *http://www.regulations.gov* and follow the instructions for sending your comments electronically.

• *Mail:* Docket Operations, U.S. Department of Transportation, West Building, Ground Floor, Room W12–140, Routing Symbol M–30, 1200 New Jersey Avenue SE., Washington, DC 20590.

• *Fax:* 1–202–493–2251.

• *Hand Delivery:* To Docket Operations, Room W12–140 on the ground floor of the West Building, 1200 New Jersey Avenue SE., Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Frank San Martin, Manager, Airports Financial Assistance, Federal Aviation Administration, 800 Independence Avenue SW., Washington, DC 20591, telephone (202) 267–3831; facsimile: (202) 267–5302.

**Authority for Grant Assurance Modifications**

This notice is published under the authority described in Subtitle VII, Part B, Chapter 471, Sections 47107 and 47122 of Title 49 United States Code.

**SUPPLEMENTARY INFORMATION:** A sponsor (applicant) seeking financial assistance

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIOT COHEN, CHARLES SHOEMAKER, and PHILIP RICASATA, on behalf of themselves and all others similarly situated, | ) Civ. No. 12-CIV-02147 (BSJ)(JLC)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| UBS FINANCIAL SERVICES, INC. and UBS AG, | )<br>)<br>) |
| Defendants. | )<br>) |

---

**DECLARATION OF CHARLES SHOEMAKER
IN OPPOSITION TO MOTION TO COMPEL ARBITRATION**

I, **CHARLES SHOEMAKER**, hereby declare and state:

1.     The following declaration is based upon my own personal observation and knowledge, and if called upon to testify about the things contained herein, I could competently so testify.

**INTRODUCTION**

2.     I am a named Plaintiff and make this declaration in opposition to Defendants' Motion to Compel Arbitration ("UBS Motion").

3.     UBS Financial Services, Inc. ("UBS") is a broker dealer which represents the U.S. business interests of UBS AG's Wealth Management Americas segment.  The client-facing organization consists of the branch network in the United States, with thousands of financial

- 1 -

advisors and billions in invested assets.  UBS sold and sells securities and other financial products with offices nationwide, including California.

4.      I reside in Sunnyvale, California and was an employee of UBS from July 2005 to November 2010.  Throughout this five year period, I was employed by UBS as a "Financial Advisor."  During that time, I was paid strictly on a commission basis and was never paid by Defendants for any overtime for work performed in excess of forty (40) hours per week as required by law.

5.      I believe that my position as a Financial Advisor at UBS is similar to the same position held by other Financial Advisors at UBS throughout California.  It was my understanding that all Financial Advisors were subject to the same policy that denied any compensation for hours in excess of forty (40) hours per week.  I believe that I, and other Financial Advisors at UBS, was purposefully misclassified as exempt from overtime.

6.      I believe that notice of this action to recover for work performed in excess of forty (40) hours per week should be given to other similarly situated Financial Advisors and that this action should proceed as a collective and class action.

**BACKGROUND**

7.      For five years, I worked for UBS as a Financial Advisor.  I worked from inside UBS' offices located in Palo Alto, California.  I primarily sold securities and other financial products.  My primary duties included contacting individuals who wished to purchase financial products, selling financial products to these individuals, assuring that client trades were successfully processed, and engaging in other activities to develop and service a book of business.  As a Financial Advisor, I received no fixed salary but instead received a commission on sales without any premium for overtime as required by federal law.

8.      Based on the time difference between the East and West Coasts, it was routine for me to arrive at the office (Monday through Friday) as early as 5:45 a.m. and begin working prior to the opening of the financial markets in New York, contacting my own clients and potential clients.  Following the close of financial markets, I worked to complete necessary paperwork for several hours, would meet with clients in the office as needed, and attended branch, product or

- 2 -

manager meetings as scheduled by UBS. I would not generally leave the office until approximately 4:00 p.m. Based on this routine, I generally worked in excess of forty (40) hours each week.

      9.    This is the same general work routine that other Financial Advisors in my Palo Alto, California office also followed. The other Financials Advisors in my office also regularly attended the same meetings at the branch office after the office closed for business.

      10.    UBS never paid me or the other Financial Advisors in my office for any hours worked above forty (40) hours per week.

      11.    The Branch Manager in Palo Alto was often in the Palo Alto office during the same hours that I and other Financial Advisors worked and had to know that the normal course of conduct for me and other Financial Advisors included working more than forty (40) hours per week. In fact, working more than forty (40) hours per week was encouraged by UBS and often resulted due to branch, product and manager meetings scheduled by UBS. UBS knew that it was not paying me and the Financial Advisors for hours worked in excess of forty (40) hours per week.

      12.    While employed at UBS, I did not perform any executive or administrative functions and was not an outside sales person as I worked from my office in Palo Alto, California. For example, I did not participate in any marketing work for UBS as a whole, nor was I a manager.

**UBS MOTION TO COMPEL ARBITRATION**

      13.    I received a copy of the UBS Motion. I understand that UBS believes that any claim that I have regarding compensation must be dealt with in arbitration. Moreover, I know that any arbitration would be held under the auspices of FINRA, the organization that is supposed to regulate the securities industry.

      14.    If this action cannot be maintained as a collective and class action, I would definitely not submit my claims to a FINRA arbitration because I believe that the expense associated with such an arbitration would be far greater than any award I could expect.

15.     My counsel, Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein"), has taken the present litigation on a contingency basis.  This means to me that they will receive their fees and expenses only if there is an award to the class and collective group and only the amount awarded by the Court.  Based on their firm resume, I was aware that Wolf Haldenstein has succeeded in obtaining significant awards for brokers in prior wage and hour cases and, as a result, has been awarded fees and expenses by a number of courts throughout the United States.

16.     Wolf Haldenstein has advised me that, based on their analysis of my situation, they would not take my individual arbitration on a contingency basis since my maximum potential recovery would almost certainly not even cover their lodestar and expenses.  As I understand it, the maximum fee and expense award that Wolf Haldenstein has received for its collective and class action recoveries for brokers in prior cases is typically no more than 25% of the award to the brokers.

17.     If Wolf Haldenstein undertook to handle my individual arbitration in this case on a non-contingency basis, their charge would depend upon whether a partner or associate did more of the work.  In general, I could expect an average hourly fee of about $500, and counsel would spend at least 300 hours in preparing this case, generating a minimum of $150,000 in legal fees.

18.     It is likely that we would have to hire at least one expert and that the fees for such an expert could easily reach $40-$50 thousand plus $150,000 in legal fees, not including non-expert expenses.

19.     Given that expense, my judgment is that it would be completely irrational for me even to consider individual arbitration in this case.  I deal with the issue of financial risk almost every day for my clients and myself.  If I did not understand financial risk and how to deal with it, I would have been out of the financial business a long time ago.  I have called on that experience to conclude that individual arbitration in the present case – given the involvement of FINRA and the expense of the arbitration relative to the possible award – would make no sense.

20.     I have done a rough estimate of my potential damages. My best estimate is that I worked about 10 hours a week of overtime, assuming a 40-hour work week. I also estimated that I took about four weeks of vacation every year during which I did little or no work.

21.     I make my living by receiving commissions on fees that I generate through the sale of financial products to individual clients. Generally, UBS took about 60% of those fees and I received about 40%. My annual income was about $190,000 during the period covered by this case – *i.e.* 2009-2010.

22.     Based on these general assumptions, a rough estimate of my damages is $25,000.

### ARBITRATION AGREEMENTS

23.     I reviewed the exhibits attached to the UBS Motion To Compel Arbitration that related to me, *i.e.*, Exhibits 6, 11, 12, 18, 19, 23 and 24. UBS asked me to sign compensation agreements in 2007 (Ex. 6) but produce no signed acknowledgement for compensation agreements in 2008, 2009 or 2010. I do not recall signing such agreements and I do not have these agreements in my records. However, if I had refused to sign the Compensation Agreement in 2007 (or any year thereafter) as well as the promissory notes (also containing arbitration agreements) in 2005 (Ex. 11) or 2007 (Ex. 12), I would have been unemployed or, in reference to promissory notes, unable to participate and hence received no monies. There was no negotiation about signing these documents. Management would provide the document and ask that it be signed. There were no discussions. All of my colleagues and I understood that our employment at UBS depended upon our signing these documents.

24.     As to the Financial Advisor Reassignment Agreements purportedly dated December 17, 2008 and March 8, 2010 (Exs. 18 and 19), UBS provides no confirmation of my "electronic signature" and simply attaches blank documents. I cannot recall if I authorized the documents electronically, and my records do not contain such an authorization. As with the compensation agreement and promissory notes, I would not have been permitted to refuse to sign these documents.

25.     Ms. Reyna in her declaration states I ended my employment at UBS "on November 4, 2007." However, the document that she cites, Exhibit 23, clearly shows that I

ended my employment on November 20, 2010 as I set forth in this declaration. *See* Ex. 23 at 7, Ex. 24 at 1.

26.     I do not now recall whether I noticed the specific terms of the arbitration agreement in any document.   It would not have made any difference, however, since I understood that there would be no negotiation of any kind regarding the arbitration agreement or any other part of the Compensation Plan.

27.     I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct and was executed in Sunnyvale, CA on 06/05/_____, 2012.

CHARLES SHOEMAKER

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIOT COHEN, CHARLES SHOEMAKER, and PHILIP RICASATA, on behalf of themselves and all others similarly situated, | ) Civ. No. 12-CIV-02147 (BSJ)(JLC) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UBS FINANCIAL SERVICES, INC. and UBS AG, | ) |
| | ) |
| Defendants. | ) |
| ------------------- | ) |

**DECLARATION OF PHILIP RICASATA IN OPPOSITION**
**TO MOTION TO COMPEL ARBITRATION**

I, **PHILIP RICASATA**, hereby declare and state:

1.    The following declaration is based upon my own personal observation and knowledge, and if called upon to testify about the things contained herein, I could competently so testify.

**INTRODUCTION**

2.    I am a named Plaintiff and on February 13, 2012 filed a consent to participate in the collective action. ECF No. 31. I make this declaration in opposition to Defendants' Motion to Compel Arbitration ("UBS Motion").

3.    UBS Financial Services, Inc. ("UBS") is a broker dealer which represents the U.S. business interests of UBS AG's Wealth Management Americas segment. The client-facing organization consists of the branch network in the United States, with thousands of financial advisors and billions in invested assets. UBS sold and sells securities and other financial

products with offices nationwide, including California.

4.      I reside in Ventura, California.  I was an employee of UBS from March 2005 to January 2010 and worked as a Financial Advisor.  I worked in UBS' office located in Oxnard, California.

### EMPLOYMENT AT UBS

5.      Beginning in late 2005, when I worked for UBS as a Financial Advisor, I was paid by UBS on a commission basis based on sales and managed assets without any premium for overtime as required by state and federal law.  Throughout my employment at UBS, I was not paid by Defendants for any overtime for work performed in excess of forty (40) hours per week as required by law.

6.      As a Financial Advisor, I worked from inside my office in Oxnard and sold financial products such as annuities, mutual funds, and life insurance to clients.  As to the managed assets held by my clients, they were assigned to either a UBS Discretionary Money Manager who would exercise discretion in my clients' investments, or I would use a "tool" (computer program) provided by UBS to create a model portfolio to allocate my clients' investments between certain pre-selected asset classes.  The UBS tool or the UBS Discretionary Money Manager would provide a periodic portfolio analysis that would be sent to my clients.  My primary duties included contacting individuals who wished to purchase financial products from UBS, including financial products structured by UBS, selling such financial products to these individuals, assuring that clients' purchases were successfully processed, and engaging in other activities to develop and service a book of business.

7.      Throughout my employment with UBS, on Monday through Friday, I would routinely arrive at 6:15 a.m. and would not leave until after 5:30 p.m.  While I worked at the Oxnard office, the Oxnard office had approximately a high of 22 to a low of 14 other Financial Advisors.  The other Financial Advisors in the Oxnard office all routinely arrived around 6:30 a.m. and did not leave the office until after 5:00 p.m.  Based on this routine, I, like the other Financial Advisors in the Oxnard office, generally worked in excess of forty (40) hours each week and eight (8) hours every day.

- 2 -

8.    UBS never paid me or other Financial Advisors for any hours worked above forty (40) hours per week or more than eight (8) hours per day. Unlike UBS, my current employer, where I have similar duties, does pay me for overtime and thus compensates me for hours above forty (40) hours per week.

9.    UBS knew and, in fact, encouraged Financial Advisors to work more than forty (40) hours as the normal course of conduct. UBS knew that it was not paying me and other Financial Advisors for hours worked in excess of forty (40) hours per week.

10.   I did not perform any executive or administrative functions and was not an outside sales person, as I generally worked from my office in Oxnard, California. For example, I did not participate in any marketing work for UBS as a whole, nor was I a manager.

## UBS MOTION TO COMPEL ARBITRATION

11.   I received a copy of the UBS Motion. I understand that UBS believes that any claim that I have regarding compensation must be dealt with in arbitration. Moreover, I know that any arbitration would be held under the auspices of FINRA, the organization that is supposed to regulate the securities industry.

12.   If this action cannot be maintained as a class or collective action, I would definitely not submit my claims to a FINRA arbitration because I believe that the expense associated with such an arbitration would be far greater than any award I could expect.

13.   My counsel, Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein"), has taken the present litigation on a contingency basis. This means to me that they will receive their fees and expenses only if there is an award to the class and collective group and only the amount awarded by the Court. Based on their firm resume, I was aware that Wolf Haldenstein has succeeded in obtaining significant awards for brokers in prior wage and hour cases and, as a result, has been awarded fees and expenses by a number of courts throughout the United States.

14.   Wolf Haldenstein has advised me that, based on their analysis of my situation, they would not take my individual arbitration on a contingency basis since my maximum potential recovery would almost certainly not even cover their lodestar and expenses. As I understand it, the maximum fee and expense award that Wolf Haldenstein has received for its

Case 14-781, Document 38, 06/26/2014, 1258591, Page164 of 200

collective and class action recoveries for brokers in prior cases is typically no more than 25% of the award to the brokers.

15.   If Wolf Haldenstein undertook to handle my individual arbitration in this case on a non-contingency basis, their charge would depend upon whether a partner or associate did more of the work. In general, I anticipate an average hourly fee of about $500 per hour, and counsel would spend at least 300 hours in preparing this case, generating a minimum of $150,000 in legal fees.

16.   It is likely that we would have to hire at least one expert and that the fees for such an expert could easily reach $40-$50 thousand plus $150,000 in legal fees, not including non expert expenses.

17.   Given that expense, my judgment is that it would be completely irrational for me even to consider individual arbitration in this case. I deal with the issue of financial risk almost every day for my clients and myself. If I did not understand financial risk and how to deal with it, I would have been out of the financial business a long time ago. I have called on that experience to conclude that individual arbitration in the present case – given the involvement of FINRA and the expense of the arbitration relative to the possible award – would make no sense.

18.   I have done a rough estimate of my potential damages. My best estimate is that I worked about 10 hours a week of overtime, assuming a 40-hour work week. I also estimated that I took about two weeks of vacation every year during which I did little or no work.

19.   At that time, I made my living by receiving commissions and fees that were generated through the sale of financial products to individual clients. Generally, UBS took about 60% of those fees and I received about 40%. My annual income was about $40,000 during the period covered by this case – *i.e.* 2009 and January 2010.

20.   Based on these general assumptions, a rough estimate of my damages is approximately $5,000.

## ARBITRATION AGREEMENTS

21.   I reviewed the exhibits attached to the UBS Motion that related to me, *i.e.*, Exhibits ("Ex.") 7, 15, 16, 17, and 25. UBS asked me to sign annual compensation agreements

in 2007, 2008 and 2009 (Ex. 7). UBS also asked me to sign a Partnering Agreement with Private Wealth Advisor Lisa Farley in 2009 (Ex. 15). As to the Partnering Agreement, it was my understanding that any arbitration agreement therein related to any claim or controversy arising out of the Partnering Agreement. Ex. 15 at 6. My overtime and expense claims do not arise out of the Partnering Agreement. If I had refused to sign the Compensation Agreements and Partnering Agreement, I would have been either unemployed or unable to be paid. There was no negotiation about any aspect of the arbitration agreements. Management would leave the agreements on my desk and ask that they be returned signed. There were no discussions. All of my colleagues and I understood that our employment at UBS depended upon our signing those documents.

22.    As to the Financial Advisor Account Assignment Agreement (Exs. 16 and 17), purportedly dated August 7, 2008 and December 30, 2009, the documents provided by UBS are blank forms, and UBS provides no acknowledgement that I "electronically" signed these documents. I searched my records and find no indication that I electronically signed these documents. Again, these documents were of a nature that one could not negotiate the terms or one would not be assigned any available accounts.

23.    I do not now recall whether I noticed the specific terms of the arbitration agreement in any document. It would not have made any difference, however, since I understood that there would be no negotiation of any kind regarding the arbitration agreement or any other part of the Compensation Plan.

24.    I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct and was executed in _Ventura, Ca_ on ___June 7th___, 2012.

PHILIP RICASATA

UBS:18925.DECL(RICASATA).V2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

ELIOT COHEN, CHARLES SHOEMAKER,　　)　Civ. No. 12-CIV-02147 (BSJ)(JLC)
and PHILIP RICASATA, on behalf of　　　　)
themselves and all others similarly situated,　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
UBS FINANCIAL SERVICES, INC. and UBS　)
AG,　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　　　　　)

**DECLARATION OF ELIOT COHEN**
**IN OPPOSITION TO MOTION TO COMPEL ARBITRATION**

　　I, **ELIOT COHEN**, hereby declare and state:

　　1.　　The following declaration is based upon my own personal observation and knowledge, and if called upon to testify about the things contained herein, I could competently so testify.

**INTRODUCTION**

　　2.　　I am a named Plaintiff and make this declaration in opposition to Defendants' Motion to Compel Arbitration ("UBS Motion").

　　3.　　UBS Financial Services, Inc. ("UBS") is a broker dealer which represents the U.S. business interests of UBS AG's Wealth Management Americas segment. The client-facing organization consists of the branch network in the United States, with thousands of financial

- 1 -

advisors and billions in invested assets. UBS sold and sells securities and other financial products with offices nationwide, including California.

4.      I reside in Los Angeles, California and was an employee of UBS from August 2005 to October 2007. Throughout this period, I was employed by UBS as a "Financial Advisor." During that time, I was paid strictly on a commission basis and was never paid by Defendants for any overtime for work performed in excess of forty (40) hours per week as required by law.

5.      It was my understanding that all Financial Advisors were subject to the same policy that denied any compensation for hours in excess of forty (40) hours per week. I believe that I, and other Financial Advisors at UBS, was purposefully misclassified as exempt from overtime.

6.      I believe that this action should proceed as a class action under California state law.

### BACKGROUND

7.      For seven years, I worked for UBS as a Financial Advisor. I worked from inside UBS' offices located in Beverly Hills, California. I primarily sold securities and other financial products. My primary duties included contacting individuals who wished to purchase financial products, selling financial products to these individuals, assuring that client trades were successfully processed, and engaging in other activities to develop and service a book of business. As a Financial Advisor, I received no fixed salary but instead received a commission on sales without any premium for overtime as required by federal law.

8.      The normal course of conduct for me included working more than forty (40) hours per week and more than eight (8) hours per day. While employed at UBS, I did not perform any executive or administrative functions and was not an outside sales person as I worked from my office in Beverly Hills, California. For example, I did not participate in any marketing work for UBS as a whole, nor was I a manager.

### UBS MOTION TO COMPEL ARBITRATION

- 2 -

13.     I received a copy of the UBS Motion. I understand that UBS believes that any claim that I have regarding compensation must be dealt with in arbitration. Moreover, I know that any arbitration would be held under the auspices of FINRA, the organization that is supposed to regulate the securities industry.

14.     If this action cannot be maintained as a class action under California state law, I would definitely not submit my claims to a FINRA arbitration because I believe that the expense associated with such an arbitration would be far greater than any award I could expect.

15.     My counsel, Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein"), has taken the present litigation on a contingency basis. This means to me that they will receive their fees and expenses only if there is an award to the class and collective group and only the amount awarded by the Court. Based on their firm resume, I was aware that Wolf Haldenstein has succeeded in obtaining significant awards for brokers in prior wage and hour cases and, as a result, has been awarded fees and expenses by a number of courts throughout the United States.

16.     Wolf Haldenstein has advised me that, based on their analysis of my situation, they would not take my individual arbitration on a contingency basis since my maximum potential recovery would almost certainly not even cover their lodestar and expenses. As I understand it, the maximum fee and expense award that Wolf Haldenstein has received for its collective and class action recoveries for brokers in prior cases is typically no more than 25% of the award to the brokers.

17.     If Wolf Haldenstein undertook to handle my individual arbitration in this case on a non-contingency basis, their charge would depend upon whether a partner or associate did more of the work. In general, I could expect an average hourly fee of about $500, and counsel would spend at least 300 hours in preparing this case, generating a minimum of $150,000 in legal fees.

18.     It is likely that we would have to hire at least one expert and that the fees for such an expert could easily reach $40-$50 thousand plus $150,000 in legal fees, not including non-expert expenses.

- 3 -

19.     Given that expense, my judgment is that it would be completely irrational for me even to consider individual arbitration in this case. I deal with the issue of financial risk almost every day for my clients and myself. If I did not understand financial risk and how to deal with it, I would have been out of the financial business a long time ago. I have called on that experience to conclude that individual arbitration in the present case – given the involvement of FINRA and the expense of the arbitration relative to the possible award – would make no sense.

20.     I have done a rough estimate of my potential damages. My best estimate is that I worked about 10 hours a week of overtime, assuming a 40-hour work week. I also estimated that I took about four weeks of vacation every year during which I did little or no work.

21.     I make my living by receiving commissions on fees that I generate through the sale of financial products to individual clients. Generally, UBS took about 60% of those fees and I received about 40%. My annual income was around $60,000 during the period covered by this case – i.e. 2007.

22.     Based on these general assumptions, a rough estimate of my damages in the California state law class action for overtime is approximately $6,500.

### ARBITRATION AGREEMENTS

23.     I reviewed the exhibits attached to the UBS Motion To Compel Arbitration that related to me, i.e., Exhibits (Ex.) 5, 10, and 22. UBS asked me to sign compensation agreements in 2007 (Ex. 5). If I had refused to sign the Compensation Agreement in 2007 as well as the promissory note (also containing arbitration agreements) in 2000 (Ex. 10), I would have been unemployed or, in reference to promissory note, unable to participate and hence received no monies. There was no negotiation about signing these documents. Management would provide the document and ask that it be signed. There were no discussions. All of my colleagues and I understood that our employment at UBS depended upon our signing these documents.

24.     I do not now recall whether I noticed the specific terms of the arbitration agreement in any document. It would not have made any difference, however, since I understood that there would be no negotiation of any kind regarding the arbitration agreement or any other part of the Compensation Plan.

- 4 -

25.    I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct and was executed in Los Angeles, CA on June 7th_____, 2012.

_____
ELIOT COHEN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
ELIOT COHEN, PHILIP RICASATA and    :
CHARLES SHOEMAKER, on behalf of     :
themselves and all others similarly :
situated,                           :
                                    :
                    Plaintiffs,     :
                                    :
            v.                      :
                                    :
                                    :
UBS FINANCIAL SERVICES, INC., and   :
UBS AG,                             :
                                    :
                    Defendants.     :
------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: _12/04/2012_

12 Civ. 2147
(BSJ)(JLC)

Memorandum and Order

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

    Plaintiffs Eliot Cohen ("Cohen"), Philip Ricasata

("Ricasata") and Charles Shoemaker ("Shoemaker"), as well as

David Hale ("Hale") and Stan Sklenar ("Sklenar") who filed

consents to sue in this action, (collectively "Plaintiffs") are

all California residents.  Along with other members of the

proposed California class and nationwide collective group, they

either currently work or previously worked for Defendant UBS

Financial Services Inc. ("UBS")[1] as financial advisors in

California and nationwide.  Plaintiffs bring the instant action

---
[1] Although UBS Financial Services Inc was Plaintiffs' sole employer, the Third
Amended Complaint also names UBS AG as a Defendant.  The Court adopts "UBS"
herein to refer to both named defendants.

1

asserting class and collective action claims for UBS' alleged violations of the Fair Labor Standards Act ("FLSA"), the California Labor Code ("CLC"), and the California Unfair Competition Law ("UCL").  In response to Plaintiffs' Third Amended Complaint, Defendants have filed the present Motion to Compel Arbitration and Stay the Action.  Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, Defendants move on the grounds that, in arbitration agreements signed by Plaintiffs during the course of their employment with UBS, Plaintiffs agreed to individually arbitrate the claims made in their Third Amended Complaint.  For the reasons discussed the Court **GRANTS** Defendants' motion.

**FACTUAL BACKGROUND**

As part of their employment with UBS, each of the Plaintiffs executed a Financial Advisor Compensation Plan (the "FA Compensation Plan").  The FA Compensation Plan states in relevant part that:

> [Y]ou and UBS agree that any disputes between you and UBS including claims concerning compensation, benefits or other terms or conditions of employment . . . or any other claims whether they arise by statute or otherwise, including but not limited to, claims arising under the Fair Labor Standards Act . . . or any other federal, state or local employment . . . laws, rules or regulations, including wage and hour laws, will be determined by arbitration . . . By agreeing to the terms of this Compensation Plan . . ., you waive any right to commence, be a party to or an actual or putative class member of any class or

2

>collective action arising out of or relating to your
>employment with UBS . . . [2]

(Decl. of Catherine Reyna ("Reyna Decl."), Ex. 1 at p. 26.)

In addition to the FA Compensation Plan, which was executed by all of the Plaintiffs, the Plaintiffs each also entered into additional agreements which contained the same or substantially similar language.  Although the specific agreements signed by each Plaintiff differ, the relevant agreements include: Employee Forgivable Loan and Promissory Notes; Financial Advisor Account Reassignment Agreements; FA/PW Partnering Agreements; and Account Reassignment Agreements.  See (Reyna Decl., Exs. 11-19.)

**STANDARD OF REVIEW**

In deciding whether to grant a motion to compel arbitration pursuant to the FAA, courts apply a summary judgment standard. Lavoice v. UBS Fin. Servs., Inc., No. 11 Civ. 2308, 2012 WL 124590, at *2 (S.D.N.Y. Jan. 13, 2012) (citing Sutherland v. Ernst & Young LLP, 768 F. Supp. 2d 547, 549 (S.D.N.Y. 2011)). "A motion to compel arbitration may be granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Id. (internal citations omitted).  The burden

---

[2] The FA Compensation Plans for 2007, 2008, 2009, and 2010 each contain identical arbitration agreements and class and collective action waivers. See Decl. of Catherine Reyna ("Reyna Decl."), Exs. 1-4.

of proving that the claims at issue are unsuitable for arbitration falls on the party opposing the motion.  <u>Green Tree Financial Corp.-Alabama v. Randolph</u>, 531 U.S. 79, 91 (2000).  To the extent that "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."  <u>Id.</u> at 92.

"Once a court is satisfied that an arbitration agreement is valid and the claim before it is arbitrable, it must stay or dismiss further judicial proceedings and order the parties to arbitrate."  <u>Lavoice</u>, 2012 WL 124590, at *2 (citing <u>Nunez v. Citibank, N.A.</u>, No. 08 Cv. 5398, 2009 WL 256107 at *2 (S.D.N.Y. Feb. 3, 2009)).

**<u>DISCUSSION</u>**

Relying on this Court's decision in the related <u>Lavoice</u>[3] action, UBS argues that the agreements previously signed by Plaintiffs compel them to pursue their claims in an arbitral forum.  In support of this argument, UBS argues that: (1) Plaintiffs agreed to arbitration in the arbitration agreements; (2) Plaintiffs claims are covered by the arbitration agreements; (3) Courts routinely enforce agreements to arbitrate FLSA and

---

[3] Plaintiffs in the instant action were employed in the same position at UBS as the Plaintiff in the <u>Lavoice</u> action, and Plaintiffs bring substantially similar claims in both actions.  The parties in the instant action are also represented by the same counsel as those in <u>Lavoice</u>.

4

state labor law claims; and (4) Plaintiffs' arbitration agreements are enforceable even though they prohibit Plaintiffs from pursuing class or collective action claims.[4]  UBS also argues that, in the event that the Court chooses not to enforce the arbitration agreements, the Court should find that: (1) Cohen's FLSA claims are time barred; (2) Plaintiffs' claims pursuant to the California Labor Code Private Attorneys General Act ("PAGA") are time barred; and (3) Plaintiffs lack standing to bring claims for injunctive relief.

In their opposition to UBS' motion, Plaintiffs do not dispute that: (1) they agreed to arbitrate in the relevant agreements; (2) their claims are covered by the arbitration agreements; and (3) FLSA and state labor law claims can be arbitrable.  Plaintiffs instead argue that the agreements at issue are unenforceable because: (1) their terms violate the arbitration rules of the Financial Industry Regulatory Authority ("FINRA"); (2) they would prevent Plaintiffs from vindicating their federal statutory rights; and (3) through its conduct in this litigation, UBS has waived its right to seek relief under the FAA.

---

[4] "As a general matter, when a party bound by an arbitration agreement raises a claim founded on statutory rights, a district court must determine: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; and (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable."  Lavoice, 2012 WL 124590, at *2 (internal citations omitted).

## I.   Impact of FINRA Rules

Plaintiffs argue in the first instance that the agreements at issue are unenforceable because they violate the FINRA rules which govern arbitration for financial advisors such as Plaintiffs.  To support their position, Plaintiffs rely on the Supreme Court's decision in Credit Suisse Secs. (USA) LLC v. Billing, 551 U.S. 264, 285 (2007).  In Billing, buyers of newly issued securities filed an antitrust lawsuit against the underwriting firms that marketed and distributed those securities.  The underwriter defendants moved to dismiss on the grounds that the federal securities laws impliedly precluded the application of antitrust laws to the conduct in question. Finding that "the securities laws are clearly incompatible with the application of the antitrust laws in this context," the Supreme Court held that such antitrust lawsuits were precluded by SEC regulations.  Id. at 285.  Likening their position to that of the Defendants in Billing, Plaintiffs argue that the arbitration agreements between the parties are unenforceable because they conflict with FINRA's own arbitration rules. Plaintiffs cite Rules 13204(a) and 13204(b) of the FINRA Code of Arbitration Procedure for Industry Disputes (the "Code"), which respectively state that "class action claims may not be arbitrated under the Code" and that "[a]ny claim that is based upon the same facts and law, and involves the same defendants as

in a . . . putative class action . . . shall not be arbitrated under the Code." Referring to these two provisions, Plaintiffs argue essentially that, since the Code expressly prohibits the arbitration of claims which could be brought collectively or by a class, FINRA rules preclude the enforcement of the arbitration agreements pursuant to the FAA.

Having reviewed the Code, the Court disagrees with Plaintiffs' reading and finds that enforcement of the arbitration agreements would not be inconsistent with FINRA's rules. Although Rule 13204 appears to prohibit arbitration of class or collective claims, the rule also expressly states that its subparagraphs "do not otherwise affect the enforceability of any rights under the Code <u>or any other agreement</u>." (emphasis added). The rule therefore: (1) recognizes that parties may choose to enter into additional agreements beyond the scope of the Code; and (2) provides that the Code does not affect the enforceability of these additional agreements. That the arbitration agreements here would preclude Plaintiffs from pursuing a class or collective action does not change the Court's view. Indeed, Rule 13204(a) specifically speaks to the possibility that a "member of the certified or putative class elects not to participate in the class." Furthermore, the Court's reading of the Code is consistent with numerous decisions which have acknowledged that parties may contract

7

beyond the default arbitration rules of the securities industry.
See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis,
903 F.2d 109, 113 (2d Cir. 1990) ("[T]he rules of a securities
exchange are contractual in nature. . . [w]here, as here, the
parties have agreed explicitly to settle their disputes only
before particular arbitration fora, that agreement controls.");
Credit Suisse First Boston Corp. v. Pitofsky, 4 N.Y.3d 149, 155
(2005) ("CSFB and its registered representatives were free to
negotiate the terms by which they would arbitrate employment-
related disputes . . . Accordingly, the parties were free to
supplant or modify the Form U-4 arbitration agreement . . . .");
and Chanchani v. Salomon/Smith Barney, Inc., No. 99 Civ 9219,
2001 WL 204214, at *5 (S.D.N.Y. Mar. 1, 2001) ([T]he terms of
the U-4s and the NYSE rules in no way prohibit member
organizations from entering into separate, private arbitration
agreements with their employees.")

    To the extent that Plaintiffs argue that the Supreme
Court's decision in Billing compels a different result, their
argument misconstrues both the Code and that case.  As an
initial matter, as has already been discussed, Plaintiffs'
selective reading of the Code as absolutely prohibiting class
and collective waiver is incorrect.  In addition, Billing dealt
with the specific impact of the federal securities regulations
on antitrust laws, and its holding cannot be broadly construed

8

as advocated for by Plaintiffs.  The Court accordingly finds
that there is nothing within the FINRA rules which would
preclude enforcement of the arbitration agreements between the
parties.

## II.  **Statutory Rights Analysis**

     Plaintiffs' next argument as to why the arbitration
agreements are unenforceable mirrors that previously advanced by
the plaintiff in the related Lavoice action.  Relying primarily
on the Second Circuit's decisions in its Amex line of cases,
Plaintiffs argue that the arbitration agreements at issue cannot
be enforced because they would prevent Plaintiffs from
vindicating their federal statutory rights under the FLSA.  See
In re American Express Merch. Litig. (Amex III), 667 F.3d 204
(2d Cir. 2011), aff'g on reh'g Amex II, 634 F.3d 187 (2d Cir.
2011), reh'g en banc denied by 681 F.3d 139 (2d Cir. 2012),
cert. granted, American Exp. Co. v. Italian Colors Restaurant,
No. 12-133, 2012 WL 3096737, at *1 (U.S. Nov. 9, 2012).

     To the extent that Plaintiffs rely on Ranier v. Citigroup
Inc., 827 F. Supp. 2d 294 (S.D.N.Y. 2011), and D.R. Horton, Inc.
and Michael Cuda, N.L.R.B. 12-CA-25764, 2012 WL 36274, *1 (Jan.
3, 2012), for the proposition that "a waiver of the right to
proceed collectively under the FLSA is unenforceable as a matter
of law," Ranier, 827 F. Supp. 2d at 314, this Court, as it did
in Lavoice, declines to follow these decisions.  The Supreme

9

Court held in <u>AT&T Mobility LLC v. Concepcion</u>, that "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." 131 S. Ct. 1740, 1748 (2011). The Court therefore finds that it would be inconsistent with the FAA for the Court to find as a matter of law that class waivers are *per se* unenforceable in this context.

The Court turns next to Plaintiffs' argument that, although class waivers like the ones at issue are not *per se* unenforceable, the waivers here cannot be enforced because they preclude Plaintiffs from vindicating their statutory rights. In support of this argument, Plaintiffs rely on the Second Circuit's decision in <u>Amex III</u> which was issued subsequent to this Court's opinion in <u>Lavoice</u>.

In <u>Amex III</u>, the Second Circuit revisited its decision in <u>Amex II</u>[5] in light of the Supreme Court's decision in <u>Concepcion</u>. The Second Circuit held in <u>Amex III</u> that, although "<u>Concepcion</u> plainly offers a path for analyzing whether state contract law is preempted by the FAA," 667 F.3d at 213, "as the class action waiver in this case precludes plaintiffs from enforcing their [federal] statutory rights, we find the arbitration provision

---

[5]For a more detailed discussion of the Second Circuit's decisions in <u>Amex I</u> and <u>Amex II</u>, and the Supreme Court's decision in <u>Concepcion</u>, the Court refers to its decision granting the motion to compel arbitration in <u>Lavoice</u>. 2012 WL 124590.

unenforceable." Id. at 218.  In reaching its decision, the
Second Circuit relied "on the need for plaintiffs to have the
opportunity to vindicate their statutory rights," id. at 219,
and gave weight to the fact that "the cost of plaintiffs'
individually arbitrating their dispute with Amex would be
prohibitive, effectively depriving plaintiffs of the statutory
protections of the antitrust laws." Id. at 217.  Following the
Second Circuit's guidance in Amex II and III, courts in this
district have held that arbitration agreements are unenforceable
when they would effectively prevent plaintiffs from vindicating
their statutory rights.  See Chen-Oster v. Goldman, Sachs & Co.,
785 F. Supp. 2d 394 (S.D.N.Y. 2011), reconsideration denied by
No. 10 Civ. 6950, 2011 WL 2671813, *1 (S.D.N.Y. July 7, 2011),
and Sutherland v. Ernst & Young LLP, 847 F. Supp. 2d 528
(S.D.N.Y. 2012).

    In its motion to compel, although it also argues that the
Supreme Court's holding in Concepcion abrogates the Second
Circuit's decision in Amex III,[6] UBS primarily rests on an
argument that Plaintiffs have failed to meet their burden of
demonstrating that they could not vindicate their statutory

---

[6] The Court notes that there is a circuit split on the issue of whether
waivers which preclude the effective vindication of statutory rights can be
enforced. Compare Amex III,667 F.3d 204 and Coneff v. AT&T Corp., 673 F.3d
1155, 1159 (9th Cir. 2012).  The Supreme Court has granted certiorari to hear
this issue. See American Express Co. v. Italian Colors Restaurant, No. 12-
133, 2012 WL 3096737 (U.S. Nov. 9, 2012).

rights through arbitration.  In determining whether a class
action waiver is unenforceable, "each waiver must be considered
on its own merits, based on its own record, and governed with a
healthy regard for the fact that the FAA is a congressional
declaration of a liberal federal policy favoring arbitration
agreements."  Amex III, 667 F.2d at 219 (internal citation
omitted).  Having reviewed the parties' submissions, the Court
agrees with UBS and finds that enforcement of the class and
collective action waivers in this case would not preclude
Plaintiffs from vindicating their statutory rights under Amex
III.

### A. Plaintiff Cohen

With respect to Cohen, since he has only asserted state law
claims,[7] the Supreme Court's decision in Concepcion precludes the
Court from engaging in a vindication of rights analysis as to
this plaintiff.  See Orman v. Citigroup, Inc., No. 11 Civ. 7086,
2012 U.S. Dist. LEXIS 131532, at *8-9 (S.D.N.Y. Sep. 12, 2012)
("The Court cannot identify any cases in which a vindication of
statutory rights analysis under the FAA has been applied to
state statutory claims.  Indeed, applying a vindication analysis
to state statutory claims would appear to be incompatible with

---

[7] See (Pls.' Surreply Mem. of Law. in Opp'n to Defs.' Mot. to Compel
Arbitration and Stay this Action 4, n. 12.) ("Mr. Cohen . . . has only a
California state claim and not an FLSA claim.")

12

the Supreme Court's analysis in <u>Concepcion</u>.")  The Court
accordingly finds that "the vindication of statutory rights
doctrine does not apply to bar arbitration" of Cohen's claims.
<u>Id.</u> at *9-10.

### B. Plaintiffs Ricasata, Sklenar, Hale, and Shoemaker

In support of their argument that the costs of arbitration
would so exceed the possible benefits that they would be
practically precluded from vindicating their statutory rights,
the remaining plaintiffs, Ricasata, Sklenar, Hale, and
Shoemaker, have submitted to the Court: (1) their prospective
FINRA filing fees; (2) the low probability that they would
prevail in FINRA arbitration; and (3) an estimate of their
potential damages.  The Court has considered Plaintiffs'
arguments and finds that, like the plaintiff in <u>Lavoice</u>,
Plaintiffs have failed to meet their burden of demonstrating
that they would be unable to vindicate their statutory rights in
the arbitral forum.

Although Plaintiffs initially submitted that the damages
for Sklenar, Ricasata, Shoemaker and Hale were in the $2,777.78
to $22,379.68 range, (Pls.' Mem. of Law in Opp'n to Defs.' Mot.
to Compel Arbitration and Stay this Action 16, n. 29), in their
Surreply, Plaintiffs amended these calculations such that their
claimed damages for these individuals now range from $49,021.33
to $178,580.22, (Pls.' Surreply Mem. of Law in Opp'n to Defs.'

13

Mot. to Compel Arbitration and Stay this Action 5).  These
substantial damages, taken with the fact that Plaintiffs would
be able to recover an award of attorney's fees in arbitration,
lead the Court to find that these plaintiffs would be able to
vindicate their statutory rights under the FLSA in arbitration.
While Plaintiffs make the additional argument that their damages
figure should be reduced to account for their low probability of
prevailing, they have provided the Court with nothing to support
their self-serving estimates as to the likelihood of success.
The Court accordingly gives no weight to this dubious argument.

    The relative position of these plaintiffs is easily
distinguished from those of the plaintiffs in Chen-Oster, 785 F.
Supp. 2d 394, and Sutherland, 847 F. Supp. 2d 528.[8]  In Chen-
Oster, the plaintiff sought to bring a pattern and practice
claim under Title VII, a type of claim which can only be pursued
by a class.  847 F. Supp. 2d at 408.  Sutherland involved a
plaintiff seeking to recover an overtime loss of a mere
$1,867.02.  847 F. Supp. 2d at 531.  Given that they may pursue
their FLSA claims individually, and their estimated damages all

--------

[8] The Court notes that Plaintiffs' damages are comparable to that of the
plaintiffs in Ranier.  As previously noted, however, the court in Ranier did
not find the class waiver unenforceable because the plaintiffs would be
precluded from enforcing their statutory rights due to cost.  827 F. Supp. 2d
at 314.  Instead, in Ranier, Judge Sweet held that "a waiver of the right to
proceed collectively under the FLSA is unenforceable as a matter of law."
827 F. Supp. 2d at 314.

14

exceed $45,000, the Court finds it clear that Ricasata, Sklenar, Hale, and Shoemaker are each differently situated than either of these two plaintiffs who they have attempted to liken themselves.

For all of these reasons, the Court finds that Cohen, Ricasata, Sklenar, Hale, and Shoemaker have each failed to demonstrate that enforcement of the arbitration agreements at issue would preclude them from vindicating their rights under the FLSA.

**III.   Waiver**

In addition to their arguments that the arbitration agreements are unenforceable, Plaintiffs also argue that, by its conduct in this litigation, UBS has waived its right to compel arbitration.  Plaintiffs' argument primarily hinges on their assertions that: (1) UBS waived its right to pursue a motion to compel arbitration when it chose to transfer the action rather than pursue such a motion in the Central District of California; and (2) UBS has chosen to transfer the case to a district court that lacks the power to compel the parties to arbitrate in California.

With respect to Plaintiffs' argument that UBS has waived, the Court notes that in this Circuit, "[a] party is deemed to have waived its right to arbitration if it engages in protracted litigation that results in prejudice to the opposing party."  S

15

& R Co. of Kingston v. Latona Trucking, Inc., 159 F.3d 80, 83
(2d Cir. 1998) (internal citations omitted).  Furthermore,
"[g]iven th[e] presumption of arbitrability, waiver of
arbitration is not to be lightly inferred." Leadertex, Inc. v.
Morganton Dyeing & Finishing Corp., 67 F.3d 20, 25 (2d Cir.
1995).  In the instant action, the Court finds that there is no
evidence that Defendants have engaged in the type of dilatory
tactics that would warrant a finding of waiver.

The Court finds similarly unavailing Plaintiffs' argument
that this Court cannot grant UBS' motion because: (1) the
parties' agreement identifies California as the location of
arbitration; and (2) this Court lacks authority to compel
arbitration beyond this district.  Although several courts have
held that, when an arbitration agreement contains a forum
selection clause, only a district court in that forum can compel
arbitration,[9] these decisions are inapposite because the
arbitration agreements in the instant action do not contain
forum selection clauses.  While Plaintiffs argue that the
agreements at issue effectively contain a forum selection clause
through their incorporation of FINRA Rule 13213(a)(1), this rule

---

[9] See J.P. Morgan Secs. Inc. v. La. Citizens Prop. Ins. Corp., 712 F. Supp. 2d
70, 82-83 (S.D.N.Y. 2010) (citing Inland Bulk Transfer Co. v. Cummins Engine
Co., 332 F.3d 1007, 1010 (6th Cir. 2003); Merrill Lynch, Pierce, Fenner &
Smith, Inc. v. Lauer, 49 F.3d 323, 326-31 (7th Cir. 1995); and Ansari v. Qwest
Commc'ns Corp., 414 F.3d 1214, 1218-20 (10th Cir. 2005))

merely states that "[t]he Director will decide which of FINRA's hearing locations will be the hearing location for the arbitration" and "the Director will generally select the hearing location closest to where the associated person was employed . . . ."  Since here, the Director of FINRA Dispute Resolution has yet to select a forum for arbitration outside of this district, the Court finds that the instant action does not present "a situation analogous to that caused by arbitration agreements containing forum selection clauses."  <u>J.P. Morgan Secs. Inc. v. La. Citizens Prop. Ins. Corp.</u>, 712 F. Supp. 2d 70, 81 (S.D.N.Y. 2010).  There is accordingly nothing that would prevent the Court from compelling arbitration in this case.[10]

<u>**CONCLUSION**</u>

The Court **GRANTS** Defendants' motion to compel arbitration and stay this action in its entirety.

The Clerk of the Court is directed to terminate motion #61 on the ECF docket and to stay the case.

---

[10] The Court also notes that UBS states in its Reply brief that it will not object to Plaintiffs making a request to the Director of FINRA Dispute Resolution for the arbitration to proceed in California.

17

**SO ORDERED:**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Dated:     New York, New York
           December 3, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
ELIOT COHEN, *et al.*,                                      :
                                        Plaintiffs,         :
                                                            :                12 Civ. 02147 (LGS)
                        -against-                           :
                                                            :                OPINION AND ORDER
UBS FINANCIAL SERVICES, INC., *et al.*,                     :
                                        Defendants.         :
                                                            :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__1/22/14__

LORNA G. SCHOFIELD, District Judge:

       Before the Court is Plaintiffs' Motion for Relief from Order Granting Motion to Compel

Arbitration.  For the reasons stated below, Plaintiffs' motion is denied in its entirety.

**BACKGROUND**

       On April 27, 2011, Plaintiffs, financial advisors employed by Defendant UBS Financial

Services, Inc., commenced the instant action against Defendants UBS Financial Services, Inc.

and UBS AG ("UBS") for violations of the Fair Labor Standards Act and California state laws.

Plaintiffs brought the suit as a putative class and collective action on behalf of themselves and

others similarly situated.  On May 3, 2012, Defendants filed a motion to compel arbitration.

       On December 4, 2012, District Judge Barbara S. Jones granted Defendants' motion and

stayed the case pending arbitration.  *Cohen v. UBS Fin. Servs., Inc.*, No. 12 Civ. 2147, 2012 WL

6041634 (S.D.N.Y. Dec. 4, 2012).  In that decision (the "December 4 Opinion"), Judge Jones

enforced the agreement between UBS and its employee financial advisors that any disputes

between them would be resolved by arbitration in individual actions.  She rejected Plaintiffs'

argument that the class and collective action waiver in the arbitration agreement violated

Financial Industry Regulatory Authority ("FINRA") rules governing arbitration for financial

advisors like Plaintiffs, holding that "there is nothing within the FINRA rules which would

preclude enforcement of the arbitration agreements between the parties." *Id.* at *2-3.

On July 3, 2013, Plaintiffs filed the instant motion for reconsideration of the December 4 Opinion under Rules 54(b), 60(b)(6) and 60(c)(1) of the Federal Rules of Civil Procedure. Plaintiffs argue that a February 2013 decision by a FINRA disciplinary hearing panel (the "Disciplinary Panel" or "Panel"), *Dep't of Enforcement v. Charles Schwab & Co., Inc.*, No. 2011029760201, 2013 WL 1463100 (FINRA Feb. 21, 2013), "constitutes new evidence or an intervening change in law . . . demonstrating that Judge Jones' holding to the contrary was an error of law and, if allowed to stand, would work a manifest injustice." In the *Schwab* ruling, the Disciplinary Panel concluded that the Schwab class and collective action waiver in its customer arbitration agreement violated the FINRA Rules, but held that the waiver nevertheless was enforceable under the Federal Arbitration Act (the "FAA").

**STANDARD**

Rule 54(b) authorizes courts to revise "any order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Under Rule 54(b), such decisions are

> treat[ed] . . . as law of the case, which gives a district court discretion to revisit earlier rulings in the same case, subject to the caveat that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964)). "Thus, those decisions may not usually be changed unless there is 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice.'" *Id.* (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d

1245, 1255 (2d Cir. 1992)).  Moreover, "[i]t is not enough . . . that defendants could now make a

more persuasive argument . . . ."  *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981) (citations

omitted).  "The law of the case will be disregarded only when the court has 'a clear conviction of

error' with respect to a point of law on which its previous decision was predicated . . . ."  *Id.*

(quoting *Zdanok*, 327 F.2d at 953).

Rule 60(b) provides that "the court may relieve a party or its legal representative from a

final judgment, order, or proceeding" for certain enumerated reasons, including "(6) any other

reason that justifies relief."  Fed. R. Civ. P. 60(b).  The catch-all provision is "'properly invoked

where there are extraordinary circumstances, or where the judgment may work an extreme and

undue hardship [.]'"  *Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 56 (2d Cir. 2004) (alteration in

original) (quoting *Matarese v. LeFevre*, 801 F.2d 98, 106 (2d Cir.1986), *cert. denied*, 480 U.S.

908 (1987); *see also Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) ("Rule

60(b) [is] a mechanism for extraordinary judicial relief invoked only if the moving party

demonstrates exceptional circumstances." (internal quotation marks omitted)).  "However, it is

well settled that a change in decisional law is not grounds for relief under Rule 60(b)(6)."

*Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 757 (2d Cir. 1986); *see also Marrero Pichardo*,

374 F.3d at 56.  Rule 60(b) motions must be filed "within a reasonable time."  Fed. R. Civ. P.

60(c)(1).

Local Rule 6.3 provides that "a notice of motion for reconsideration or reargument of a

court order determining a motion shall . . . set[] forth concisely the matters or controlling

decisions which counsel believes the Court has overlooked," and must be served within 14 days

of the Court's determination of the original motion.  S.D.N.Y. Local Civ. R. 6.3.  "The standard

for granting such a motion is strict, and reconsideration will generally be denied unless the

moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways*, 956 F.2d at 1255 (internal quotation marks omitted). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader*, 70 F.3d at 257.

## DISCUSSION

### A.   Timeliness

At the outset, the Court notes the substantial delay in Plaintiffs' filing of this motion, which comes seven months after the December 4 Opinion and more than four months after the FINRA Disciplinary Panel decision in *Schwab*. By either count, far more time has elapsed than the 14 days provided by Local Rule 6.3 for motions for reconsideration or reargument. Plaintiff provides no justification or excuse for the delay, and the Court finds that the Rule 60(b)(6) motion was not made "within a reasonable time."[1] Fed. R. Civ. P.  60(c)(1). Nevertheless, in light of the language in Rule 54 providing that any order subject to the Rule "may be revised at any time before the entry of a judgment," the Court will address Plaintiffs' Rule 54(b) argument on the merits.

### B.   Rule 54(b)

Plaintiffs make four arguments in their moving papers. First, Plaintiffs challenge Judge Jones's holding in the December 4 Opinion that the class and collective action waiver in the

---

[1] Plaintiffs contend that Rule 60 allows them to bring a motion thereunder within a year of the entry of the order from which they seek relief. As Rule 60(c)(1) clearly states, however, the one-year period applies only to motions made under one of the first three enumerated reasons in Rule 60(b) – mistake, new evidence, or fraud. Fed. R. Civ. P. 60(c)(1). Because Plaintiffs invoke only Rule 60(b)(6) here, the one-year period is inapplicable.

arbitration agreement between the parties did not violate the FINRA Rules.  Second, Plaintiffs

contend that the FINRA Rules violation renders the waiver void under Section 29(a) of the

Exchange Act.  Third, Plaintiffs argue that the applicable FINRA rules do not conflict with the

FAA.  Finally, Plaintiffs argue that the waiver is unenforceable because it is inconsistent with

another provision of the arbitration agreement and with Defendants' agreement with FINRA.

With the exception of the *Schwab* decision, the relevance of which is limited to the

question of whether the waiver violated the FINRA Rules, Plaintiffs' arguments were raised or

should have been raised in their response to Defendants' Motion to Compel.  Having already had

an opportunity to "battle[] for the court's decision," Plaintiffs should not now be "permitted[] to

battle for it again."  *Color Tile*, 322 F.3d at 167; *cf. Wechsler v. Hunt Health Sys., Ltd.*, No. 94

Civ. 8294, 2004 WL 2210261, at *2 (S.D.N.Y. Sept. 30, 2004) ("A party seeking reconsideration

is not supposed to treat the court's initial decision as the opening of a dialogue in which that

party may then use such a motion to advance new theories or adduce new evidence in response

to the court's rulings." (internal quotation marks and citation omitted)).  Moreover, Plaintiffs'

second, third and fourth arguments do not present the Court with "an intervening change of

controlling law, the availability of new evidence, or the need to correct a clear error or prevent a

manifest injustice," which the Second Circuit found to be the usual bases for revision under Rule

54(b).  *Color Tile*, 322 F.3d at 167.  Consequently, the Court declines to consider them.

Plaintiffs argue that the *Schwab* decision constitutes "new evidence or an intervening

change in law" warranting a revision of the December 4 Opinion under Rule 54(b).  First, the

*Schwab* decision is not "evidence," as it does not change or add to the facts in this case.  *See* Fed.

R. Evid. 401 ("Evidence is relevant if . . . it has any tendency to make a *fact* more or less

probable than it would be without the evidence." (emphasis added)); *cf. Stevens v. United States*,

5

No. 96 Civ. 9230, 2003 WL 22416149 (S.D.N.Y. Oct. 22, 2003) (holding, in the Rule 60(b)

context, that a favorable decision in a another case could not be considered "evidence").

Neither can the *Schwab* decision be considered an "intervening change in controlling

law." First, although the FINRA Disciplinary Panel found that the class action waiver in the

Schwab customer agreement violated FINRA rules, it ultimately held that those rules were

unenforceable as contrary to the FAA, and that the waiver was therefore valid. *Schwab*, 2013

WL 1463100, at *1, *19. Thus, the Panel's finding that the waiver had violated FINRA rules is

mere dicta, and the Panel's ultimate holding supports the outcome in this case. The Disciplinary

Panel's decision cannot support a finding that the December 4 Opinion had a "clear conviction of

error" necessitating revision under Rule 54(b). *Fogel*, 668 F.2d at 109.

Second, even if the Panel's conclusion about the violation of the FINRA Rules were to be

given controlling weight, it is inapplicable to the question currently before this Court. The

*Schwab* decision concerned waivers in customer-industry agreements, while this case concerns

waivers in intra-industry (i.e., employment) agreements. The rule that the Disciplinary Panel

found Charles Schwab's waiver to have violated is Rule 2268(d), *Schwab*, 2013 WL 1463100, at

*13, which governs "Predispute Arbitration Agreements for Customer Accounts." FINRA R.

2268. Plaintiffs do not contend that a counterpart exists for intra-industry agreements, or that

Rule 2268(d) directly applies to industry agreements. The Disciplinary Panel itself specifically

distinguished this Court's December 4 Opinion on the ground that its holding relates to intra-

industry disputes and therefore "does not apply to customer-industry disputes." *Schwab*, 2013

WL 1463100, at *13 n.58. Thus, the Disciplinary Panel's determination on the FINRA Rules

does not compel the result that Plaintiffs seek, and cannot be considered controlling here.

Because the Court finds no intervening change in controlling law or new evidence, the

December 4 Opinion stands as law of the case.  Plaintiffs' motion for revision of the December 4 Opinion under Rule 54(b) is denied.

    **C.**    **Rule 60(b)**

    Although Plaintiffs' failure to file the Rule 60(b) motion "within a reasonable time" is itself a sufficient ground for denial, Fed. R. Civ. P. 60(c)(1), it is also worth noting that Rule 60(b) is inapplicable here because the December 4 Opinion was not a "final judgment, order, or proceeding."  Fed. R. Civ. P. 60(b).  *See Usinor Steel Corp. v. M/V Konigsborg*, No. 03 Civ. 4301, 2004 WL 230910, at *3 (S.D.N.Y. Feb. 6, 2004) (holding that a stay during arbitration "is not appealable as a final order") (citing *Salim Oleochemicals v. M/V Shropshire*, 278 F.3d 90, 93 (2d Cir. 2002)).  Moreover, Plaintiffs have failed to demonstrate the presence of any "extraordinary circumstances" warranting Rule 60(b)(6) relief.  *Marrero Pichardo*, 374 F.3d at 55-56.  Finally, even if the *Schwab* decision were a shift in controlling law (which it is not, as discussed above), "a change in decisional law is not grounds for relief under Rule 60(b)(6)." *Travelers Indem. Co.*, 794 F.2d at 757.

**<u>CONCLUSION</u>**

    For the foregoing reasons, Plaintiffs' Motion for Relief is hereby DENIED in its entirety. The Clerk of Court is directed to close the motion at Docket Number 93.

    SO ORDERED.

Dated: January 22, 2014
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIOT COHEN, *et al.*, | |
| Plaintiffs, | 12 Civ. 02147 (LGS) |
| -against- | **STIPULATION AND** |
| | **[PROPOSED] ORDER TO** |
| UBS FINANCIAL SERVICES, INC., *et al.*, | **DISMISS WITH PREJUDICE** |
| Defendants. | **PLAINTIFFS' COMPLAINT** |

WHEREAS, on April 27, 2011, the plaintiffs in the above captioned action filed a Class and Collective Action Complaint (the "Complaint"), against defendants in the above captioned action (the "Action");

WHEREAS, on December 4, 2012, this Court granted defendants' motion to compel arbitration and stayed the Action (the "December 4 Order"), ECF 90;

WHEREAS, on July 3, 2013, plaintiffs filed a motion for reconsideration of the December 4 Order under Rules 54(b), 60(b)(6) and 60(c)(1) of the Federal Rules of Civil Procedure (the "Reconsideration Motion"), ECF 93;

WHEREAS, on January 22, 2014, this Court denied the Reconsideration Motion in its entirety (the "January 2014 Order"), ECF 113;

WHEREAS, on February 5, 2014, plaintiffs filed a motion for reconsideration of the January 2014 Order to the extent that the January 2014 Order did not provide for dismissal of the Action; or, alternatively, for an order certifying an interlocutory appeal of the December 4 Order (the "February Reconsideration Motion"), ECF 115;

739904

WHEREAS, this Court ordered defendants to file a response of no more than seven pages in length to the February Reconsideration Motion by February 13, 2014, ECF 116;

WHEREAS, the plaintiffs have irrevocably determined not to pursue any of the claims raised by the Complaint in arbitration;

WHEREAS, on February 6, 2014 counsel for the parties discussed the February Reconsideration Motion and agreed to stipulate that an order to dismiss the Action with prejudice should be added to the January 2014 Order; and,

WHEREAS, the parties agree that the plaintiffs may appeal the order of this Court granting defendants' motion to compel arbitration,

IT IS HEREBY ORDERED THAT:  the Action shall be dismissed with prejudice, and the plaintiffs may appeal the order of this Court granting defendants' motion to compel arbitration.

IT IS STIPULATED AND AGREED that a facsimile copy of the signature(s) on this stipulation may be treated as an original for all purposes.

2

A-194

Dated:  New York, New York
        February 13, 2014

By: _Jeoug G Smith (By MHG w/permission)_

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
Jeffrey G. Smith (JS 2431)
Robert Abrams (RA 7559)
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Fax: (212) 545-4653
Email: smith@whafh.com
       abrams@whafh.com

Attorneys for the Plaintiff

**MORGAN, LEWIS & BOCKIUS, LLP**

By: _____
Andrew J. Schaffran (AJS1236)
Joseph A. Nuccio (JN7610)
101 Park Avenue
New York, NY 10178
Telephone:  (212) 309-6000
Fax: (212) 309-6001
Email: dschaffran@morganlewis.com
       jnuccio@morganlewis.com

Attorneys for Defendants, UBS Wealth Management
Americas, UBS AG and UBS Group

**SO ORDERED**

_____

HON. LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

3

A-195

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ELIOT COHEN, *et al.*,

                              Plaintiffs,

-against-

UBS FINANCIAL SERVICES, INC., *et al.*

                              Defendants.

12 Civ. 02147 (LGS)

### NOTICE OF APPEAL

Notice is hereby given that Eliot Cohen, plaintiff in the above-captioned action (the "Action"), on behalf of himself and all others similarly situated, pursuant to the Stipulation and Order of the District Court for the Southern District of New York dated February 14, 2014 (the "February 14, 2014 Order") dismissing the Action with prejudice, ECF No. 118, hereby appeals to the United States Court of Appeals for the Second Circuit from the dismissal of the Action, the Memorandum and Order dated December 4, 2012 granting Defendants' motion to compel arbitration and stay the action (ECF No. 90), and the Order and Opinion dated January 22, 2014 denying Plaintiffs' motion for relief from the December 4, 2012 Order (ECF No. 113). True and correct copies of the December 4, 2012 Memorandum and Order, the January 22, 2014 Order and Opinion and the February 14, 2014 Order are annexed hereto.

Dated:  New York, New York
        March 12, 2014

                             Respectfully submitted,

                             By: _____

                             **WOLF HALDENSTEIN ADLER**
                             **FREEMAN & HERZ LLP**
                             Jeffrey G. Smith (JS 2431)
                             Robert Abrams (RA 7559)
                             Matthew M. Guiney (MG 5858)
                             270 Madison Avenue
                             New York, NY 10016
                             Telephone: (212) 545-4600
                             Fax: (212) 545-4653

729994

A-196

Email: smith@whafh.com
abrams@whafh.com
guiney@whafh.com
Attorneys for the Plaintiff

742209

729994